## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES CARROLL and MARY CARROLL, as CO-ADMINISTRATORS of the ESTATE OF PATRICK J. KANNEY **Plaintiffs** | : : CIVIL ACTION<br>: : JURY TRIAL DEMANDED<br>: : No. 16-01580<br>: |
| **v.** | : : |
| LANCASTER COUNTY et al. **Defendants** | : : |

### ORDER

**AND NOW**, this          day of          2017, after consideration of

Plaintiffs' Motion to Compel Defendant PrimeCare to produce certain documents and any

Response thereto, it is hereby **ORDERED** that said Motion is **GRANTED**, and

Defendant PrimeCare shall produce to Plaintiff, within ten (10) days from the date of this

Order, the following documents:

1. Lindsey Hayes' 2011 Report regarding Lancaster County Prison:

2. Mortality/Morbidity Review/Report regarding death of Patrick Kanney;

3. Mortality/Morbidity Reviews/Reports for all suicides at Lancaster County Prison from 1998 to the present.

BY THE COURT:

_____
J.

ABRAMSON & DENENBERG, P.C.
BY:  ALAN E. DENENBERG, ESQUIRE
IDENTIFICATION NO: 54161
1315 WALNUT STREET, 12TH FLOOR
PHILADELPHIA, PA 19107
(215) 546-1345

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES CARROLL and MARY CARROLL,<br>as CO-ADMINISTRATORS<br>of the ESTATE OF PATRICK J. KANNEY<br>       Plaintiffs | : CIVIL ACTION<br>:<br>: JURY TRIAL DEMANDED<br>:<br>: No.  16-01580<br>: |
|        v. | : |
| LANCASTER COUNTY et al.<br>       Defendants | : |

## PLAINTIFFS' MOTION TO COMPEL DEFENDANT PRIMECARE TO PRODUCE CERTAIN DOCUMENTS

Plaintiffs, James and Mary Carroll, as Co-Administrators of the Estate of Patrick Kanney, by and through their attorney, Alan Denenberg, Esquire, hereby file this Motion to Compel Defendant PrimeCare to Produce Certain Documents and in support thereof avers as follows:

1.    Plaintiffs filed a claim pursuant to 42 U.S.C. § 1983 against Defendant PrimeCare, and a number of other Defendants, regarding their son, Patrrick Kanney's suicide while incarcerated as a Pre-Trial Detainee at Lancaster County Prison.

2.      Lancaster County Prison has been plagued with a number of inmate suicides (at least 15) over the past twenty years, and between 2010 and 2015 the suicide rate at the Prison "leaped 450% when compared to 1985-2010".  Exhibit "A", Article.

3.      Plaintiffs served Defendant PrimeCare Request for Production of Documents in July of 2016, and PrimeCare served the Plaintiff with Answers on November 28, 2016.

3.      In its Answer to Request No. 7, which asked for "[a]ny autopsy, police or other reports and/or statements in Defendant's possession which pertain to Mr. Kanney", Defendant PrimeCare identified that a "Mortality Review" was conducted and a "Report" was generated, but objected to producing the Report on the grounds that it was part of "a self-critical analysis" privilege.  Exhibit "B", PrimeCare's Response Request #7.

4.      On April 25, 2017, Plaintiffs served PrimeCare a Second Request for Production wherein they specifically requested "[a] true and correct copy of the Mortality/Morbidity Revie(sic)/Report regarding the death of Patrick Kanney in April 2014."  Exhibit "C", Second RFPD's to PrimeCare, #5.

5.      Plaintiffs also requested "[a] true and correct copy of the Mortality/Morbidity Report for all suicides at Lancaster Co. Prison 1988 to present."[1] Exhibit "C", Second RFPD's to PrimeCare, #6.

6.      In addition to these Requests, in their Second Request for Production of Documents the Plaintiffs requested "[a] true and correct copy of Lindsey Hayes report

---

[1]      The date in this Request is a typo.  Plaintiffs are only seeking the Mortality/Morbidity Reports from 1998, and not 1988.

conducted in 2011, pertaining to Lancaster County Prison."[2]  Exhibit "C", Second RFPD's to PrimeCare, #1.

7.  Plaintiffs learned of existence of the Hayes Report during the discovery process, which Report pertains to the policies and practices of Lancaster County Prison in regard to inmate suicides.

8.  While PrimeCare objected to the production of the Mortality/Morbidity Report regarding Patrick Kanney in its Response to Plaintiff's initial Request for Production of Documents, it did not serve Plaintiffs with a Response to the Second Set of Request for Production of Documents, which specifically requested the Mortality/Morbidity Report as to Kanney and all other inmates who committed suicide at Lancaster County Prison, going back to 1998, and also requested the Hayes Report.

9.  In accordance with Fed. R. Civ. P. 37(a)(1), Plaintiffs' attorney has "in good faith conferred or attempted to confer with [PrimeCare's counsel]" regarding the disclosure of the Mortality/Morbidity Reports and Hayes Report, but to date PrimeCare has refused to produce the referenced documents.  Exhibit "D", e-mail; Exhibit "E", Certification.

10.  Pursuant to Fed. R. Civ. P. 34, PrimeCare was required to serve its responses/objections to Plaintiff's Second Request for Production of Documents within thirty (30) days, or by May 25, 2017, and has failed to do so; accordingly, pursuant to Fed. R. Civ. P. 37(a)(1), Plaintiffs are filing the instant Motion to Compel the production of the Mortality/Morbidity Report as to Kanney and all other inmates who committed suicide at Lancaster County Prison, going back to 1998, and also the Hayes Report.

---

[2]  Lindsey Hayes is a nationally recognized  Prison Suicide Expert who was retained by PrimeCare to conduct an inspection of the Lancaster County Prison and make recommendations regarding suicide prevention following three (3) suicides that occurred at the Prison in 2011.

11.     PrimeCare has been steadfast in refusing to produce any of the Mortality/Morbidity Reports, including the one relating to Patrick Kanney, and raises as an objection the "self-critical analysis" privilege.  Exhibit "A", PrimeCare's Response Request #7.

12.     PrimeCare has wrestled with this issue before.  *See Weiss v. County of Chester*, 231 F.R.D. 202 (E.D. Pa. 2005)(refusing to apply Pennsylvania Peer Review Protection Act privilege and requiring PrimeCare to produce Mortality Review Report in prison suicide case).

13.     In *Weiss*, PrimeCare argued that under the Pennsylvania Peer Review Protection Act, it enjoyed a privilege and was not required to produce the Mortality Review Report.  231 F.R.D. at 204-206.

14.     Applying well-established principles governing privileges in Federal Court, the Court rejected PrimeCare's claim of privilege, finding that the Mortality Review Report amounted to an investigation into the suicide that contained relevant findings and therefore was admissible.  *Id.* at 203-206.

15.     In this case, Defendant PrimeCare is not relying upon the privilege under the Pennsylvania Peer Review Protection Act or a "peer review privilege", but instead is relying upon the "self-critical analysis" privilege.

16.     The Courts have held that the "self-critical analysis" privilege is analogous to the "peer review privilege".  *Davis v. Kraft Foods North America*, 2006 U.S. Dist. LEXIS 87140, at *8 (E.D. Pa. Dec. 1, 2006).

17.     More importantly, in this Circuit, the Courts have consistently held that the privilege does not apply in Federal Court.  *Alaska Elec. Pension Fund v. Pharmacia*

*Corp.*, 544 F.3d 342, 351 n. 12 (3rd Cir. 2009)(observing in footnote that the privilege "has never been recognized by this Court and we see no reason to recognize it now."); *see also Slaughter v. Amtrak*, 2011 U.S. Dist. LEXIS 21838, *11 (E.D. Pa. March 4, 2011)(court refused to "employ the self-critical analysis privilege".); *Craig v. Rite Aid Corp.*, 2010 U.S. Dist. LEXIS 137773, *23 (M.D. Pa. Dec. 29, 2010)(refusing to apply privilege); *Zoom Imaging, L.P. v. St. Luke's Hospital & Health Network*, 513 F. Supp 2d 411, 417 (E.D. Pa 2007)("Because 'reason' and 'experience' weigh against the creation of a self-critical analysis privilege, I decline applying such a privilege in this case."); *Davis*, 2006 U.S. Dist. LEXIS 87140, at *8 ("The Third Circuit has not recognized the self-critical analysis privilege, and is unlikely to do so.  Accordingly, I vacate my May 18, 2005 Order applying the privilege.").

18.     Not only have the Courts in the Third Circuit refused to recognize or apply a self-critical analysis privilege, but also the majority of Courts in the other circuits have refused to apply the privilege.  *See In re Qwest Communication Int'l*, 450 F.3d 1179, 1198 n.8 (10th Cir. 2006); *Burden-Meeks v. Welch*, 319 F.3d 897, 899 (7th Cir. 2003); *Union Pacific R. Co. v. Mower*, 219 F.3d 1069, 1076 n.7 (9th Cir. 2000); *In re Kaiser Aluminum and Chemical Co.*, 214 F.3d 586, 593 (5th Cir. 2000); *Reynolds Metals Co. v. Rumsfeld*, 564 F.2d 663, 667 (4th Cir. 1977).

19.     In reaching the conclusion that the self-critical analysis privilege does not apply, the Court's in the Third Circuit have generally relied upon a similar rationale, that is, the privilege was not recognized at common law, it has not been adopted by either the Supreme Court or Third Circuit Court of Appeals, and is unlikely to be adopted, and it is

contrary to Fed. R. Evid. 501's policy of disfavoring privileges and instead "favoring full disclosure of facts during discovery." *Craig*, 2010 U.S. Dist. LEXIS 137773, at *15-18.

20.     Based on the above, PrimeCare's claim that the production of the Mortality Review Report is barred by the self-critical analysis privilege must be denied.

21.     While this certainly covers the Mortality Review Report regarding Patrick Kanney, and requires that PrimeCare produce the Report as to Kanney, Plaintiffs have also requested the Mortality Review Report of all inmates that committed suicide at Lancaster County Prison dating back to 1998.  Exhibit "C", Second RFPD's to PrimeCare, #6.

22.     PrimeCare has not specifically raised an objection to the production of the Mortality Review Report of all inmates that committed suicide at Lancaster County Prison dating back to 1998 because it was requested in the Second Request for Production of Documents to which Defendant has not served a response; however, for the reasons stated above, the Mortality Review Reports dating back to 1998 are not privileged nor should there production precluded on any other basis.

23.     The Mortality Review is conducted to "learn from a person's death, to discover if the same or similar situations may affect others in the future, and to improve overall quality of care", and has as one of its purposes the "indentifi[cation] [of] significant issues that require[] immediate attention for the health and safety of other consumers".  Exhibit "F", Mortality Review Instructors Guide.

24.     Accordingly, the Mortality Review seeks to identify "red flags", "patterns and trends" and "to prevent similar occurrences" in the future.  Exhibit "F", Mortality Reveiw Instructors Guide.

25.    The information contained in a Mortality Review Report is clearly relevant to Plaintiffs' *Monell* claim against PrimeCare.  *See* Plaintiff's Amended Complaint, Count II.

26.    It is well-established law that Municipal liability, or in this case the liability of PrimeCare, which is treated as a Municipality for purposes of *Monell*, can be established by showing an unconstitutional custom.  *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3rd Cir. 1996).

27.    An unconstitutional custom can be proved in a number of ways:  "Custom . . . can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law," *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990);  Custom also can be proven by evidence of a pattern of similar incidents and inadequate responses to those incidents, *Beck*, 89 F.3d at 972; finally, custom can be proven by showing that the responsible policy makers knew that a particular policy resulted in constitutional violations and did nothing in the face of such knowledge to change it.  *Id.* at 851; *Beck*, 89 F.3d at 971 ("Custom . . . may also be established by evidence of knowledge and acquiescence.").

28.    *Monell* liability can also be established by showing that PrimeCare failed to adopt a certain policy when the need for the policy was obvious.  *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 585 (3rd Cir. 2003) ("A reasonable jury could conclude that the failure to establish a policy to address the immediate medication needs of inmates with serious medical conditions creates a risk that is sufficiently obvious as to constitute deliberate indifference to those inmates' medical needs.").

29.     Against this legal backdrop, it is clear that the Mortality Review Reports extending back to 1998 are relevant to Plaintiffs' *Monell* claim against PrimeCare and would be perhaps the best evidence regarding whether the history of suicides at Lancaster County Prison constitute "a pattern of similar incidents and inadequate responses to those incidents", and also regarding what PrimeCare knew about the suicides at Lancaster County Prison, and what they did based on this knowledge to alleviate the risk.

30.     Accordingly, PrimeCare should be required to produce not only the Mortality Review Report regarding Patrick Kanney, but also the Mortality Review Reports regarding every suicide at Lancaster County Prison dating back to 1998.

31.     Finally, PrimeCare should be required to produce the 2011 Report of Lindsey Hayes.

32.     Plaintiffs learned in discovery that in response to a series suicides at Lancaster County Prison in 2011, Lindsey Hayes, an expert on prison conditions and suicides, was retained by PrimeCare to review the most recent suicide at the Prison and provide a Report based on his findings that would include recommendations to prevent future suicides.[3]

33.     Although obviously relevant to Plaintiffs' claims against PrimeCare, and its individual employees, Defendant has failed to produce the Report, or to offer an objection to its production.

34.     Pursuant to Fed. R. Civ. P. 26(a)(5)(b)(1), PrimeCare is required to produce "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."

---

[3]     This Report was requested by PrimeCare and is in their possession.  Exhibit "G", Lancaster Cnty's Response RFPDs.

35.     Furthermore, when "a party withholds information otherwise discoverable by claiming that the information is privileged or subject to protection as trial preparation material", it must "expressly make the claim"[4].  Fed. R. Civ. P. 26(a)(5)(b)(5)(A)(i).

36.     As stated above, PrimeCare was served the Second Set of Request for Production of Documents on April 25, 2017, but has failed to answer them despite Plaintiffs good faith efforts.

37.     Pursuant to Fed. R. Civ. P. 26(a)(5)(b)(1) and 26(a)(5)(b)(5)(1), Defendant was required to produce the Lindsey Hayes Report within 30 days of the April 25, 2017 Order, or to provide Plaintiff's with it objections.  *See also* Fed. R. Civ. P. 34.

38.     PrimeCare had failed to do either; accordingly, the Plaintiffs' are entitled to have their Motion to Compel granted, and PrimeCare should be required to produce the 2011 Lindsey Hayes Report.

**WHEREFORE,** Plaintiffs' respectfully requests that this Honorable Court grant their Motion to Compel and require Defendant PrimeCare to produce all of the items listed in the attached Order.

RESPECTULLY SUBMITTED,

BY: _s/ Alan Denenberg_____
ALAN DENENBERG, ESQUIRE

---

[4]     Any argument that production of the Lindsey Hayes Report is privileged has been waived in light of the fact that PrimeCare has shared the Report with Co-Defendant Lancaster County and the Report has been used to train Lancaster County staff in suicide prevention.

ABRAMSON & DENENBERG, P.C.
BY:  ALAN E. DENENBERG, ESQUIRE
IDENTIFICATION NO:  54161
1315 WALNUT STREET, 12TH FLOOR
PHILADELPHIA, PA 19107
(215) 546-1345

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES CARROLL and MARY CARROLL,<br>as CO-ADMINISTRATORS<br>of the ESTATE OF PATRICK J. KANNEY<br>Plaintiffs | :  CIVIL ACTION<br>:<br>:  JURY TRIAL DEMANDED<br>:<br>:  No.  16-01580<br>: |
| v. | :<br>: |
| LANCASTER COUNTY et al.<br>Defendants | :<br>: |

## CERTIFICATE OF SERVICE

I, Alan Denenberg, Esquire, hereby certify that on June 13, 2017, I served a true

and correct copy of Plaintiffs' Motion to Compel on all counsel of record via the Court

Electronic Filing System (PACER).


Date:  June 13, 2017                             BY:  _s/ Alan Denenberg_____
                                                 ALAN DENENBERG, ESQUIRE

# Suicides at the Lancaster County Prison were costing taxpayers

POSTED 4:42 PM, JANUARY 6, 2017, BY LEAH KIRSTEIN, *UPDATED AT 05:40PM, JANUARY 6, 2017*



**Preventing prison suicides**



LANCASTER, Pa. - The Lancaster County Prison Board says between 2010-2015 the inmate suicide rate was at an all-time high. It leaped 450% when compared to 1985-2010.

"We get sued for virtually all of them. So, even if we win, we spend hundreds of thousands of dollars or potentially millions of dollars when you add it all together on these cases. That's taxpayer money," said Commissioner and Prison Board member Josh Parsons.

The warden and the board decided something needed to be done. They created a suicide prevention committee and had staff go through special training. On Friday, they announced there were no inmate suicides in 2016.

"I think the there were 7 staff members involved in 2 different situations as result of that and you know that all goes with the morale. Their extra motivation, their skills and the training that have received. I am very grateful to them," said Warden Cheryl Steberger.

Steberger says the cost of prevention is much less than the cost one one inmate suicide.



http://lancasteronline.com/news/local/list-suicides-at-the-lancaster-county-prison-since/article_9543609a-bd1f-5099-b94e-5e321168bb60.html

Inmate Deaths Under Scrutiny

# List: 15 suicides at the Lancaster County Prison since 1998

LancasterOnline Digital   Jan 14, 2015





Lancaster County Prison

The two most recent Lancaster County Prison inmates who died as a result of hanging themselves were both pronounced dead on the same day.

Zachary Keifer, 23, of Elizabethtown, and Michael "Mikey" Lausell, 21, hanged themselves at the prison and were later taken off of life-support Jan. 10.

The two most recent suicides at the prison bring the number to 15 inmates who have killed themselves at the 625 E. King St. facility since 1998, according to records kept by Lancaster Newspapers staff.

The county's Prison Board and the prison's health care provider have conducted studies designed to improve the response of prison personnel to potential suicides.

After Patrick Kanney's suicide in April 2014, prison officials announced plans to remove locks that kept staff from getting to the 26-year-old New Jersey man who hanged himself.

Two prison correctional officers were also fired as a result of an internal investigation into Kanney's suicide.

An internal review of the circumstances also prompted then-Warden Dennis Molyneaux to call for a suicide hotline to be included in the prison's new telephone contract.

Here is a list of the 15 suicides at the Lancaster County Prison since 1998.

**2015 - Zachary Keifer**

Keifer, 23, died Jan. 10 after being taken off life-support. Keifer was incarcerated Dec. 22, 2014 for charges including disarming of a police officer, resisting arrest and theft by unlawful taking.

**2015 - Michael "Mikey" Lausell**

"Mikey" Lausell, the father of two children ages 1 and 2, died Jan. 10 at Lancaster General Hospital after his family took him off of life support. Lausell's mother, Naomi Lausell said her son hanged himself with a blanket in his cell in the medical housing unit in the early morning hours of Jan. 5 and said at least 20 minutes passed before anyone found her son and provided life-saving procedures.

Naomi Lausell said her son was diagnosed with paranoid schizophrenia when he was 17 years old. Mikey Lausell had been incarcerated since July 2014 on an aggravated assault charge. Naomi Lausell said her son should have been put in a mental hospital, not a prison.

## 2014 – Nathan Blake Nixdorf

Nixdorf, a married father of two, was in prison on a parole violation due to a DUI charge last month, according to court documents. He attempted suicide Thursday while alone in a two-man cell, officials said. Nixdorf, 30, died late Friday night, according to Coroner Dr. Stephen Diamantoni.

## 2014 – Patrick Kanney

Kanney, of New Jersey, died April 23, two days after he hanged himself in a bathroom at the prison, police reported. Kanney had been committed to the prison on charges of theft and loitering and prowling at night as the result of incidents Friday in Ephrata. County officials are conducting an investigation of the matter.

## 2013 – Matthew Wisniewski

Wisniewski, 28, hanged himself in April 2013 and was taken to Lancaster General Hospital where he was on life-support for a period of time before being declared brain dead. Wisniewski, of 104 Eagle Drive, Ephrata, wrapped a bed sheet around his neck and hanged himself from the upper part of a bunk in his cell

## 2011 – Ronald A. Snyder Jr.

Snyder, 26, of Elizabethtown, was found hanging in his cell in September 2011. At the time, he was facing charges of raping a woman while she was sleeping on a friend's couch at an Elizabethtown home.

## 2011 – Matthew McNamara

McNamara, 45, of Delaware County, died in July 2011 after jumping 13 feet from the upper tier of a cellblock, according to newspaper records. He had been incarcerated on charges relating to a fatal vehicle crash on Route 322 in Caernarvon Township.

## 2011 – John Harry Kruger

Kruger, 50, of Lancaster, died after falling from an upper level of the facility in March 2011, according to newspaper records. The coroner ruled the death a suicide.

## 2010 – Lester Anthony Shultz

Shultz, a 52-year-old Lancaster man who had no history of psychiatric problems, made a noose and hanged himself in his cell in May 2010, according to newspaper records.

## 2008 – Luis David Villafane

Villafane, 28, an accused child molester, tied knots in his bed sheet and hanged himself in his cell on C-2 block, the prison's disciplinary area also known as "the hole," in November 2008.

## 2006 – Joseph Patrick Keohane

Keohane, 22, took his life by hanging himself from a braided sheet he attached to a vent grate in his cell on Thanksgiving Day 2006. His parents later filed a federal civil lawsuit alleging the prison and members of its staff with "reckless indifference" to their son, resulting in his death. The county settled and paid $700,000.

## 2003 – James J. Hodapp Jr.

Hodapp was jailed Dec. 4, 2003, for violating parole. He had been charged about four months earlier with defiant trespass, theft and public drunkenness, according to newspaper records. Hodapp suffered from clinical depression and required prescription medication. According to newspapers records, Hodapp was placed on suicide watch five times while incarcerated.

Deprived of medicine, he threatened to commit suicide. On Dec. 14, 2003 - his 31st birthday - Jay Hodapp tied a bed sheet around his neck and hanged himself from the bars of his prison cell.

## 2000 – Derek Ryan Klugh

Klugh, 20, used his bedsheets to hang himself, according to newspaper records. At the time, he was being housed in a minimum- to medium-security section of the prison.

## 1999 – Kenneth A. Walsh

Walsh, 38, hanged himself only hours after he was imprisoned for a parole violation, according to newspaper records.

## 1998 – Michael A. Smith

Smith, 27, made a noose out of a bedsheet and hanged himself in his cell in July 1998. He was sent to prison on an outstanding warrant for parole violations. He was originally arrested for burglary and criminal conspiracy.

## More Headlines

- ⊠Insider A retrospective of the Conestoga River
- ⊠Insider A journey to find the source of Lancaster County's Conestoga River
- ⊠Insider Lancaster County community calendar: June 15, 2017
- ⊠Insider Judge's preliminary opinion: Senators lack legal standing in civil suit to oust Lancaster County Sheriff Mark Reese
- Warriors complete NBA title run with 129-120 Game 5 win over Cavaliers
- Donegal defeats L-S to earn spot in State 5A softball championship
- Lampeter-Strasburg tripped up by rival Donegal, denied return trip to state softball title game
- Body recovered during search for missing East Hempfield Township man
- ⊠Insider Heart Association donates infant CPR kits to Women and Babies Hospital
- 64 charged with welfare fraud in Pennsylvania including 6 Lancaster County residents
- The safest sunscreens for summer 2017

6.      A copy of the contract between Lancaster County and the entity/company/corporation that was providing health care to inmates at Lancaster County Prison at the time of the Mr. Kanney's suicide.

ANSWER:

**See attached hereto as Exhibit 1 the Health Services Agreement between PrimeCare Medical, Inc., and Lancaster County which was in effect in April 2014.**

7.      Any autopsy, police or other reports and/or statements in Defendants' possession which pertain to Mr. Kanney.

ANSWER:

**Objection.  Answering Defendants object to this request as it is overly broad to time and scope.  Moreover, it is seeking information which may be protected by the attorney/client privilege.  A Mortality Review was also conducted.  Answering Defendant objects to producing the Mortality Review Report as it part of a self-critical analysis.  Without waiving said objection, see "Inmate Death or Near Death Report" and Incident Reports attached hereto as Exhibit 2, and the Post Mortem Report of Patrick Kanney attached as Exhibit 3.  As discovery is ongoing, Answering Defendant reserves the right to supplement this response.**

8.      Any records in any form (such as logs etc.) which contain information concerning correctional officer's cell and supply area tours and inmate behavior noted on each tour.

ANSWER:

**Not within the control of Answering Defendants.**

9.      Any and all photographs or video etc. taken of Mr. Kanney prior to and after the suicide as well as any photographs or video etc. taken of the bathroom where the incident occurred and adjacent areas of the prison.

ANSWER:

4



EXHIBIT
"B"

**ABRAMSON & DENENBERG, P.C.**
**BY:  ALAN E. DENENBERG, ESQUIRE**
**IDENTIFICATION NO: 54161**
**1315 WALNUT STREET, 12TH FLOOR**
**PHILADELPHIA, PA 19107**
**(215) 546-1345**

---

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---

| | |
|---|---|
| **JAMES CARROLL and MARY CARROLL,** | : |
| as **CO-ADMINISTRATORS** | : **CIVIL ACTION** |
| of the **ESTATE OF PATRICK J. KANNEY** | : |
| **Plaintiffs** | : **JURY TRIAL DEMANDED** |
| | : |
| | : No.  16-01580 |
| | : |
| **v.** | : |
| | : |
| **LANCASTER COUNTY et al.** | : |
| **Defendants** | : |

---

### PLAINTIFFS' SECOND REQUEST FOR PRODUCTION OF
### DOCUMENTS DIRECTED TO PRIMECARE

Per the requirements of the Federal Rules of Civil Procedures, within thirty (30) days of receipt of this Request For Production of Documents, please produce for inspection and copying at the office of Alan E. Denenberg, Esquire, Abramson & Denenberg, P.C., 1315 Walnut Street, 12th Floor, Philadelphia, PA 19107, the following:

1. A true and correct copy of Lindsey Hayes report conducted in 2011, pertaining to Lancaster County Prison;
2. A true and correct copy of the "Detox logs" maintained by correctional officers in cell block G1 from April 19, 2014 – April 22, 2014 at Lancaster County Prison;
3. A true and correct copy of any and all lists showing that Patrick Kanney was on "detox watch", from April 19, 2014 – April 22, 2014;
4. A true and correct copy of the list of inmates brought to the medical unit by correctional officer Miller and correctional officer Philips on April 22, 2014.
5. A true and Correct copy of the Mortality/Morbidity Revie/Report regarding the death of  Patrick Kanney in April 2014.
6. A true and correct copy of all Mortality/Morbitity Report for all suicides at Lancaster Co. Prison from 1988 to the present.


ABRAMSON & DENENBERG, P.C.



BY: _____
                    ALAN E. DENENBERG, ESQUIRE

Dated:  April 25, 2017

**EXHIBIT**
**" C "**

ABRAMSON & DENENBERG, P.C.
BY:  ALAN E. DENENBERG, ESQUIRE
IDENTIFICATION NO:  54161
1315 WALNUT STREET, 12TH FLOOR
PHILADELPHIA, PA 19107
(215) 546-1345

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES CARROLL and MARY CARROLL, | : |
| as CO-ADMINISTRATORS | : CIVIL ACTION |
| of the ESTATE OF PATRICK J. KANNEY | : |
| **Plaintiffs** | : JURY TRIAL DEMANDED |
| | : No.  16-01580 |
| v. | : |
| | : |
| LANCASTER COUNTY et al. | : |
| **Defendants** | : |

## CERTIFICATE OF SERVICE

I, Alan E. Denenberg, Esquire, attorney for the plaintiff, hereby certify that on **July**

**25, 2016**, I served a true and correct copy of Plaintiffs' Request for Production of Documents

via First Class Mail, postage prepaid, on the following:

John R. Ninosky, Esquire
Johnson, Duffie Stewart & Weidner
301 Market Street, P.O. Box 109
Lemoyne, PA  17043-0109

David J. MacMain, Esquire
Nicole Freiler, Esquire
The MacMain Law Group
101 Lindenwood Dr., Suite 160
Malvern, PA  19355

Robert P. Didomenicis, Esquire
Holsten & Associates
One Olive Street
Media, PA  19063

Date:  April 25, 2017          _____

ALAN DENENBERG, ESQUIRE



**Alan Denenberg <adenenberg@adlawfirm.com>**

## Kanney vs. Primecare
1 message

**adenenberg@adlawfirm.com** <adenenberg@adlawfirm.com>                     Fri, May 26, 2017 at 2:35 PM
To: "John R. Ninosky" <JRN@jdsw.com>
Bcc: svonier@adlawfirm.com

John:
    Can you please email me the Lindsay Hayes report. Thanks and I hope you have an enjoyable and relaxing holiday weekend.
Alan

Sent from my iPhone



BY:  ALAN E. DENENBERG, ESQUIRE
IDENTIFICATION NO: 54161
1315 WALNUT STREET, 12TH FLOOR
PHILADELPHIA, PA 19107
(215) 546-1345

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JAMES CARROLL and MARY CARROLL, as CO-ADMINISTRATORS of the ESTATE OF PATRICK J. KANNEY<br>**Plaintiffs**<br><br><br><br>**v.**<br><br>LANCASTER COUNTY et al.<br>**Defendants** | : **CIVIL ACTION**<br>:<br>: **JURY TRIAL DEMANDED**<br>:<br>: No.  16-01580<br>:<br>:<br>:<br>:<br>: |

## CERTIFICATE OF GOOD FAITH BY ALAN DENENBERG

1.      I,  Alan Denenberg, Esquire, am an attorney licensed to practice law in the Commonwealth of Pennsylvania and represent the Plaintiffs, James and Mary Carroll, co-administrators of the Estate of Patrick Kanney, in the above captioned matter.

2.      I hereby certify that before filing the instant Motion to Compel the Disclosure of the Mortality Review Report and Lindsey Hayes Report I made a good faith effort to obtain the afore mentioned documents.

3.      This good faith effort included conversations with Defense Counsel wherein I expressly requested the documents and e-mails.

4.      I have been informed by PrimeCare's counsel that it will not produce the requested documents, leaving me with no alternative but to file the instant Motion.



ALAN DENENBERG, ESQUIRE
ATTORNEY FOR PLAINTIFFS

# Mortality Review

## Module VI

### Instructor's Guide

| | |
|---|---|
| **Length of Session:** | 1 to 1.5 hours |
| **Intended Audience:** | Regional center staff; Mortality Review Committee Members; Members of the regional center's Risk Management, Assessment, and Planning committee; health care providers |
| **Class Size:** | Limited only by room capacity |
| **Training Materials:** | Power Point presentation (or transparencies): *Mortality Review* |
| | LCD projector or Overhead projector |
| | Flipchart and markers (as desired) |
| **Methods:** | Lecture; instructor guided discussion; interactive |

### Course Outline

I.    Welcome and Introductions

II.   Introduction to Mortality Review

III.  Designing Mortality Review Systems

IV.   Potential Pitfalls

V.    Summary and Closing

VI-1



# Mortality Review

## Module VI

### Learning Objectives

At the conclusion of this module, participants will:

1. Describe the Mortality Review process.

2. Identify reasons for completing mortality reviews.

3. Describe the basic elements of a mortality review system.

4. Identify potential limitations of mortality review systems.

Risk Management Training Manual
Mortality Review
Module VI

# Mortality Review

1

| Script for Instructor | Suggestions for Instructor |
|---|---|
| **Slide 1: Mortality Review**<br><br>The goal of mortality review is to learn from a person's death, to discover if the same or similar situations may affect others in the future, and to improve overall quality of care. Assessing incompetence, intentional injury or violation of rights, rules, or regulations **is not** the intended goal of mortality review. These issues, if present, are generally addressed through other administrative means.<br><br>Deaths, regardless of where or when they occur, must be reported as Special Incidents. In addition, regional centers have an obligation to develop and implement 'a process for reviewing medical records and coroner reports, as appropriate, associated with special incidents to ensure that appropriate medical attention was sought and/or given" (Title 17, Article 2, 54327.2, (b) (5). This must be covered in the regional center's Risk Management and Mitigation Plan. | *Start the Power Point presentation or display the title overhead transparency.*<br><br>*Ask participants to identify actions typically taken at this regional center following a death.*<br><br>*Ask participants to identify how their regional center could benefit from looking at deaths as an opportunity to improve services.* |

Risk Management Training Manual
Mortality Review
Module VI

2

| Script for Instructor | Suggestions for Instructor |
|---|---|
| **Slide 2: Benefits of Mortality Review**<br><br>In a mortality review system, factual information is reviewed to determine ways to improve the quality of future services. Benefits of mortality review systems include:<br><br>• Improved monitoring of quality of care<br>• Development of a mortality database<br>• Improved timeliness of documentation and reporting<br>• Increased attention to quality across all service areas<br>• Enhanced ability to respond to external inquiry/scrutiny (licensing, media, etc.) | |
| **Slide 3: Organizational Support**<br><br>There are specific organizational factors that support the mortality review process. Foremost is an organizational culture supportive of risk reduction and safety. When this culture is present, the organization utilizes mortality review as a preventative process. Additionally, a cross-disciplinary, collaborative team approach is necessary to integrate knowledge, experience with the person's circumstances, and different areas of expertise. | *Ask participants how their organization is (or could be) supportive of the mortality review process (for example, policies in place, an active mortality review committee, training for committee members, documentation requirements, etc.)* |

3

| Script for Instructor | Suggestions for Instructor |
|---|---|
| **Slide 4:  Purposes of Mortality Review** | |
| Mortality Reviews should be conducted to: | |
| ▪ Determine if there are any red flag areas that need immediate resolution. | |
| ▪ Determine contributing factors of the circumstances surrounding the individual's death. | |
| ▪ Identify patterns or trends of concern (areas needing system support). | |
| ▪ Determine whether changes are needed to prevent similar circumstances affecting other consumers. | |
| ▪ Propose care and treatment recommendations, if appropriate. | |
| **Slide 5:  Designing the Mortality Review System** | |
| When designing a mortality review system, some fundamental questions need to be asked: | |
| • Why conduct mortality reviews? | |
| • How are mortality reviews conducted? | |
| • When are mortality reviews conducted? | |
| • Who will be involved? | |

Risk Management Training Manual
Mortality Review
Module VI

4

| Script for Instructor | Suggestions for Instructor |
|---|---|
| **Slide 6: Why Conduct a Mortality Review?** | *If participants are involved in the mortality review process currently, have them discuss this intended outcome and why or why not their process is successful in meeting it.* |
| The outcome of the review should be a determination of areas where, in retrospect, support for the consumer could have been improved. The committee should pool ideas of recommendations for future changes in the service system. | |
| Changes may include such activities as follow-up training for provider and/or regional center staff; training and information dissemination to hospitals, physicians, other care providers; and organizational changes within the provider or regional center. | |
| Recommended organizational changes might vary from revising communication systems among providers to establishing a task force charged with increasing the availability of specific services. | |
| If the committee identifies a significant issue that requires immediate attention for the health and safety of other consumers, a committee member should be charged with ensuring that the situation is rectified as soon as possible. | |

Risk Management Training Manual
Mortality Review
Module VI

5

## Slide 7: How are Mortality Reviews Conducted?

Several methods may be used to complete the review process. It is suggested that, prior to the meeting, each committee member reviews the facts surrounding the events to be reviewed.

A thorough review should be made of the case history, medical records, and facts surrounding the incident/illness leading to the death, treatment plans, and other relevant records.

In addition to medical and nursing issues, residential supports, day services, healthcare utilization, special incidents, and individual planning efforts during the life of the consumer should be reviewed to identify instances where supports might have been better provided.

The review should consider information available throughout the life of the consumer but should focus on the previous twelve months to identify:

- trends in planning;
- use of resources;
- deviations from normal health status; and,
- limitations or failures of support.

*Ask participants currently involved in mortality reviews to discuss their procedures. You might ask for strategies they think work well in their system or for areas they think could be enhanced.*

**Risk Management Training Manual**
**Mortality Review**
**Module VI**

6

## Slide 7 (continued)

All aspects of the review should be discussed during the committee meeting.

If the committee determines that further information is needed, a request should be made to obtain these records and a subsequent review is scheduled.

The objective is to examine the impact of all supports on the person's life, not to second-guess the provision of medical and nursing care or to provide a second-opinion of the cause of death.

The committee should summarize its findings by identifying areas of concern and making recommendations for any needed follow-up.

Risk Management Training Manual
Mortality Review
Module VI

## Slide 8:  When are Mortality Reviews Conducted?

Regional centers review all deaths. Consideration should be given to the information on the special incident report (SIR) that would prompt a mortality review.

Suggested "triggers" include the following:

- High percentage of deaths of unknown origin
- Lack of preventative health care
- Lack of emergency health care services
- Lack of availability of routine health services
- Unexpected deaths with one or more of the following conditions:  gastrointestinal bleeding, intestinal obstruction, aspiration pneumonitis, malnutrition, decubitus ulcers, cervical cancer, melanoma, diabetic ketoacidosis, tardive akathisia, tardive dyskinesia, or neuroleptic malignant syndrome
- All injury-related deaths

8

### Slide 9: Who Will Be Involved?

When designing a mortality review process, it is important to determine who should be involved in the review process. Generally, a committee composed of a clinical staff person such as a physician or nurse, or both, completes a mortality review. Some committees include other members who are specifically charged with addressing program planning issues, social issues and relationships, environmental issues, etc.

It is also recommended that representatives of the regional center management team such as a service coordination supervisor and quality assurance supervisor be included.

A regional center may choose to form a mortality review committee as a sub-committee of the Risk Management, Assessment and Planning Committee. The mortality review committee should meet on a routine basis (e.g., once monthly, twice monthly) depending on the number of cases to be reviewed.

_Ask participants who serves on their committee, if committees are currently being used in their organization._

Risk Management Training Manual
Mortality Review
Module VI

9

### Slide 10: Information Dissemination

Following the review process, recommendations for improvement should be compiled and shared across the entire system. Regional centers will need to consider methods of information dissemination, paying particular attention to confidentiality issues related to the decedents and their families, vendors, and others involved in the person's care and treatment.

*Ask participants what happens to the findings from these reviews. If mortality reviews are not used, have participants list those who should receive, or could benefit, from this information. Lead a discussion on how sharing could be done without compromising confidentiality. Possible solutions could be to: share aggregate results to supervisors such as the number of reviews completed, number and type of recommendations, information available for review, etc.; making aggregate data (altered for confidentiality) available for review by appropriate parties; composing fictitious accounts based on actual reviews that could be used for training.*

### Slide 11: Potential Challenges

What are some problems typically found when completing mortality reviews?

- There may not be sufficient information available to conduct a satisfactory review or arrive at definitive conclusions.

- Regional centers may not be notified of a death in a timely manner.

## Slide 11 (continued)

- Autopsies may not be conducted or reports may not be available, even in situations where the cause of death is unclear.

- Death certificates, if available, may list a cause of death that is not included as a diagnosis in pre-mortem records.

Despite these possible variables, the process of mortality review can still serve as an enhancement to the delivery of services and supports.

## Slide 12: Mortality Review

A structured mortality review process is a way to analyze mortality statistics, monitor sentinel health events, and provide qualitative review of individual events. A structured mortality review process results in system-wide quality enhancement.

VI-4

# Mortality Review

# Benefits of Mortality Review

- improved monitoring of quality of care

- development of a mortality database

- improved timeliness of documentation and reporting

- increased attention to quality across all services

- enhanced ability to respond to outside inquiry (licensing, media, etc.)

2

3

# Organizational Support

- Culture

- Cross-disciplinary team approach

# Purposes of Mortality Review

- To determine "red flags"

- To determine contributing factors of the circumstances surrounding the individual's death

- To identify patterns or trends

- To prevent similar occurrences

- To determine whether changes are needed

- To make care and treatment recommendations

4

5

# Designing the Mortality Review System

- Why Conduct Mortality Reviews?

- How Are Mortality Reviews Conducted?

- When Are Mortality Reviews Conducted?

- Who Will Be Involved?

6

# Why Conduct a Mortality Review?



- Outcomes

- Recommendations

# How?

- Collect Information

- Review Life of Consumer

- Identify Issues and Concerns

- Propose Recommendations

# When are Mortality Reviews Conducted?

Triggers from Special Incident Reports

Emergency Care

Unexpected Deaths



Injury Related

Preventative Care

8

# Who?

- Clinical Staff

- Members of Management Team

- Sub-Committee of Risk Management, Assessment and Planning Committee

9

# Information Dissemination

- Recommendations Shared

- Confidentiality Ensured

10

# Potential Challenges

- Sufficient information available

- Timely notification

- Autopsies not conducted

- Death certification information

11

# Mortality Review

## System-Wide Quality Enhancement

# The Lindsey Hayes report is the property of Prime Care Medical a copy of this document can be obtained by contacting the PCM legal department.

Lancaster County 0430

