# EXHIBIT "KK"

# PRIMECARE
## MEDICAL, INC.+

### Psychological Autopsy

**Name:**               Luis David Villafane  a/k/a Luis David Laboy
**Place of Incarceration:**   Lancaster County Prison
**Date of Birth:**         March 24, 1980
**Date of Death:**        November 19, 2008
**Reviewed:**           Lancaster County Prison - Medical Records

**Prepared by:**         Robert M. Nichols, M.S.,
                     Psychologist

**Background Information** – Luis David Villafane is a 28 year-old single male of Hispanic origin who was born in Brooklyn, New York. He transferred to Lancaster County Prison (LCP) from State Correctional Institution (SCI) Rockview on September 22, 2008 where he was incarcerated for the past three and a half years. He provided no street address at commitment however, during previous incarcerations at LCP he reported 139 Schoolhouse Road, Lancaster, PA as his home address from 1998 to 2005. He reported receiving special education services in school and completed the 11th grade in high school. He was unemployed from 1998 to 2008 with one exception; Labor Ready employed him at some time in 2005. He declared his occupation as laborer. He never served in the military.

On September 22, 2008, Luis was transferred to LCP from SCI Rockview where he completed a sentence of three and a half years. Luis transferred to LCP on charges of rape of a person less than 13 years of age (2 counts), aggravated indecent assault of a person less than 13 years of age, and indecent assault of a person less than 13 years of age. His bail was set at $750,000.00. He was incarcerated six or more times at LCP from 1998 to 2005. Prior offenses include driving under influence, theft by unlawful taking, criminal conspiracy, receiving stolen property, indecent assault, and corruption of minors. In addition to his incarceration at LCP and SCI Rockview, he reported an incarceration in Lewisville Development Facility, location unknown.

Institutional misconduct history was unavailable. However there are chart notes referencing "returning to C2," the disciplinary unit, indicating he had received at least one misconduct. The medical records reviewed contain no mention of assaultive or threatening behavior. Luis did report experiencing stress related to problems with the legal system, and problems with primary support group. His adjustment was problematic and he had difficulty coping with the possibility of receiving a long prison sentence and the recent death of his mother.


CONFIDENTIAL

Luis David Villafane
DOD: November 19, 2008
Page 2

It should be noted that he reported his mother being dead on September 22, 2008, and on October 30, 2008, he reported his mother died of a heart attack on October 13, 2008. Several days later, Luis stated that his father and siblings were killed in an automobile accident several days after his mother was buried.

Luis' family history is limited however, Luis did report a family history of diabetes and heart disease. The history was negative for family members with mental illness, suicidal behavior, and substance abuse.

**Description of Suicide Act** – On November 19, 2008, at approximately 1345 hrs, a 'code blue' was called to C2. Medical staff responding were Ashley Garcia MA, Cynthia Dickert LPN, Odalis Rivera MA, and Brooke Johnson LPN. When they arrived at C2-24, Officer Byrd was supporting Luis Villafane in order to take pressure off his neck and facilitate removal of (untie) the sheet tied around his neck. The other end of the sheet was tied to the cell bars. Another officer present untied the sheet from the bars. Once the sheet was released, the officers lowered him onto the bunk. Nurse Johnson then checked Luis' vitals while the officers present applied the AED pads to his chest. No respirations or pulse was detected.

Luis was then moved to the hallway floor to provide sufficient room to begin CPR. Nurse Dickert and Johnson began CPR. Nurse Johnson directed officers in the hallway to call 911. Nurse Garcia left the area to call for oxygen and to tell the Sergeant to call 911. Tami Featherlin, BSN arrived and instructed a staff member to go to medical and get the ambu bag. When the ambu bag and oxygen arrived, these were utilized and CPR continued. Rodney Hostetler PA arrived several minutes later. He relieved Johnson who was performing the rescue breathing. The AED never advised a shock. The CPR continued for approximately ten more minutes until Emergency Medical Service arrived and assumed CPR.

EMS personnel placed leads on Luis' chest and no heart wave activity was noted. They contacted the EMS physician who instructed them to terminate resuscitation efforts and pronounce Luis dead. EMS pronounced him dead, secured their equipment, and left the scene. Staff covered Luis' body with a sheet and secured the area until the coroner arrived.

Additional persons present at times during emergency included Dr. William Young MD, Carol Williams RN, Officer Dickert, Lieutenant Billy, Sergeant Aberts, and Officer Plummer.

CONFIDENTIAL

PCM02177

Luis David Villafane
DOD: November 19, 2008
Page 3

**Presence of Suicidal Risk Factors**

<u>Historical Factors</u> – The Health Assessment, completed at admission to LCP, indicated
Luis Villafane received treatment for asthma, ulcers, and mental illness (depression,
anxiety, and attention deficit hyperactivity disorder). He was treated at SCI for these
problems and brought with him medication he was taking at the time of his discharge
from Rockview. Medications included CTM, Albuterol inhaler, Prozac, and Colace. He
scored a 13 on the suicide intake screen, and was placed on suicide precautions until
mental health staff could assess him. Luis stated he had attempted suicide six months ago
at SCI however he denied any current suicidal ideation.

He reported a history of depression, anxiety, and ADHD. Before his incarceration several
years ago, dates unknown, he received psychiatric treatment at Lancaster General
Hospital, St. Josephs' Hospital, and Reading Medical Center. He also was treated for
ADHD and depression as an adolescent. At that time, he received case management and
treatment services through Lancaster MHMR.

Treatment for both his medical and psychiatric problems was provided at SCI Rockview
where he was incarcerated for the past three and a half years. SCI Rockview did not
provide a medical summary or transfer information as required to provide for continuity
of care. Therefore, the details of his health and treatment history were not known at LCP.

His first suicide attempt was when he was 11 years old. Additional suicide attempts, and
periods of suicidal ideation were documented throughout his numerous incarcerations
over the last ten years at LCP. He received medication for depression, typically
antidepressants, many times over the years at LCP. It is not known if he continued taking
medication when he was in the community.

As an adult, he presents a history of continuous drug and alcohol abuse. The drugs of
choice are marijuana and alcohol. Heroin, cocaine, and embalming fluid were used to a
lesser degree. Intake records indicate he requested drug and alcohol treatment each time
he was committed to LCP. However, no record of whether he actually received treatment
is in his file.

The history Luis provided lacks specifics and detail. He reports inconsistent information
regarding mental illness, drug use, and suicidal behavior from one assessment to the next
and from person to person. At times, he completely denies any mental illness or suicidal
behavior. At other times, he reports a history of depression, anxiety, and suicidal ideation
that contradict information he provided during earlier incarcerations.



Luis David Villafane
DOD: November 19, 2008
Page 4

For example, during this incarceration Luis reported a suicide attempt six months before coming to LCP to staff at intake. Later he denies any past suicide behavior or suicidal ideation to a different staff member within the same two-week period. Another example would be his inconsistent reporting of his mother's death. He told the intake nurse she had died before he was committed to LCP. He informed different mental health clinicians that she died on October 13 and October 18. Apparently, his mother is alive and resides in Lancaster.

Information regarding his family is limited. There is no history of mental illness or drug and alcohol abuse. Medically there is a family history of heart disease and diabetes.

<u>Environmental Factors</u> – Luis Villafane is a single never married twenty-eight year old Hispanic male. There is no record of him being involved in a serious relationship. He has family living in the Lancaster. However, given the inconsistent and erroneous information regarding the death of family members, it is difficult to determine the quality of the relationships.

LCP medical records indicate Luis experienced several identifiable stressors, including interactions with the legal system and problems with his primary support group. He was incarcerated much of his adult life, usually unemployed when in the community, and he abused drugs and alcohol. His frequent incarcerations often involved parole violations. He apparently had difficulties complying with the conditions of parole. The preceding three and a half years before coming to LCP, he was incarcerated at SCI Rockview. He reportedly attempted suicide there and received treatment for depression and anxiety. However, the information on his level of functioning, general health, programming, conduct, etc. was not provided to LCP from SCI at the time of his transfer.

<u>Precipitating factors</u> – Luis reported feeling under a great deal of stress at different times during his incarceration. He was depressed and anxious. His sleep and appetite were poor. He reported the loss of his mother and other family members to staff at intake and then several weeks later. He stated that his mother was all he ever had and that she was the only person who cared about him. He presented with a variable, sometimes inconsistent mood from the date he was committed to when he committed suicide. He was placed on suicide precautions at commitment and later during the weeks preceding his suicide.

Approximately three weeks before his death on November 1, 2008, Luis was injured during an incident with prison staff and subsequently sent to the hospital for treatment. Details of the incident were not in the record. Luis was placed on suicide precautions before he was taken to the hospital. While at the hospital, he informed the hospital staff that he had suicidal ideation at times over the past few weeks and suffered from



Luis David Villafane
DOD: November 19, 2008
Page 5

flashbacks of his suicide attempt at SCI. Information that he did not share with prison
staff. He was treated at the hospital for his injuries and released.

During the following weeks he reported feeling depressed and under a great deal of
stress. He was oriented to time, place and person, reported no hallucinations, and denied
any thoughts of suicide. The psychiatrist saw him on November 3, and his medication
was changed. November 7, Luis mood was normal and he continued to deny any suicidal
thoughts. His suicide precautions were decreased to psychiatric observation at that time.

On November 10, he was again reporting feeling depressed with illogical thoughts, and
he was having nightmares about his deceased parents. Several days later on November
13, 2008, Luis was seen and stated he felt he was ready to move back to general
population. At that time, he appeared slightly anxious; his affect normal, and verbalized
no thoughts of suicide. Villafane remained on psychiatric observation.

On November 18, 2008, Luis' mood is improved, he smiled, was generally positive and
no longer depressed. He stated he was ready to move, that he preferred to go
administrative segregation rather than disciplinary (C2) but he understood that C2 was a
possibility. Shambaugh cleared Villafane for general population.

**Lethality factors involved in suicide** – Luis Villafane committed suicide on November
19, 2008, at approximately 1345 hours. He hanged himself with a sheet tied to the upper
cell bars apparently died from strangulation. Information regarding Luis' state of mind on
the days preceding his death is conflicted. He reported feeling depressed, anxious, and his
mood was variable. During the last five days before his death, he reported improvement
in his mood to generally positive, no longer depressed. The day before his suicide, Luis
was smiling his mood improved and stating he was ready to move to either C2 or general
population.

Luis hanged himself, a method that is usually lethal. Luis may have planed to kill himself
days before and waited for the opportunity once he moved off observation status. It is
also possible that he did not plan on killing himself until he arrived on C2 and his mood
became depressed again either in reaction to endogenous or exogenous factors and he
became suicidal. He may also have thought that staff would interrupt the attempt, and that
he did not intend to kill himself. However, this is unlikely, as Villafane had no history of
suicidal gestures or threats for secondary gain.

Staff did not find a suicide note in the cell.

**Psychological factors** – Luis had a history of mental illness that began in adolescence.
Initially diagnosed with ADHD, for which he received special education in school. In his


CONFIDENTIAL

Luis David Villafane
DOD: November 19, 2008
Page 6

late teens, he was also treated for major depression and anxiety. During the past few months at LCP, he appeared to have mood disorder. Details on his substance abuse/dependency history lack detail. He reported suicidal thoughts and feeling anxious and depressed at commitment to LCP. There is no information on whether these thoughts and feelings began at the time of commitment, in SCI when he knew he would be returning to LCP on charges of rape, or at some other time. His predominate cognitive style and personality cannot be determined from the available records.

**Conclusions/Recommendations** – The method and timing of the suicide act, and precipitating factors make it difficult to determine if the suicide was planned or a more impulsive act. His decision to commit suicide is likely due to his reaction to significant stressors and his subsequent feelings of hopelessness over his future. It seems unlikely that Luis intended to be discovered and rescued during his suicide, but this cannot be known with certainty.

After reviewing the medical records, it seems that LCP staff did everything possible to save Luis' life when he was discovered hanging. The following recommendations are offered based on the review of medical records provided from LCP.

1. When inmates are committed from another facility, a medical transfer summary should accompany them. If they arrive without a summary or an inadequate one, staff should have the inmate sign a release of information and have send for the information to the transferring facility as soon as possible. Telephone calls and follow-ups are often necessary to obtain the information.

2. Records from psychiatric hospitalizations or inpatient substance abuse treatment must be requested at minimum for inmates that received treatment six months preceding incarceration. Any refusal to authorize the release of information by an inmate is documented in his file and further explored clinically by mental health staff.

3. Inmates determined to be at risk for suicide and placed on suicide precautions must be "stepped-down" as per Primecare Medical policy. Please refer to the policy for details.

4. The use of the term 'Code Blue' may be problematic. The use of this term should be carefully reviewed. While it is intended to indicate a person in medical crisis, i.e., not breathing, no pulse, etc. it may in practice be misused for all medical situations, with no regard to the severity of the injury or condition and whether or not it is life threatening. The result is that medical staff may not bring oxygen, the AED, etc. when responding to Code Blue,



CONFIDENTIAL

Luis David Villafane
DOD: November 19, 2008
Page 7

although by definition they should. Medical taff should review the procedures
for responding to emergencies at the next staff meeting.

_[signature]_      1-14-09
Robert M. Nichols, M.S.        Date
Psychologist
Director of Mental Health
Primecare Medical, Inc.

CONFIDENTIAL

PCM02182

Lancaster County Prison
## Clinical Mortality Review
## (9J-A-10) (P-A 10), 1999 (Y-11)

**DATE**
June 22, 2010

## Confidential and Privileged Information

## Mortality Review

**Participants:**

Vincent Guarini, Warden
Dr. Carl Hoffman, Corporate Medical Director
Major Edward Klinovski
Tammy Moyer, Executive Assistant
Dr William Young, Medical Director
Todd Haskins, Vice President of Operations
Kelly Ehrich, Jr. Vice President of Operations
Tamaria Featherlin, Health Service Administrator
Kevin Frantz, Director of Nursing

The meeting began with an explanation that the purpose of this meeting is to conduct a Mortality Review, as is required by <u>NCCHC Standard J-A 10.</u>  The review is to assess and determine the appropriateness of the clinical care; whether corrective action in terms of policies, procedures, or practices is warranted; and whether there are trends requiring further study.  This is also a <u>Peer Review</u> protected from disclosure by the <u>Pennsylvania Peer Review Protection Law;</u> that means what is said here and later put in writing is confidential and solely for the benefit of those in attendance.

| | |
|---|---|
| **Death of:** | **Shultz, Lester Anthony** |
| | **LNCP No. 10-0443** |
| **DOB:** | **05/12/52 (53)** |
| **Booking Date:** | **01/27/10 3:16 pm** |
| **Charges:** | **Violation of Probation** |
| | **Violation of Parole** |
| | **Burglary** |
| | **Theft by Unlawful Taking – Movable Property** |
| **Housing Unit:** | **3-2** |
| **Cause of Death:** | **Passive Hanging – autopsy results pending** |
| **Date of Hospitalization:** | **05/24/10** |
| **Date of Death:** | **05/24/10** |
| **Time of Death:** | **12:09 pm** |
| **Pronounced by:** | **Lancaster General Hospital** |
| **Autopsy:** | **Lancaster County Coroner – results pending** |

CONFIDENTIAL

1

PCM02183

|                          |                     |
|--------------------------|---------------------|
| Initial Intake Screening: | 01/27/10 6:25 pm   |
| Initial PE:              | 02/09/10            |

**Other Diagnoses:**
- r/o scabies
- dermatitis
- HIV positive*

*HIV positive reported on last intake but no further mention of the diagnosis in the PE or provider visits and prior incarcerations report testing negative.  No indication that the patient was scheduled for chronic care follow up, dental screening or mh referral that is standard practice for all new commitments reporting a diagnosis as HIV positive.  Lack of additional documentation or reports from the patient lead us to believe that the report of HIV positive is a mistaken entry.

**Allergies:**
- certain soaps

**Prior Surgical History:**

- Splenectomy 1970's

Please note that the above medical history was obtained as self reported by the patient at the time of incarceration.

**Current Medications at time of transfer to Lancaster General Hospital**

- Aristocort A 0.001 cream topical QD (no doses taken)

**Administrative Review**

A debriefment with the medical and mental health staff was held on May 26, 2010 to discuss the emergency response and events surrounding the passive hanging, cardiopulmonary arrest, resuscitation efforts and subsequent death of this patient.  In reviewing the medical records and discussing the individuals presentation with the staff that had direct contact with the patient there were no indications this individual was in any imminent distress.  All medical and mental health policies and procedures have been reviewed and they were followed as written.

During the discussion with staff the suggestion was made to add individuals on HA/BA (house alone/block out alone) status for contact isolation to the segregation rounds to ensure these individuals have sufficient human contact/interaction.  Mr. Shultz had been on HA/BA status for 12 days for a potential scabies infestation prior to his successful suicide attempt.  While the HA/BA status of the patient is not considered a contributing factor to his suicide the additional availability of the medical and mental health staff may have given him additional avenues for discussion of his intentions giving us the opportunity to intervene.

**Clinical Mortality Review: Completed by William Young MD**

CONFIDENTIAL

Statistics:

2

PCM02184

Lester Shultz was born on May 12, 1958(53). He was booked into Lancaster County Prison on 1/27/10 at 1516.

Confinement medical summary:

Shultz had a splenectomy in the past. He denied other medical problems. He took no medication. He reported testing positive for HIV (?)

The inmate was seen seven times on sick line, all concerned with dermatitis. A number of treatments were tried, including hydrocortisone, triamcinolone, tolnaftate, diflucan, keflex, A&D, eucerin, permethrin. At the time of the inmates demise, he was HABA for presumed scabies.

It was reported the inmate was discovered hanging. Medical staff responded to the "CODE BLUE" and found the inmate lying on the floor pulseless with his face red/blue. Resuscitative efforts were started and the inmate was transferred to Lancaster General Hospital. He was pronounced dead at the Emergency room.  An autopsy was done.

### Psychological Autopsy: Completed by Robert Nicols

| | |
|---|---|
| Name: | Lester Anthony Shultz |
| Place of Incarceration: | Lancaster County Prison |
| Date of Birth: | May 12, 1952 |
| Date of Death: | May 24, 2010 |
| Reviewed: | Medical Records (March 11, 2008 to present) |
| | Prison Intake Documents |
| | Staff Incident Reports |

Background Information – Lester Anthony Shultz is a 53 year-old, single white male who was born in Lancaster, Pennsylvania, and presumably has lived there his entire life. He reports his current address as 622 Olive Street Lancaster where he lives with his mother, Joann Herbert. There is no record of Lester having any children.

The highest grade Lester completed in school was the eleventh grade. At some point in the past few years, he did receive his GED. He reports his occupation as a self-employed painter and laborer. He was unemployed prior to coming to jail earlier this year. No other specifics were available regarding his occupational history.

At 3:15 pm on January 27, 2010, Lester was committed to Lancaster County Prison (LCP) on a bench warrant for "parole/probation violations". LCP records indicate he has been incarcerated ten times since 1997 for "various offenses"; the specific criminal charges were not available. However, his past four incarcerations on March 11, 2008, April 25, 2008, February 16, 2009, and most recently January 2010 were all for probation/parole violations.

Medical History–

Medical assistant Travers completed the intake screen within three hours of Lester's commitment to LCP. Several medical problems were noted. Lester reported having a rash on both feet, and dental pain that Lester attributed to numerous cavities in his teeth. He received treatment for these conditions during previous incarcerations. He also reported that he had tested positive for HIV.

On the intake suicide screen, Lester received a score of 0 which indicates that he exhibited none of the risk factors for suicide covered on the screen. The form did indicate that he was on suicide precautions in the past and seen by mental health staff during a previous incarceration in April of 2008. At that time, he presented with "signs of depression" and stated "he was feeling suicidal". No suicide precautions were ordered, presumably because he scored a one on the intake suicide screen. He was referred to mental health and was evaluated by Paula Haigh, LSW. Her evaluation indicated that he was not suicidal, he reported no suicidal thoughts, no psychosis was present, his mood and affect were appropriate, he denied any history of mental illness, and had no symptoms of depression or

3



PCM02185

anxiety. There are no other indications in the chart that he experienced any depression or suicidal thoughts since that time. No further psychiatric problems are noted since April of 2008.

Travers did not make any referrals to medical or mental health staff after completing the intake screen.

Several days later Lester requested treatment for his rash and was evaluated by nursing who then ordered medication. The nurse practitioner and physician provided continuing care for the rash (identified as dermatitis or psoriasis) until his death. Lester also submitted sick call slips seeking treatment for his dental problems and likewise was seen by the dentist and treated.

Lester admitted occasional alcohol use, approximately once every two weeks. Chart notes from previous incarcerations indicate weekly use of as much as ten beers at a time. In the past, he smoked half a pack of cigarettes a day, but reported he was now a non-smoker. He also reported using cocaine during a previous incarceration.

There is no history of mental health problems in the medical record since 2008. Lester stated that he was never been treated for mental illness. The only exception was in April of 2008, which was already discussed.

No other significant medical problems are noted.

Antecedent Circumstances – Lester was committed to LCP on January 27, 2010 on parole/probation violations. The transporting officer did not consider Lester to be at risk for suicide, have any apparent mental health problems, or to be under the influence of drugs or alcohol. Medical Assistant Travers completed the intake suicide screen, which indicated that Lester was not at risk of suicide. There were no indications of mental illness or adjustment problems throughout his incarceration.

On April 19, 2010, Lester was court ordered committed to Department of Corrections for evaluation to determine if he would be eligible for sentencing to the state intermediate punishment program. However, on April 27, before he was transferred, additional criminal charges were filed for five counts of burglary and theft by unlawful taking. Bail was set at $25,000. Because of these charges, Lester would have to be sentenced on the new charges before being considered for the intermediate punishment program. In fact, the new charges may have precluded him from consideration for intermediate punishment.

Two weeks later on May 12, 2010, Lester was evaluated by the nurse practitioner, who began treating him for scabies. In order to prevent the spread of scabies to other inmates or staff, Lester was ordered housed in medical segregation (isolation) by the nurse practitioner. Medication was prescribed for treatment and he was scheduled to be seen the following week.

The physician saw Lester again sometime the morning of May 19, 2010. Notes indicate some improvement in his condition, additional medication was ordered, and he was continued in medical isolation. Later that morning at 11:28 am, Lester was discovered hanged in his cell by the unit officer.

Description of Suicide Act – Lester Shultz was discovered hanging by his jumpsuit by the unit officer while serving lunch on the unit at 11:28 am on May 19, 2010. He immediately radioed for medical assistance calling a "code blue". Correctional officers and medical staff responded. Officers entered the cell, untied the jumpsuit from around his neck, and lowered Lester to the floor where medical staff attended to him. Lester was not breathing and had no detectable pulse. The AED was applied (advised no shock), and CPR was initiated. Staff called 911 requesting emergency medical services. EMS arrived at 11:38 and relieved medical staff. CPR was continued and Lester was readied for transport to the hospital. EMS departed the prison at 11:58. Lester was subsequently pronounced dead at 12:09 pm at Lancaster General Hospital.

No suicide note was found.

Lancaster City Police conducted an investigation reporting to prison staff that they believed it was a suicide.

There were no known problems with other inmates or staff. Inmates housed in cells near Lester stated the he did not complain of having any problems.

Recent stressors include recent changes in legal status (new criminal charges), that precluded Lester's consideration for intermediate punishment and could possibly result in his being sentenced to additional time in state prison. Additionally, Lester was housed alone in medical isolation since May 12, 2010. Lastly, he had no support from

4

CONFIDENTIAL

PCM02186

family or friends on the outside, having made only one phone call, and no visitors since he was committed. There is no information available indicating how Lester was affected by these stressors, and his ability to manage them.

There are no reports that Lester displayed any changes in behavior or signs of depression. Earlier that morning, the physician saw him. The last time he was seen by staff was by the unit officer at 11:04 am. Neither the physician nor unit officer noted any behaviors of concern. Lester had the opportunity to talk with the physician or the unit officer if he wanted help.

There is only one documented instance of Lester being seen by mental health and that was in 2008. There is no history of suicidal behavior. There is no information available that would or should have raised staff's level of awareness that Lester was suicidal.

Conclusions/Recommendations – The information reviewed is consistent with a person determined to commit suicide. The suicide was possibly in reaction to the identified stressor(s), or some unidentified stressor or problem. It seems unlikely that he believed he would be discovered while in the act of suicide since the office was busy with serving lunch to the unit at that time.

There is no evidence of ambivalence in his actions, although it he may have acted impulsively or only thought about suicide for a short time before he acted. As noted above, the timing, location, and the method chosen, (hanging, which is typically lethal in several minutes), all point to his intent to kill himself.

After reviewing the available records, it is apparent that security and medical staff responded quickly and efficiently in an attempt to save Lester Shultz once he was found hanged. Further, there is no evidence to suggest that staff knew or should have known that he was suicidal before he committed suicide. There are no specific recommendations offered after review of the incident reports associated with the suicide and Lester Shultz's medical file. The following are considered essential training for staff in order to identify suicidal inmates and intervene when a suicide is discovered in progress.

1.  Staff should have yearly training in CPR and in the use of the AED.

2.  Staff should receive yearly training in suicide prevention. The training should include specific training in risk factors for suicide, protective factors that decrease suicide risk, and on procedures on how to respond to a suicide in progress. It is important to review not only medical procedures but also security procedures as well.


**Post Presentation – Response/Discussions by Participants:**

Recommendations from the psychological autopsy discussed and all medical and correctional staff have suicide training yearly and CPR/AED training every year for correctional officers and every two years for medical staff with additional yearly medical emergency response and psychological emergency training for the medical staff.


**Corrective Action to be taken:**

*   Patients on HA/BA status for contact isolation are added to the segregation rounds book for medical and mental health and are seen three time weekly by the medical staff and once weekly by the mental health staff during segregation rounds checks.



5

PCM02187

Confidential and Privileged Information
Mortality Review
June 22, 2010

The medical record of Shultz, Lester Anthony is sealed.  PrimeCare Medical, Inc reserves the
right to reopen this review dependant on the autopsy results as they are no available at this time.

Respectfully Submitted,

Tamaria Featherlin, RN, BSN
Health Service Administrator
June 22, 2010



6

10/20/2010  3:29PM

PCM02188

Lancaster County Prison
## Clinical Mortality Review
## (9J-A-10) (P-A 10), 1999 (Y-11)

Date: April 11, 2011

## Confidential and Privileged Information

**Participants:**
Vincent Guarini, Warden
Tammy Moyer, Executive Assistant to Warden Guarini
Joseph Shiffer, Deputy Warden of Inmate Services
Kenneth Arnold, Deputy Warden of Operations
Todd Haskins, Vice President of Operations
Kelly Ehrich, Jr.  Vice-President of Operations
Kevin Frantz, Acting Health Service Administrator
Jennifer Miosi, Director of Nursing
Dr. Robert Nichols, Psy. D, Mental Health Director
Dr. Marc Turgeon, Psychiatrist
Dr. Robert Shambaugh, Psy.D  Psychologist

The meeting began with an explanation that the purpose of this meeting is to conduct a Mortality Review, as is required by NCCHC Standard J-A 10.  The review is to assess and determine the appropriateness of the clinical care; whether corrective action in terms of policies, procedures, or practices is warranted; and whether there are trends requiring further study.  This is also a Peer Review protected from disclosure by the Pennsylvania Peer Review Protection Law; that means what is said here and later put in writing is confidential and solely for the benefit of those in attendance.

| | |
|---|---|
| **Death of:** | Kruger, John Harry |
| | LNCP No. 11-0241 |
| **DOB:** | 04-22-1960 (50) |
| **Booking Date:** | 01-18-2011 |
| **Charges:** | Simple Assault |
| **Housing Unit:** | MHU |
| **Cause of Death:** | Multiple Traumatic Injuries |
| **Date of Hospitalization:** | 03-22-2011 |
| **Date of Death:** | 03-22-2011 |
| **Time of Death:** | 2341 |
| **Pronounced by:** | Dr. John Lee (LGH) |
| **Autopsy:** | Lancaster County Coroner - Dr. Ross |
| | Preliminary Report—Multiple Traumatic Injuries |

CONFIDENTIAL

PCM02189

Initial Intake Screening:     01-18-2011 @ 1328
Initial Health Assessment:  01-18-2011 @ 1338
14 day PE:                        01-29-2011 @ 0313

**Diagnoses:**
- Psychotic Disorder (Not otherwise specified)

**Allergies:**
- NKMA

**Prior Surgical History:**

- NONE

Please note that the above medical history was obtained as self reported by the patient at the time of incarceration.

**Current Medications at the time of death.**

- NONE

**Clinical Administrative Review:**

In reviewing the medical records and discussing with the individual staff members present there was no medical indication that Mr. Kruger was in any imminent distress or danger. Mr. Kruger was committed to Lancaster County Prison on the day of January 18, 2011 at which time his intake screening was completed. He did not report being on any medications and did not report being under a doctors care at the time of incarceration. The Medical Assistant (Tina Trudel) on intake noted that patient was mumbling to self acting nervous, anxious and scared at which time a referral was made to mental health. Inmate was seen by Dr. Stein of the PrimeCare mental health team and placed on suicide level II. On January 24, 2011 information was obtained from family of Mr. Kruger's personal physician and a release for records was obtained. Records were received from Dr. Rice (Mr. Kruger's physician) and it was noted of past family history of diabetes but no medical conditions were found for Mr Kruger himself. It was determined that Mr. Kruger was most recently seen on January 17, 2011 by his private physician for depression due to numerous stressors and a recent call to crisis intervention had been placed on January 16, 2011. PrimeCare Mental health continued to follow Mr. Kruger's care on nearly a daily basis through February 9, 2011 and thereafter had visited with in at a minimum of one time a week. Mr. Kruger was seen by Dr. Turgeon, psychiatrist (PrimeCare Medical) on February 1, 2011 and was diagnosed with psychotic disorder. It was reported that inmate was not eating and a food log was initiated on January 31, 2011 to ascertain that inmate was receiving appropriate nutritional intake. During this time period the inmate did not eat/drink anything on 2/2/11 thru 2/3/11; Refused 5 meals (out of a total of 21) 2/7/11 thru 2/13/11; began normal intake again on 2/15/11 and food log discontinued on 2/21/11 due to normal intake. A referral was made to the PrimeCare medical doctor for consult to rule out any organic cause. Dr. Young evaluated the inmate on February 2, 2011 and a CT scan of the head was ordered. The CT scan was completed on February 14, 2011 and noted as no acute intracranial findings by Dr. Young on February 15, 2011. No further medical evaluation or testing was ordered. On March 22, 2011 at 1815 hrs a code blue was called in MHU. Upon arrival it was reported



PCM02190

that inmate jumped from the upper tier sustaining a laceration to his head. EMS was called at 1823. Dressings were applied to the inmates head and a cervical collar applied. He was secured to a long spine board and moved to medical department to await EMS. During immobilization inmate stated he wanted to be let up from the backboard and did not need to be treated, inmate also stated he didn't want to live. EMS arrived at 1830 and transported Mr. Kruger to Lancaster General Hospital at 1836. Per prison records inmate was admitted about 1950. An updated report from Lancaster General Hospital report received at 2238 and the nurse in trauma department said that some end of life decision making may be needed soon. IM was combative and responsive while in ED and when the trauma team received him he began to crash quickly. IM was intubated and has a reported pneumothorax and a chest tube was placed; IM has a brain herniation and is currently enroute to the OR for a craniotomy; there is visible right shoulder deformity and several fractured ribs; IM has a right temporal parietal scull fracture; Other injuries are being uncovered as assess continues. At 2234 another update was received that Mr. Kruger had massive internal bleeding and he was being cleaned up and returned to the trauma room. Bob Resch (brother-in-law) was notified of the situation and was reporting to LGH with IM's sister Cynthia. Inmate ceased to breath at 2341 hours on March 22, 2011 and was pronounced dead by Dr. John Lee.

**Clinical Mortality Review: Completed by Mae Caleb, MD**

DOB  04-22-1960
DOD  03-22-2011
SS#   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

Clinical Course:

Mr. Kruger was incarcerated on January 18, 2011 and the intake process was completed and appropriate referral was made to PrimeCare mental health team. There were no medical concerns noted at the time of intake. On February 1, 2011 Mr. Kruger was referred to Dr. Young by Dr. Turgeon for evaluation to rule out any organic cause. On February 2, 2011 Dr. Young evaluated the patient and a CT scan of the head was ordered. The CT scan was completed on February 14, 2011 and results were reviewed by Dr Young on February 15, 2011 with results of no acute intracranial abnormality. Dr Young again evaluated Mr. Kruger on February 8, 2011 due to report of refusing to eat or drink with no new interventions initiated, inmate was placed on a food log by nursing previously. On review of the food logs inmate had entirely missed 9 meals during the period of 1/31/11 thru 2/6/11, missed 5 meals during time period of 2/7/11 thru 2/13/11, Mr Kruger then began and continued to eat on a regular basis. Mr. Kruger, per witnesses, jumped from the upper tier on the evening of March 22, 2011 and later that same evening expired during treatment at Lancaster General Hospital.

**Psychological Review:**

See attached report from Dr. Robert Nichols, Psy D, Director of Mental Health.



**Administrative Review:**

The Warden's administrative review is pending at this time.  A Root Cause Analysis is being conducted by the prison and final report will be submitted with the findings of this group.

**Post Presentation – Response/Discussions by Participants:**

**Corrective Action to be taken:**

1) Inmates with severe symptoms will be reviewed at least weekly.  This will be accomplished by weekly provider meetings with the mental health supervisor, NP/PA, medical doctor, psychiatrist, HSA and DON.

2) When referrals are made to the medical doctor by the psychiatrist, or vice versa, after the consult is completed a direct conversation should occur between them and a chart note entered by both.

3) Any medical records received and the Master Problem list indicates past mental health issues a task must be created for the review of these records by the psychiatrist. Once completed a chart note must be entered.

4) Inmates with serious mental illness are to be reviewed on a weekly basis with the mental health staff and Deputy Warden of Inmate Services.

5) Increase the height of the railings on the upper tier of the Medical Housing Unit.

6) All inmates assigned to housing on the lower tier of MHU be limited to the bottom tier and not be allowed access to the upper tier.

7) Those inmates with serious mental health illness, or after incarceration is determined to be at risk, be housed on the on the lower tier only.


Confidential and Privileged Information

Mortality Review


The medical record of John Harry Kruger is sealed. PrimeCare Medical, Inc reserves the right to reopen this review dependant on the results of the autopsy as they are not available at this time.


Respectfully Submitted,


Kevin C. Frantz, RN

Acting Health Service Administrator

April 11, 2011



PCM02192

### Psychological Review

| | |
|---|---|
| **Name:** | John H. Kruger |
| **Place of Incarceration:** | Lancaster County Prison |
| **Date of Birth:** | April 22, 1960 |
| **Date of Death:** | March 22, 2011 |
| **Reviewed:** | Medical Record |
| | Staff Reports on Suicide |
| | Intake documents |
| **Prepared by:** | Robert M. Nichols, Psy. D. |

**Background Information** – John H. Kruger is a 50 year-old married white male who was born in Lancaster, Pennsylvania. He lists his residence as 7 Graftin Circle, Lancaster, Pennsylvania. He graduated high school and reported that he completed additional education after high school. He was unemployed at the time of his arrest. He was employed most of his life as a HVAC technician. It is not known specifically when he became unemployed however, it was at sometime prior to January 2011.

On January 18, 2011, John Kruger was arrested in Lancaster, Pennsylvania on a charge of simple assault. It was reported that he had assaulted his wife Debra whom had a protection from abuse order on him at the time of the assault. It is unclear as to when the protection from abuse order was filed as John reported living with his wife up to his arrest. This was John's first incarceration and it appears that this was also the first time he was charged with a criminal offense.

No information was provided on John's institutional record. However, the medical record indicates he was screened for segregation housing twice, on February 5 and February 10. Additionally, there are several entries noting John's reluctance to return to his cell after being seen by medical staff, and his refusal to be celled with another inmate. None of the reports included indicate any assaultive behavior.

Records indicate he experienced a great deal of stress regarding his arrest, incarceration, his family, and his financial situation. He had adjustment problems that remained unresolved throughout his time in prison. There is no reported family history of substance abuse or mental illness.



PCM02193

John H. Kruger
DOD: March 22, 2011
Page 2

**Description of Suicide Act** – On March 22, 2011 at 6:18pm, Corrections Officer (CO)
Wesley Williams was on the Medical Housing Unit (MHU) serving the evening meal
when he heard a "loud bang". CO Williams went to investigate the cause of the noise and
found John Kruger lying on the floor in a "fetal position". CO Williams asked Kruger if
he was all right when Williams noticed he was bleeding from his head. Williams called a
"code blue". Medical and prison staff responded immediately. Kruger was breathing and
conscious, telling medical staff to leave him along that he did not want their help.
Medical staff bandaged his head, placed a neck collar on him, and then placed him on a
backboard before placing him on the stretcher. During this process, Kruger became
combative and struggled, which necessitated staff restraining him to prevent him from
causing further harm to himself.

Kruger was taken to the medical department to await emergency medical service (EMS)
for transport to the hospital. 911 was contacted at 6:23pm and they dispatched emergency
medical services (EMS) to the prison. EMS arrived approximately 6:30pm, and relieved
medical staff. EMS departed from the prison at 6:36 pm on route to Lancaster General
Hospital. Kruger arrived at LGH at 7:50 pm. He was later pronounced dead at 11:41pm.

**Presence of Suicide Risk Factors**

Historical Factors – The intake assessment indicated John Kruger displayed signs of
depression, anxiety, and was acting strangely. He reported he suffered a head injury on
that day but there is no further information available on the injury. Kruger also reported
he attempted suicide 10-15 years before by carbon monoxide but did not provide further
details. He denied any history of psychiatric treatment. He stated the last time he saw a
physician was on January 11, but no specifics are provided.

Kruger's mental health history, based on outside medical records, indicates Kruger was
treated for depression since 1991. He took antidepressants from 1991 to 2007,
specifically Imipramine and Effexor. However, he had not taken medication for the past
four years. It appears he suffered from Major Depression for at least the last 20 years of
his life.

He denied any history of drug use but admits to alcohol use of one six pack at a time once
a month. Other records indicate his admitted alcohol use was about one to two six packs
per weekend. He denied any current medication.

He denied any thoughts of suicide, but admitted one prior attempt that occurred 10 to 15
years before using carbon monoxide poisoning. There is no documentation in prison
records indicating impulsivity, violence, or acting out behaviors with the exception of the
instant criminal offense, simple assault.

CONFIDENTIAL

John H. Kruger
DOD: March 22, 2011
Page 3

Environmental Factors - John Kruger is a married 50-year-old white male. He lived with
his wife and daughter until the time of his arrest. He had been experiencing several
significant stressors before his arrest. He was unemployed, his father was terminally ill,
he was experiencing financial difficulties secondary to the loss of employment, and was
faced with the possibility of losing his home. According to his primary care physician
(PCP), Kruger's coping mechanisms were failing.

On January 16, 201, Kruger, accompanied by his wife, went reluctantly to see his PCP.
His wife was concerned that he was suicidal. John had been very depressed and
expressed to other family members that he was thinking about killing himself. His wife
was concerned about leaving him unattended that if given the chance he might kill
himself. At the PCP's insistence, John reluctantly agreed to seek psychiatric help and
counseling in lieu of immediate hospitalization. John did not want to take any
antidepressants. The following day January 17, 2011, John physically assaulted his wife
by reportedly attempting to strangle her. Details surrounding this incident are not known.

In addition to the above stressors, it should be noted that there was considerable friction
and discord among various family members and John's wife Debra.

Precipitating factors - Kruger was seen by Elicia Stein, Psy.D. on January 19, 2011. He
reported having suicidal thoughts and was placed on suicide precautions, stripped cell,
and 15-minute checks. He remained on this status until January 26, when it was upgraded
by Robert Shambaugh, Psy.D. to psychiatric observation, 30-minute checks. Kruger
remained on psychiatric observation until March 22, when he committed suicide. From
his initial mental health assessment through March 22, Kruger suffered from delusional
thinking and paranoia in addition to depression. At times, Kruger also reported
hallucinations. He refused to take a shower and had poor hygiene, often he would refuse
to eat his meals. Kruger was often uncooperative or minimally cooperative with
assessments or provided only limited information. He consistently refused to take
medication or accept psychiatric hospitalization.

Kruger was seen and assessed by Primecare Medical mental health staff frequently from
January 19 to March 16. He was referred to the psychiatrist and was seen by Dr. Turgeon
on February 1 due to concerns regarding his paranoid delusions, hallucinations,
depression, and anxiety. Initially Kruger refused to be seen by mental health staff. He
was indifferent to questions asked. He refused to take medication, and did not provide
basic information. Dr. Turgeon then referred Kruger to the physician to rule out medical
reasons for Kruger's apparent psychotic symptoms, e.g. hallucinations, paranoia. Dr.
Young saw Kruger on Feb 2 and ordered a CT scan, which was performed several days
later and was normal. No other diagnostics were ordered. Kruger was again referred to



John H. Kruger
DOD:  March 22, 2011
Page 4

Dr. Young on Feb 8 to evaluate him because he was refusing to eat or drink. Dr. Young
ordered a food log and monitoring of vitals, noting that the inmate was psychotic.

On January 24, Robert Shambaugh received a telephone call from John's brother-in-law
stating that John's father had died the day before. The family tried to get John bailed out
to attend the funeral. Shambaugh attempted to coordinate an involuntary commitment
with posting of bail by John's family so John would be able to attend his father's funeral
and go to the hospital for psychiatric treatment. On February 1, 2011 Shambaugh filed a
302 and contacted county crisis, however the crisis worker refused to accept the 302
petition and it was denied. Despite this, John refused to accept bail under those
conditions. He continued to be paranoid, and refused to accept hospitalization or
medication. Although medication was prescribed to John over a period of approximately
a week, he only took medication one time and was otherwise noncompliant.

Regarding existing social support, there appeared to be family support from his brother in
law, mother, and several other family members. However, he apparently remained at
odds with his wife and never spoke with her during his time in Lancaster County Prison.
He expressed several times that he wanted to "go home" and did not seem to understand
why he was in prison and the "reality of this situation". It seems due to his paranoia and
delusions he was unable to accept treatment and therefore his condition did not improve
throughout his time at LCP. He was in contact with family members via telephone
several times, and on at least one occasion, this was done with Robert Shambaugh when
he was trying to get John to accept psychiatric treatment as a condition of bail.

**Lethality factors involved in suicide** – On March 22, 2011 at approximately 6:20pm,
John Kruger jumped off the upper tier in the medical housing unit head first in an obvious
attempt to kill himself. Several surveillance cameras captured this. In reviewing the video
from the event, it is clear John jumped under his own volition. Before jumping, John can
be seen looking out of his cell to the right and left to make sure no one was in the area
before he climbed the railing and jumped. Provided this information it is clear that John
deliberately jumped off the tier head first with the intent to kill himself. The medical
records do not indicate any significant change in behavior in the week preceding John's
suicide. His symptoms and presentation were consistent throughout his incarceration with
few exceptions e.g. hallucinations reported several times but not consistently, and several
periods heightened anxiety such as when he was going to court and when he was to be
housed with a cellmate.

No suicide note was reported found on John's person or in his cell.

**Psychological factors** – John had an extensive history of mental illness for at least 20
years prior to his incarceration. According to the records from his PCP, he was treated



John H. Kruger
DOD: March 22, 2011
Page 5

with antidepressants, Imipramine and Effexor from 1991 to 2007. After 2007, it does not
appear that he was taking antidepressants; at least there is no record to indicate that he
continued with this medication. John also had one documented suicide attempt 10 to 15
years ago, however the details surrounding this event were not available, and John
refused to discuss it further than he tried to kill himself by carbon monoxide poisoning.
Similarly, John reported drinking alcohol about once a month and about a six-pack of
beer each time. His PCP documented that John had a problem with alcohol and that he
needed to cut down on its use due to concerns of weight and risk for diabetes. The PCP
noted that John admitted he drank at least a six-pack a day on the weekend. Whether this
self-report is accurate is not known but typically persons under report their actual alcohol
use.

Throughout his incarceration, John consistently experienced delusional thinking,
depression, anxiety, and was paranoid. He refused to accept medication, and even refused
to be bailed out of prison, possibly due to his paranoia or the condition that he be
hospitalized for psychiatric treatment. John also was experiencing significant stressors at
the time of his arrest for reportedly choking his wife and subsequent incarceration. John
was unemployed, he feared losing his house, and his father was terminally ill. John's wife
took him to see his PCP on January 16, because she feared he was going to hurt himself
or commit suicide, as his depression was so great. Unfortunately, the PCP did not pursue
involuntary commitment at that time. Instead, it was deiced that John would seek
psychiatric treatment and therapy and if he did not follow through that the PCP
recommended to John's wife that she pursue involuntary commitment.

**Conclusions/Recommendations** – It is clear from the video record that John Kruger
intended to take his life. The timing of the suicide act, his looking around before he
climbed the railing to make certain no one was there to interfere, and his method,
jumping head first off the upper tier so that he would strike the concrete floor head first
all support this conclusion. It is unclear why he chose to commit suicide when he did.
Records indicate a consistent presentation of psychiatric symptoms during his
incarceration (paranoia, delusions, depression, anxiety). He also experienced
hallucinations and intense anxiety at several different times.

John experienced several stressors, which at times were similarly more acute, e.g. his
father's death, his court appearance, however these did not result in any suicidal behavior
or reported suicidal thoughts. According to the records John was a poor historian and
often uncooperative with mental health assessments. He either refused to answer specific
questions or provided only limited information. Thus, it was difficult to evaluate John's
mental status accurately. Further, John consistently refused treatment including a plan to
bail him out of jail to seek psychiatric hospitalization. He also refused all medication. It is


CONFIDENTIAL

PCM02197

10/05/2011 WED 15:34   FAX 717 295 2057                                      ☒012/061

John H. Kruger
DOD: March 22, 2011
Page 6

not clear from the records whether his refusal to accept treatment options was primarily influenced by his paranoia, his refusal to accept that he has mental illness or both.

After reviewing the available records, it appears that LCP staff did everything possible to save John Kruger's life after he jumped off tier and received critical injuries. Further, there is no evidence to suggest that LCP staff knew or should have known that John Kruger was an imminent risk for suicide before he jumped off the tier. The following recommendations are based on the review of the available records.

1. Inmates exhibiting severe symptoms of mental illness, (i.e. psychosis, delirium, dementia) should be followed closely. They should be reviewed on at least a weekly basis by the psychiatrist, psychologist(s), and HSA or director of nursing. Additional consultation, assessment, or testing should be ordered by the psychiatrist when the inmate remains symptomatic for more than two weeks and/or to assist in the diagnosis and treatment of the inmate. Referrals should be made to the physician in cases where organicity or delirium is suspected. The physician should perform a physical examination and diagnostic testing to rule out possible medical causes for psychiatric symptoms.

2. When referrals for consultation are made between providers, e.g. psychiatrist refers inmate to physician to rule out medical causes for psychiatric symptoms or the physician refers an inmate to the psychiatrist for an assessment, the provider, once they have completed the assessment will contact the referring provider directly and discuss the findings. Tasking a response such as "completed" or "nothing found" is not sufficient, providers are expected to speak with each other when reporting their findings. The providers are to document the details of the consult in the inmate's chart.

3. When medical records are received from outside providers such as hospitals, physicians, agencies, etc., the psychiatrist is to be tasked; informing him of the presence of the medical records whenever an inmate has a psychiatric psychological problem listed on the master problem list.

4. Inmates with serious mental illness that are either refusing treatment or fail to improve for 15 days are to be reported via email to the Director of Mental Health.

5. Inmates with serious mental illness are to be reviewed on a weekly basis with mental health staff and the Deputy Warden of Inmate Services.

 CONFIDENTIAL

PCM02198

John H. Kruger
DOD: March 22, 2011
Page 7

    6.  Inmates with significant unresolved symptom of mental illness (e.g.
        psychosis, delirium, and dementia) are to remain in the medical housing unit
        and are not to be housed on the upper tier.

_____        Date
Robert M. Nichols, Psy.D.
Psychologist
Director of Mental Health
Primecare Medical, Inc.



PCM02199

10/05/2011 WED 15:35   FAX 717 295 2057                                    ☑025/061

Lancaster County Prison
# Clinical Mortality Review
## (9J-A-10) (P-A 10), 1999 (Y-11)

### Date: August 18, 2011

## Confidential and Privileged Information

**Participants:**
Vincent Guarini, Warden
Tammy Moyer, Executive Assistant to Warden Guarini
Joseph Shiffer, Deputy Warden of Inmate Services
Kenneth Arnold, Deputy Warden of Operations
Todd Haskins, Vice President of Operations
Kelly Ehrich, Jr.  Vice-President of Operations
Kevin Frantz, RN Acting Health Service Administrator
Jennifer Miosi, Director of Nursing
Dr. Robert Shambaugh, Psy.D  Psychologist

The meeting began with an explanation that the purpose of this meeting is to conduct a Mortality Review, as is required by NCCHC Standard J-A 10. The review is to assess and determine the appropriateness of the clinical care; whether corrective action in terms of policies, procedures, or practices is warranted; and whether there are trends requiring further study. This is also a Peer Review protected from disclosure by the Pennsylvania Peer Review Protection Law; that means what is said here and later put in writing is confidential and solely for the benefit of those in attendance.

| | |
|---|---|
| Death of: | McNamara, Matthew Thomas |
| | LNCP No. 11-3355 |
| DOB: | 08/29/65 (45) |
| Booking Date: | 07-21-2011 |
| | |
| Charges: | Accident involving death/injury-not properly licensed |
| | Driving while operating privilege suspended/revoked |
| | |
| Housing Unit: | Block 3-5 |
| Cause of Death: | Traumatic Brain injury |
| Date of Hospitalization: | 07/21/2011 |
| Date of Death: | 07/24/2011 |
| Time of Death: | 1515 |
| Pronounced by: | Dr. John Lee (LGH) |
| Autopsy: | NONE |
| | Manner of Death per Coroner:  Suicide |

CONFIDENTIAL

10/05/2011  3:44PM (GMT-04:00)

PCM02200

Initial Intake Screening:    07-14-2011 @ 1620
Initial Health Assessment:   07-14-2011
14 day PE:                   Not completed (Inmate here 7 days)

**Diagnoses:**
- Right rib pain secondary to motor vehicle collision. (Diagnosis by LGH)

**Allergies:**
- NKMA

**Prior Surgical History:**

- NONE

Please note that the above medical history was obtained as self reported by the patient at the time of incarceration.

**Current Medications at the time of death.**

- Tylenol with codeine 4 times a day as needed.

**Clinical Administrative Review:**

In reviewing the medical records and discussing with the individual staff members present there was no medical indication that Mr. McNamara was in any imminent distress or danger. Mr. McNamara was committed to Lancaster County Prison on the day of July 14, 2011 at which time his intake screening was completed. Mr. McNamara reported he was recently treated at LGH following a motor vehicle accident which is confirmed by his discharge instructions from Lancaster General Hospital with a diagnosis of status post motor vehicle accident and status post alcohol intoxication. His intake screening was unremarkable except for admission to smoking marijuana 2 days prior to commitment. He denies any past medical history, mental health history, allergies, surgeries, alcohol or controlled substance abuse. The suicide screening was completed at the time of intake and Mr. McNamara answered all questions and no indications of any suicide risk were given. The patient was referred to the provider for follow-up of the reported right rib injury and was seen by Lori Hostetter, CRNP on 7/15/11. At this time he was continued on Tylenol with codeine for rib pain as needed for rib pain as prescribed by Lancaster General Hospital of which the patient has been receiving until the time of this incident on 7/21/11 in addition to instructions of coughing and deep breathing exercises. Mr. McNamara was scheduled for follow-up on 7/26/11. From 7/15/11 to 7/21/11 there were no sick call requests received from the inmate and no requests from custody staff indicating any need for the inmate to be seen by medical or mental health staff. On July 21, 2011 at approx 0818 hours a medical code was paged for Block 3-5. Medical staff upon arrival were told by correctional staff that inmate jumped from second tier. Inmate was lying supine on floor with correctional staff performing CPR. Patient had large amount of blood present from head wound. Cervical spine immobilization maintained by staff. AED was placed by medical personnel and no shock was advised. Victim remained pulseless and without respirations and CPR with artificial respirations via bag-valve mask continued. A cervical collar was placed on victim. Lancaster Emergency Medical Services arrived and assumed care of



victim who was immobilized on long back board and transported to Lancaster General Hospital. Mr.
McNamara was admitted to the ICU at Lancaster General until the inmate ceased to breath at 1515
hours on July 24, 2011 and was pronounced dead by Dr. John Lee.

**Clinical Mortality Review: Completed by Mae Caleb, MD Medical Director**

DOB  08/29/1965
DOD  07/24/2011
SS#   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

Clinical Course: Mr. McNamara was committed to Lancaster County Prison on July 14, 2011 after
being treated at the Lancaster General Hospital with diagnosis of status post motor vehicle accident and
alcohol intoxication. It was also reported by patient that he sustained a "cracked" rib. Mr. McNamara
had no previous incarcerations at the Lancaster County Prison but did report to the intake Medical
Assistant of previous incarceration at Chester County Prison. He did not specify the reason. He denied
any significant medical history but admitted to smoking marijuana 2 days prior to his incarceration.
The intake screening was reviewed and was unremarkable for medical conditions, mental health
disease, suicidal ideation or attempts. He had no history of allergies to medication. Mr. McNamara was
seen by Lori Hostetter, CRNP on 7/15/11 for follow-up after his discharge from the Lancaster General
Hospital the previous day. He was continued on Tylenol with codeine for rib pain and scheduled for
follow-up on 7/26/11. His medical course was otherwise unremarkable with no requests for medical
attention up until July 21, 2011. On July 21, 2011 at approximately 8:15am a Code Blue was called
after the patient reportably jumped from the second tier. Medical staff responded in a timely manner.
CPR was in progress by the correctional staff. The cervical spine was immobilized throughout the
emergency process. This includes application of a stiff neck cervical collar. The AED was applied with
no shockable rhythm noted. EMS was summoned and the patient was transported to the Lancaster
General Hospital for further evaluation and treatment. The patient was treated in the Emergency
Department and admitted to the Neuro Trauma Unit. He was on a ventilator at that time. He remained
on the ventilator with no change in his condition. Mr. McNamara expired and was pronounced at 1515
on July 24, 2011 by Dr. John Lee. The case was referred to the County Coroner and the case was not
accepted therefore no autopsy was performed. The Cause of Death was Traumatic Brain Injury. The
Manner of Death-Suicide per the County Coroner.


**Psychological Review:**

See attached report from Dr. Robert Nichols, Psy D, Director of Mental Health.



**Administrative Review:**

The Warden's administrative review was conducted. All incoming phone calls were reviewed
which was a total of 5 calls all with Mr. McNamara's wife. There was no indication that Mr.
McNamara was at risk for suicide. The video footage from the incident of July 21, 2011 was

reviewed with several different camera views obtained. Mr. McNamara was out for his block out time and had been sitting at the day room table for 13minutes and 30 seconds occasionally looking around the room and stretching. At approximately 0815 hours the inmate arose from the table and climbed the stairs to the second tier, climbed over the railing and jumped. Security and medical personnel responded appropriately to administer medical care to include CPR. The inmate was then transported to Lancaster General Hospital.

**Post Presentation – Response/Discussions by Participants:**

It was requested of each participant in this review for any specific input regarding the Death of Inmate Matthew McNamara. No additional corrections or additions were indicated by all present.

**Corrective Action to be taken:**

1.) Maintain the yearly training in suicide prevention and in addition a review of the suicide prevention and psychological emergencies will be conducted at the next staff meeting.

2.) Discuss with security how medical may be informed at the time of intake of person being incarcerated for high profile crime.

Confidential and Privileged Information

Mortality Review

The medical record of Matthew Thomas McNamara is sealed. PrimeCare Medical, Inc reserves the right to reopen this review.

Respectfully Submitted,

Kevin C. Frantz, RN

Acting Health Service Administrator

August 18, 2011



PCM02203

### Psychological Review

| | |
|---|---|
| Name: | Matthew Thomas McNamara |
| Place of Incarceration: | Lancaster County Prison |
| Date of Birth: | 08/29/1965 |
| Date of Death: | 07/24/2011 |
| Reviewed: | Medical Records, Lancaster County Prison Records |

Prepared by:              Robert M. Nichols, Psy. D.

**Background Information** – Matthew McNamara was a 45-year-old married white male. He was born in Philadelphia, Pennsylvania and last residence was New Holland, Pennsylvania where he resided with his wife. He completed 9 years of education. He reported his occupation as laborer. He was employed at the time of his arrest as a member of the International Union of Painters and Allied Trades, AFL-CIO, District 21, Philadelphia, Pennsylvania.

On July 13, 2011, Matthew McNamara was involved in a car accident which caused the death of one person and serious injuries to a second person while under the influence of alcohol (blood alcohol level (BAC) was 0.17%). He was taken into custody and transported to Lancaster General Hospital for treatment. On July 14, 2011, Matthew was arrested on charges of Accident involving death/injury and not properly licensed, and driving while operator privilege suspended or revoked. He was unable to post the bail of $100,000. Therefore once discharge from hospital, was committed to Lancaster County Prison (LCP) at 1245 hrs.

Several hours later at 1620 hrs, Matthew was interviewed by Estafany Silva, Medical Assistant. She completed the Receiving Screening, Intake Suicide Screening, and Mental Health Screen. All responses on the suicide screen were scored "0" indicating no risk for suicide. On the receiving screen, the only medical problem noted was the recent injury, a cracked rib, from the car accident, was listed. On the mental health screen, the only question endorsed was "Have you ever tried to avoid reminders, or not to think about something terrible that you experienced or witnessed?" It requires six or more items to be endorsed to trigger an automatic referral for a mental health evaluation. Matthew was cleared for general population with the restriction that he is to be kept on a lower bunk due to his injury.



Matthew T. McNamara
DOD: July 24, 2011
Page 2

The following day, July 15, 2011, Matthew McNamara received additional more serious criminal charges, Homicide by vehicle while driving under the influence, Aggravated assault by vehicle while driving under the influence, Driving under the influence (DUI) – general impaired or incapable of driving safely and DUI – first offense of BAC of > 0.16%.

Matthew reported that he felt he would do "fair" with being incarcerated. He reported that he had been incarcerated once before in Chester County Prison for several days. Other than the identified stressor of arrest, incarceration, and interaction with the criminal justice system, no other stressors were indicated or reported by Matthew. He his mood and affect were appropriate and did not feel he needed to see a psychologist or psychiatrist at that time.

Matthew McNamara was incarcerated in Chester County Prison for four days in 2009. He had a prior conviction for a DUI in 1989 and disorderly conduct in 1997. In 2009, he was convicted of another DUI, and possession of marijuana charge.

**Description of Suicide Act –**

At approximately 0820 hours on July 21, 2011, a "loud bang" was heard which was the sound of Matthew McNamara's body striking the floor. CO Simione immediately called a "Code Blue" as he responded to where he was lying face down on the floor. CO Simione assessed McNamara and did not detect a pulse. The first staff to arrive was CO Pena and Sergeants Alberts, Steberger, and Wolfe. CO Simione told Steberger to call 911. Steberger radioed for 911 to be contacted and to send an ambulance to the prison. At this time, staff rolled McNamara onto his back, CO Simione began CPR, and Sgt. Alberts attached the AED to Matthew's chest. Medical staff arrived including Nurses Reynolds LPN, Wynn LPN, and Dickert, LPN. Simione continued to perform CPR and Dickert attempted to clear Matthew's airway and CO Pena attempted to provide oxygen via ambu bag as instructed by nurse Dickert. CO Hersh took over CPR and relieved Simione while staff continued to supply oxygen and breaths via the ambu bag. Twice during CPR, the AED analyzed Matthew but did not deliver a shock. Nurse Frantz arrived and took over CPR from Hersh and continued CPR until relieved by the emergency medical technicians that arrived on the unit at approximately 0831 hours at which time the EMTs took over care of Matthew, placed him on a backboard and gurney. At approximately 0849 hours, the ambulance left the prison for LGH.

Matthew McNamara was admitted to hospital and died several days later on July 24, 2011.

There are no reports of a suicide note being found.



CONFIDENTIAL

Matthew T. McNamara
DOD: July 24, 2011
Page 3


**Presence of Suicidal Risk Factors**

Historical Factors — At intake, Matthew McNamara did not report any history of mental illness. His medical record provides no indication of any depression, anxiety, or adjustment problems at any time in his life. He denied ever having used heroin, opiates, benzodiazepines, cocaine, etc. He did admit to using marijuana two days before his arrest, however, no information on the frequency or duration of use was documented. He also denied ever having used alcohol. Despite the obvious contradiction with his criminal charges, no further quires were made. In 2009, when incarcerated at Chester County Prison, Matthew reported drinking alcohol two times per week, but reported no other drug use.

Matthew reported no medical problems with the exception of his current injury sustained from the motor vehicle accident (MVA). He stated he had a cracked rib, and it hurt to cough for which he was prescribed #3 Tylenol for pain, which he was taking. He was not taking any medication before his arrest.

On July 15, 2011, he was seen by Nurse Practitioner Lori Hostetter for follow-up care for the injuries he sustained in the MVA. Matthew complained about pain in his ribs when he coughed, and tenderness was evident in the lower portion of his anterior ribs. The treatment plan was to continue the Tylenol #3 for the next 10 days, and to "splint ribs" and cough and breathe deeply. A follow-up appointment was scheduled for July 26, 2011. Other than this evaluation, Matthew did not see any other providers (medical or mental health) nor was he scheduled to see anyone in the future other than the nurse practitioner for follow-up.

Environmental Factors — Matthew denied having any thoughts of suicide or self-harm at intake. He also denied ever having attempted suicide or self-harm or of having suicidal thoughts at any time in his life. There are no reports from the police or LGH of suicidal statements or of presenting any risk of suicide from his arrest until he was brought to LCP. There are no indications of any mental health problems in his record. The only indication of any problem is from his arrest for driving under the influence with a blood alcohol level of 0.17%, indicating at least episodic abuse of alcohol, which is confirmed by prior DUI related arrests in 1989 and 2008.

No information is available on his relationship with his family, his work history, and financial situation. Therefore, no determination can be made on his level of functioning, and his ability to manage stress.

Precipitating factors - As discussed previously, Matthew denied any mental health problems or problems with drugs or alcohol. There is no indication, in the information



Matthew T. McNamara
DOD: July 24, 2011
Page 4

reviewed, that Matthew experienced any problems with other inmates or staff at LCP, or difficulties adjusting or coping with jail. He had no misconducts or official warnings. He did not submit any sick call slips or make any requests to be seen by mental health. There is no record of Matthew having any visitors, but since he was a recently committed to LCP, he may not have been permitted visitors. It is not known whether he made any phone calls, or attempted to make any phone calls to family or friends. This information might be useful in understanding Matthew's decision to commit suicide.

Given that, there is little information available on which to base conclusions as to the reason(s) Matthew committed suicide, the possibility that guilt over the MVA may have been a factor in his suicide should be considered. However, caution must be exercised in assuming it is the only, or even primary reason he committed suicide. Further, without detailed information on the rest of Matthew's life and history, can guilt over the MVA, be ascribed as *the* reason Matthew committed suicide.

**Lethality factors involved in suicide** – At approximately 0820 hours on July 21, 2011, Matthew McNamara jumped off the upper level tier on Unit 3-5. He struck the concrete floor headfirst. He apparently remained unconscious from that time until his death on July 24, 2011.

The records do not indicate any significant change in behavior during Matthew's incarceration. Inmates reported that he was quiet and kept to himself.

**Psychological factors** – Matthew McNamara has no documented history of mental illness. He did not report any problems to medical or custody staff before he committed suicide. There were documented instances of alcohol abuse in his history, but there is insufficient information to determine if he had alcohol dependency. He did not report taking any psychotropic medication before his incarceration nor is there any report of him having taken it as an adult.

**Conclusions/Recommendations** –

No suicide risk factors were identified in the discharge paperwork from LGH and Matthew McNamara's medical history he provided at intake. He specifically denied having suicidal thoughts nor did he have any prior reported suicide attempts. Information on his behavior while in jail likewise did not indicate any risk of suicide. Therefore, there was no way medical/mental health staff and prison staff could have anticipated he would commit suicide.



10/05/2011   3:44PM (GMT-04:00)

PCM02207

Matthew T. McNamara
DOD: July 24, 2011
Page 5

Prison staff, both custody and medical, should be commended on their response to the medical emergency and the treatment they provided to Matthew McNamara after he jumped off the tier on 3-5 unit. They were able to provide emergency treatment and stabilized Matthew until the EMTs arrived. Unfortunately, his injuries were too severe for him to survive and he died several days later.

The following recommendations are made on the review of available records

1.   Staff should continue yearly training in suicide prevention policy and procedures.

2.   Staff should continue to maintain certification in CPR and first aid.

3.   Medical staff should review during the receiving screen process and address any differences between the medical screening and the custody screening.

4.   Discuss how medical can be informed at intake when a person is being committed for a notorious crime, high profile crime, etc. so that the assessment and referral process can appropriately address these factors.

5.   Send for all records of previous psychiatric and psychological treatment if known or discussed.

6.   When calling for medical personnel during a medical emergency, staff are reminded to provide essential details on the nature of the medical emergency, i.e. inmate jumped from upper tier, inmate not breathing, inmate found hanging, etc.

_____                    Date
Robert M. Nichols, Psy. D.
Director of Mental Health
Primecare Medical, Inc.

CONFIDENTIAL



PCM02208

Lancaster County Prison
# Clinical Mortality Review
# (9J-A-10) (P-A 10), 1999 (Y-11)

### Date: October 24, 2011

## Confidential and Privileged Information

**Participants:**
Vincent Guarini, Warden
Major Ed Klinovski
Tammy Moyer, Executive Assistant to Warden Guarini
Todd Haskins, Vice President of Operations
Kelly Ehrich, Jr.  Vice-President of Operations
Kevin Frantz, RN Acting Health Service Administrator
Tara Houser, Director of Nursing
Dr. Robert Shambaugh, Psy.D  Psychologist
Dr. Mae Caleb, MD Medical Director

The meeting began with an explanation that the purpose of this meeting is to conduct a Mortality Review, as is required by **NCCHC Standard J-A 10.**  The review is to assess and determine the appropriateness of the clinical care; whether corrective action in terms of policies, procedures, or practices is warranted; and whether there are trends requiring further study.  This is also a **Peer Review** protected from disclosure by the **Pennsylvania Peer Review Protection Law;** that means what is said here and later put in writing is confidential and solely for the benefit of those in attendance.

| | |
|---|---|
| **Death of:** | **Snyder, Ronald Andrew** |
| | **LNCP No. 11-4662** |
| **DOB:** | **08/14/1985 (26)** |
| **Booking Date:** | **09/27/2011** |
| **Charges:** | **Rape of Unconscious Person** |
| **Housing Unit:** | **Block 3-5** |
| **Cause of Death:** | **Passive Hanging** |
| **Date of Hospitalization:** | **Not Hospitalized** |
| **Date of Death:** | **09/28/2011** |
| **Time of Death:** | **1905** |
| **Pronounced by:** | **Eric Bieber, Deputy Coroner** |
| **Autopsy:** | **9/29/2011** |
| | **Manner of Death:  Suicide** |

CONFIDENTIAL

|                            |                                     |
|----------------------------|-------------------------------------|
| **Initial Intake Screening:** | **09-27-11 @ 2036**              |
| **14 day PE:**             | **Not completed (Inmate here 1 day)** |

**Diagnoses:**
- Narcotic Withdrawal-Percocet (not prescribed)

**Allergies:**
- NKMA

**Prior Surgical History:**

- NONE

Please note that the above medical history was obtained as self reported by the patient at the time of incarceration.

**Current Medications at the time of death.**

- Bentyl 20 mg three times a day
- Hydroxyzine Pam 50mg three times a day
- Pepto Bismol 30 cc by mouth two times a day as needed
- Phenergan 25mg Injection or by mouth every 6 hours as needed

**Clinical Administrative Review:**

In reviewing the medical records and discussing with the individual staff members present there was no medical indication that Mr. Snyder was in any imminent distress or danger. Mr. Snyder was committed to Lancaster County Prison on the day of September 27, 2011 at 1100hrs with a charge of Failure to Appear His intake screening was completed at 2036hrs on the same day (over 8 hours after commitment) to include suicide screening, ppd placement/Vital signs, and receiving screening. There were no risk factors identified on the suicide screening and his vital signs were within normal limits. On the receiving screening Mr. Snyder admitted to casual consumption of alcohol last consuming alcohol more than a month ago and use of Percocet 30mg 3 to 4 times daily for the past year last taken the morning prior to commitment. The patient denies being under the care of a physician at this time. Past medical history included a head injury of undetermined origin several years ago. Mr. Snyder denied any mental health history and did not request to see mental health. The receiving intake was reviewed by nursing at 1:00am on September 28, 2011 and tasks were created for detox checks and to be seen by the provider. Detox checks were initiated as a nursing measure; however no call was placed for any further detoxification orders. Mr. Snyder was seen by Lori Hostetter, CRNP at 1037 hours on September 28, 2011. The inmate reported to provider that he was experiencing cold sweats, nausea, vomiting and diarrhea. On exam there were no tremors noted and his skin was warm and dry. Detoxification medications were ordered and started, the inmate was scheduled for follow-up in one week. At 1745hrs on September 28, 2011 a "Code Blue" was called on Block 3-5 for cell 4033. It was reported to medical staff upon response that patient was found hanging. Patient was lying on floor supine facing the doorway upon arrival. It was noted that CPR was initiated immediately in addition to notification of EMS. The AED was applied with no indication for shock advised and no pulse



palpated. EMS arrived and applied their cardiac monitor, automated CPR machine and intraosseous access obtained (cannulation into bone marrow for medication therapy). Advanced Life Support was continued with no response to therapy and treatment was ceased at 1806hours. The patient was moved via stretcher to the medical department to await the Lancaster County Coroner. At 1905 hours the patient was declared dead by Chief Deputy Coroner Eric Bieber. The patient was removed from the prison by the Coroners Office.

## Clinical Mortality Review: Completed by Mae Caleb, MD Medical Director

```
DOB   08/14/1985
DOD   09/28/2011
SS#   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
```

Clinical Course:

The complete medical record of patient Ronald Andrew Snyder was reviewed. Mr Snyder was committed on September 27, 2011. His intake was completed and it was self reported to the use of Percocet up to 120mg daily which was not prescribed by a licensed provider. Mr. Snyder was placed on detox watch by the nursing staff and referred to the medical provider the next day for evaluation of his detoxification from Percocet. Mr. Snyder was evaluated by Lori Hostetter, CRNP on September 28, 2011 and appropriate medication therapy was initiated and started with a scheduled follow-up scheduled for 1 week. No other medical issues were reported by the inmate at the time of intake or during the evaluation by the provider. He also denied medical care by a physician prior to incarceration. On the afternoon of September 28, 2011 a code blue was called after Mr. Snyder was found hanging in his cell. Emergency Procedures were initiated by custody and medical personnel in addition to summoning EMS. Advanced Life Support was performed by EMS and despite their efforts Mr. Snyder did not recover and pronounced dead at 1905hours on September 28, 2011 by the coroner.

## Psychological Review:

See attached report from Dr. Robert Nichols, Psy D, Director of Mental Health.

## Administrative Review:

The Warden's administrative review was conducted. The inmate had no mental health history, the criminal charges were over 6 months old and the inmate had been in jail briefly in March 2011. He had returned from a bail hearing in court and exhibited no unusual behaviors at that time. He was on an initial classification of "house alone" due to newspaper articles as per standard protocol to assess any potential retaliation by unknown inmates, due to this coverage. During the evening meal distribution he was found unresponsive in his assigned cell in the processing unit. A full investigation was conducted by Lancaster City Police and the Lancaster County Coroners Office. Cause of death was listed as passive hanging.



**Post Presentation – Response/Discussions by Participants:**

It was requested of each participant in this review for any specific input regarding the Death of Inmate Ronald Snyder.

**Corrective Action to be taken:**

1) Intakes will be reviewed by the HSA or DON for compliance of the 4 hour receiving screening being completed in addition to necessary treatment, referral, and medications being initiated in a timely manner.

2) All officer screening sheets to be reviewed and initialed by the medical personnel completing the receiving screening to make certain they are aware of any reported problems with the patient prior to commitment to Lancaster County Prison.

3) Complete review and revision of the intake process by both the prison administration as well as medical staff.

4) Medical department and mental health to be made aware of all high profile cases/charges upon commitment or return from court to assess the need for initiation of suicide watch if warranted. Prison administration has instituted a set of 3 questions which are being asked on the inmates return from court.

5) Development and distribution of an informational pamphlet regarding mental health services available to the patients.

Confidential and Privileged Information

Mortality Review

The medical record of Ronald Andrew Snyder is sealed. PrimeCare Medical, Inc reserves the right to reopen this review.



Respectfully Submitted,

Kevin C. Frantz, RN
Acting Health Service Administrator
October 24, 2011



CONFIDENTIAL

PCM02213

### Psychological Review

**Name:**                         Ronald A. Snyder Jr.
**Place of Incarceration:**       Lancaster County Prison
**Date of Birth:**                08/14/1985
**Date of Death:**                08/29/2011
**Reviewed:**                     Medical Records


**Prepared by:**                  Robert M. Nichols, Psy. D.


**Background Information** – Ronald Snyder was a 26 year-old single never married white male. He was born in Lancaster, Pennsylvania and last residence was listed as Round Top Rd Elizabethtown, Pennsylvania. This is also the residence of his mother, Cheryl Snyder. He is a high school graduate having completed 12 years of education. He reported his occupation as laborer. He was employed at the time of his arrest by DAS Distributors in Elizabethtown, Pennsylvania.

On September 27, 2011 at 1100 hours Ronald was committed to Lancaster County Prison on a Bench Warrant for "Failed to Appear". Ronald was on bail for a charge of Rape of an Unconscious Person. The transporting law enforcement officers reported no specific concerns regarding medical problems or psychiatric problems. They specifically indicated they did not believe he was a danger to himself or others.

The medical intake for Ronald was not completed until 2036 hours. At that time, Estefany Silva MA noted that Ronald reported no medical problems or history of medical problems. Likewise, he reported no history of mental illness. The suicide intake screen indicated no risk for suicide and no risk factors were noted on the form. No referrals were made to mental health or psychiatry.

Ronald did report a history of opiate dependency. He reported taking 30 mg of Percocet three to four times a day for the past year. According to Silva, Ronald stated the last time he had taken Percocet was "this morning" however; Silva noted that the last time he took any Opiates including Percocet was "yesterday" or September 26, 2011. Ronald denied any history of using other drugs such as marijuana, cocaine, methamphetamines, etc. He did report use of alcohol about once a month (typically a couple of shots and a six-pack of beer). Silva then placed Ronald on a detox checks for cocaine and noted in his chart "Cocaine Withdrawal". Silva also created a task where she wrote, "Please obtain detox



Ronald A. Snyder Jr.
DOD: September 28, 2011
Page 2

orders – Percocet off street daily". Neither the psychiatrist nor physician was called for medication orders.

About five hours later at 0053 hours on September 28, 2011 Shannon Rudy LPN performed a detox check, noting "complaints of back pain and chills." Despite Ronald's obvious symptoms of opiate withdrawal, no call was made to the psychiatrist or physician at that time either.

Several minutes later at 0100 hours, Laura Rineer, LPN reviewed the intake forms and apparently missed the obvious contradictions on the intake form. Rineer also failed to note that Ronald was already experiencing withdrawal symptoms. Rineer made no changes or corrections to the intake information, nor did she change the medical problem "Cocaine Withdrawal" to "Opiate Withdrawal". She also did not contact the psychiatrist or physician.

The following morning at 0951 hours Tara Houser RN completed the task "Please obtain detox orders – Percocet off street daily" by noting *Completed Appointment.*" It is unclear what if anything Houser did when she completed this task.

Later at 1041 hours, Lori Hostetter NP examined Ronald who at this time was reporting "cold sweats, nausea, vomiting, and diarrhea." Ronald told Hostetter he was taking at least 120 mg of Percocet a day for the past year. Hostetter ordered an opiate detox and prescribed medication at this time. She scheduled a follow-up appointment in one week. Ronald began receiving detox medication at 1200 hours.

**Description of Suicide Act –**

At sometime after 1200 hours, Ronald Snyder was taken to court for arrangement. He was returned to LCP, time unknown. Later at approximately 1745, he was discovered hanged in his cell in unit 3-5. A medical emergency was called and the following medical staff reportedly responded: Wynn LPN, Bernard LPN, Gordon LPN, Miosi RN, Anaya MA, Silva MA, and Dr. Caleb MD. Wynn noted that Ronald Snyder was found laying on the floor and was unresponsive. Wynn then told Sgt. Probst to call 911, which occurred at 1742. CPR was conducted by CO Zielinski, and CO Pena assisted by providing ventilations with the Ambu bag. Wynn applied the AED and it advised no shocks. CO Zielinski alternating with CO Morningstar and Gordon LPN continued CPR. EMS arrived at 1755 and assumed care of Ronald Snyder. EMS pronounced Ronald dead at 1806 and transported his body to the medical department to await the coroner. The coroner arrived at 1905 and pronounced Ronald Snyder

There are no reports of a suicide note being found.



Ronald A. Snyder Jr.
DOD:  September 28, 2011
Page 3

**Presence of Suicidal Risk Factors**

Historical Factors – At intake, Ronald Snyder did not report any history of mental illness.
His medical record provides no indication of any depression, anxiety, or adjustment
problems at any time in his life. He reported opiate dependency. He was using illegally
obtained Percocet, 120 mg or more per day for the past year. He denied use of marijuana,
cocaine, methamphetamines or any other drugs or abuse.

There is no reported history of suicidal behavior or previous self-harm. His criminal
record is apparently limited to the instant offense; Rape of an Unconscious Person.

Environmental Factors – Ronald denied having any thoughts of suicide or self-harm at
intake. He also denied ever having attempted suicide or self-harm or of having suicidal
thoughts at any time in his life. There are no reports from the transporting officer of
suicidal statements or of Ronald presenting any risk of suicide.

No information is available on his relationship with his family, his work history, and
financial situation. There is insufficient information to make a determination of his level
of functioning, and his ability to manage stress.

Precipitating factors - As discussed previously, Ronald denied any mental health
problems. He did admit to an opiate dependency, using illegally obtained Percocet for the
past year. There is no indication, in the information reviewed, that Ronald experienced
any problems with other inmates or staff at LCP, or that he experienced any difficulties
adjusting or coping with jail. There is substantial evidence to indicate that he was
experiencing opiate withdrawal.

He had no misconducts or official warnings. He did not submit any sick call slips or
make any requests to be seen by mental health. It is not known whether he made any
phone calls, or attempted to make any phone calls to family or friends. This information
might be useful in understanding Ronald's decision to commit suicide.

Despite the fact that there is little information available on which to base conclusions as
to the reason(s) Ronald committed suicide, it is possible that the withdrawal he was
experiencing was a contributory factor in his suicide. However, caution must be exercised
in assuming it is the only, or even primary reason he committed suicide. Additional
known stressors include problems related to interaction with the legal system including
incarceration.



Ronald A. Snyder Jr.
DOD:  September 28, 2011
Page 4


**Lethality factors involved in suicide** – At approximately 1745 hours on September 28, 2011, Ronald Snyder was found hanged in his cell on Unit 3-5. It is not known how long he was unconscious. Emergency efforts to revive him were unsuccessful and he was subsequently pronounced dead at 1806 by EMS.


**Psychological factors** – Ronald Snyder has no documented history of mental illness. He did not report any problems to medical or custody staff before he committed suicide. He report an addiction to opiates. He further reported alcohol use. He did not report taking any psychotropic medication. There were no reports of excessive anxiety, agitation, or depression found in the medical record or on the custody intake form.


**Conclusions/Recommendations** –
The single identified suicide risk factor was opiate withdrawal. This was not identified on suicide intake screen (#17 Detainee appears to be under the influence of alcohol or drugs, if yes is detainee incoherent or showing signs of withdrawal or mental illness). Ronald reported Percocet abuse, and had documented withdrawal symptoms two hours after his intake screening was completed. Had this been noted on the suicide intake screen Ronald would have been placed on suicide watch which may have prevented his suicide.

Ronald specifically denied having suicidal thoughts nor did he have any prior reported suicide attempts. There is no documented behavior, other the opiate withdrawal, which would indicate a risk of suicide. Therefore, once the suicide screen was completed and #17 was not marked in the affirmative, no one seems to have considered Ronald's withdrawal symptoms as a risk for suicide.

Custody staff should be commended on their response to the medical emergency and the treatment they provided to Ronald Snyder after he was discovered hanged on 3-5 unit. They provided CPR until EMS arrived and assumed care for Ronald Snyder. Medical staff also provided support, specifically in the placement and use of the AED. Unfortunately, his injuries were too severe for him to survive and he was pronounced dead at the scene.

The following recommendations are made on the review of available records

1.   Estafany Silva and Laura Rineer's performance related to Ronald Snyder should be reviewed. In addition, it is recommended that an audit be completed on a sample of their work (i.e. a review of their medical documentation and related performance).

CONFIDENTIAL

Ronald A. Snyder Jr.
DOD:  September 28, 2011
Page 5

2.    Staff should continue to maintain certification in CPR and first aid.

3.    Medical staff should perform a meaningful item by item review of intake
      screening by critically examining the intake forms and subsequent referrals,
      tasks, doctor's orders, etc.

4.    Discuss how medical can be informed at intake when a person is being
      committed for a notorious crime, high profile crime, etc. so that the
      assessment and referral process can appropriately address these factors. This
      continues to be an ongoing problem.

5.    Send for all records of previous psychiatric and psychological treatment if
      known or discussed.

_____          _____
Robert M. Nichols, Psy. D.                    Date
Director of Mental Health
Primecare Medical, Inc.

CONFIDENTIAL

PCM02218

0Lancaster County Prison
Clinical Mortality Review
May 16, 2013
Conference Room 11:00AM
Confidential and Privileged Information
Mortality Review

**Participants:**
Paul Smeal, Acting Warden
Joe Shiffer, Deputy Warden
Michael Billy, Deputy Warden
Tammy Moyer, Director of Administration
Ashley Garcia, Executive Assistant
Todd Haskins, Vice President of Operations PCM
Kelly Rhoads, Assistant Regional Manager PCM
Robert Nichols, Psy.D., Director of Mental Health
Stephanie Meyer, Health Service Administrator


**Facilitated By:**
Dr. Robert Nichols, Psy.D., Director of Mental Health
Stephanie Meyer, Health Service Administrator


The meeting began with an explanation that the purpose of this meeting is to conduct a Mortality Review, as is required by **NCCHC Standard J-A 10.** The review is to assess and determine the appropriateness of the clinical care; whether corrective action in terms of policies, procedures, or practices is warranted; and whether there are trends requiring further study. This is also a **Peer Review** protected from disclosure by the **Pennsylvania Peer Review Protection Law;** that means what is said here and later put in writing is confidential and solely for the benefit of those in attendance.

| | |
|---|---|
| **Death of:** | **Wisniewski, Matthew Clayton** |
| | **LNCP No. 13-1830** |
| **DOB:** | **06-01-1984 (28)** |
| **Booking Date:** | **4/25/13 7:38am** |
| **Charges:** | **Parole Violation** |
| **Housing Unit:** | **G-1** |
| **Cause of Death:** | **Autopsy report is pending** |
| **Date of Death:** | **4/28/2013** |
| **Time of Death:** | **3:05pm** |
| **Pronounced by:** | **Dr. Edavettal** |
| **Autopsy:** | **Pending** |

CONFIDENTIAL

**Initial Intake Screening:      4/25/2013 at 10:19am**
**Initial Health Assessment: History and Physical Examination was**
**scheduled to be performed on 5/7/2013. Patient expired prior to**
**assessment being completed.**

**Other Diagnoses:**
- **History of chronic back pain**
- **History of bursitis right olecranon**
- **History of anxiety**

**Allergies:**
- **NKMA**

**Prior Surgical History:**
- **History of back surgery**

Please note that the above medical history, is stated by medical documentation obtained with the consent of this patient by the Lancaster County Prison medical staff and affirms documentation of diagnostic findings and treating physician's progress notations that had been received and read by this medical department's practitioners and is part of the medical record.

**Current Medications:**
- Doxepin 25mg PO TID
- Paxil 60mg PO QD
- Vistaril 50mg PO TID PRN

**Chart Summary:**

Mr. Wisniewski was admitted to Lancaster County Prison on 4/25/2013.  On 4/25/13 at 1009 Mr. Wisniewski's intake suicide screening was completed by E. Abernathy. His initial medical intake was completed by E. Abernathy, LPN on 4/25/13 at 1019 by E. Abernathy. Mr. Wisniewski's medication verification was completed on 4/25/13 at 1028. On 4/27/13 at approximately 1332 hours a "Code Blue" was called for G-1. Medical staff were directed to cell 2110 to find the inmate sitting on lower bunk slouched to the right side after being cut down by the officers. Per security the inmate was found actively hanging from the top bunk by correctional staff. Mr. Wisniewski was unresponsive with a white cloth ligature knotted multiple times around his neck. The white cloth ligature was removed from inmate's neck. The inmate was without any pulse or respirations and was lowered to the floor by medical staff. CPR was initiated by C. Hohenwarter, LPN and rescue breathes via Ambu bag were performed by J. Shuey, LPN. S. Rudy, LPN called 911 immediately. AED pads were applied to inmate's chest. Upon application of the pads the AED did not turn on. A second AED was placed and "no shock was advised." CPR continued as EMS arrived at 1340 hours. The inmate was intubated by EMS personnel. An intraosseous line was performed by EMS and IV fluids and epinephrine were administered. The inmate was transported via backboard out of the cell and onto the stretcher to the ambulance. Mr. Wisniewski was transported to Lancaster General



Hospital Emergency Department at 1355 hours. Mr. Wisniewski was pronounced dead at Lancaster General Hospital by Dr. Edavettal on 4/28/2013 at 1505 hours.

**Administrative Review/Actions:**
Per Deputy Warden Billy a telephone call between Mr. Wisniewski and his girlfriend occurred the day before and they discussed finding him dead in a year's time.

See attached letter from Acting Warden

**Post Presentation – Response/Discussions by Participants:**


**Corrective Actions:**

1. There were five new Cardiac Science AED's were ordered for the prison.
2. Emergency checklist continues to be completed by the charge nurse at the beginning of every shift including checking the battery function and checking pad expiration dates every shift.
3. "Burst" training for suicide prevention is being provided by Mental Health to officers and ancillary prison staff.
4. Posting for County Prison Mental Health Tips and Information for Residents was placed in the Prison lobby for family/visitor education.
5. Mental Health Services Handout continues to be given at commitment.
6. Records from psychiatric hospitalizations or inpatient substance abuse treatment facilities must be requested for anymore that received treatment in the past year.
7. All emergency equipment is to be taken to every "Code Blue" including guerney with backboard, AED, oxygen, emergency medical bag, and wheelchair.


Confidential and Privileged Information
Mortality Review
May 16, 2013

The medical record of Wisniewski, Matthew Clayton. is sealed.

Respectfully Submitted,

Stephanie Meyer, RN, BSN
Health Service Administrator
May 16, 2013

CONFIDENTIAL

**Comprehensive Clinical Review**

| | |
|---|---|
| **Name:** | Matthew Clayton Wisniewski |
| **Place of Incarceration:** | Lancaster County Prison |
| **Date of Birth:** | June 1, 1984 |
| **Date of Death:** | April 28, 2013 |
| | |
| **Reviewed:** | CorEMR, Incident Reports, Log Sheets, |
| | Hospital Records, Local Newspaper Articles |
| | |
| **Prepared by:** | Robert M. Nichols, PsyD |



**Background Information** – Matthew Clayton Wisniewski, was a 28-year-old single white male. He was born in Apple Valley, California. He lived at 104 Eagle Drive, Ephrata, Pennsylvania with his fiancé/girlfriend Melissa Schmuck. He also had two children from former relationships. He was a graduate of the Washington Education Center, an alternative school in the Ephrata School District. He was employed by D. & M. Concrete in Reamstown, Pennsylvania.

**Criminal History** – Matthew was committed to Lancaster County Prison (LCP) on April 25, 2013 for a county parole violation. It was also noted that on April 24, he was also charged with making terroristic threats against his mother, Gloria Ludwig. Ludwig reported to police that Matthew told her "he should break her neck and punch her in the face and break her jaw." Bail for this offense was set at $5,000.



Matthew Clayton Wisniewski
DOD: April 28, 2013
Page 2

Records indicate Matthew was incarcerated at Lancaster County Prison seven times prior to this commitment beginning in 2007. At that time he was charged with recklessly burning or exploding and other charges resulting from an incident with his then girlfriend when he set fire to her clothing and threatened to set her on fire. He served 9 months for that offense which carried a maximum of 23 months, with 3 additional years of probation.

Matthew spent over two years out of the past six years in LCP (twelve months from November 2008 to November 2009, four months from June 2010 to October 2010, seven months from March 2012 to October 2012, and four months from December 2012 to March 20, 2013). His criminal convictions include several simple assaults, resisting arrest, a DUI, several disorderly conducts, two thefts, and numerous public drunkenness charges. Matthew also had an extensive criminal record as a juvenile.

**Medical History –** Matthew's medical history included the following problems chronic back pain, bursitis, and low blood pressure. He had back surgery 10 years ago and continued to experience pain since that time for which he received treatment for both in and out of jail.

**Psychiatric History –** Matthew's psychiatric history includes three reported psychiatric hospitalizations. He was involuntarily hospitalized for suicidal ideation at Ephrata Hospital in 2012. He was also hospitalized at Lancaster General Hospital in December of 2012 at some time last year, possibly for suicidal ideation however the details are not known.

Most recently, in April, he was a patient at Cove Forge, a dual diagnosis treatment center, where according to Matthew he was diagnosed with anxiety disorder and schizophrenia. He was discharged from Cove Forge one-week prior to this incarceration.

Matthew has an extensive history of behavioral problems beginning in adolescence and continuing up to the time of his death. He attended a special education school, Washington Education Center, for behavioral and emotional problems. He reportedly has received psychiatric treatment since the age of 16.

**Drug and Alcohol History –** Matthew began abusing alcohol as an adolescent when he had several underage drinking convictions. His alcohol abuse continued into adulthood and includes one DUI conviction. Matthew admitted to alcohol abuse and heroin abuse as recently as four months ago. He denied abusing any other legal or illegal drugs.



Matthew Clayton Wisniewski
DOD: April 28, 2013
Page 3

His recent treatment at Cove Forge withstanding, there is no documentation of previous drug and alcohol treatment in Matthew's medical record.

**Precipitating Factors** – Matthew was committed to LCP on July 25, 2013 at 0738 hours. He was detained for a county parole violation, and terroristic threats. His last incarceration at LCP was from December 28, 2012 to March 20, 2013.

During his intake, Matthew reported to the booking officers that he was recently treated at Cove Forge for anxiety and schizophrenia and that he was prescribed medication by the psychiatrist at Cove Forge. Custody officers requested that mental health staff assess Matthew based on his reported mental illness. Nursing also tasked mental health to assess Matthew due to his recent treatment at Cove Forge and his previous psychiatric hospitalization in December of 2012 (prior to his last incarceration). Dr. Turgeon was contacted for orders and prescribed Buspar, and Fluoxetine.

The intake suicide screen administered by the intake officer was negative for risk of suicidal behavior as was the screen administered by the medical assistant.

Bonnie Bair, Mental Health Clinician, assessed Matthew at the officers' desk in booking. She documented the assessment by completing a sick call note. She did not complete the Mental Status Examination or the Mental Health Assessment, which is standard practice for all initial assessments by mental health staff for each incarceration. She noted, "Patient reports he is stable on Thorazine, Paxil, Doxepin, and Vistaril" and that he was in jail for "TT". Further, it was noted "Patient denied suicidal ideation and prior attempts" and "Patient denied any psychiatric hospitalizations since his release one month ago. Patients family provides him with support." Ms. Bair also noted Matthew was "alert and oriented; mood was neutral, and congruent with affect". She concluded her assessment by stating, "Patient has a history of anxiety. Patient did not present with features of major mental illness, does not present as a danger to himself or others."

Ms. Bair tasked psychiatry for a follow up assessment "New patient on Doxepin, Vistaril, Thorazine, and Paxil". She further noted that general support would be provided as needed and that Matthew would be seen again at his request. Ms. Bair did not request treatment records from Cove Forge, or other prior psychiatric hospitalizations as is standard practice.

**Description of Suicide Act** – Reportedly CO Maldonado, assigned to G-1 Unit, was the last staff member to see Matthew Wisniewski alive when he performed his *block check* at 1300 hours. Thirty minutes later, at approximately 1330 hours on April 27, 2013, CO Palkowitz



CONFIDENTIAL

Matthew Clayton Wisniewski
DOD:  April 28, 2013
Page 4

while conducting a *block check* discovered Matthew Wisniewski in cell 2110 hanging from a sheet tied to the top bunk.

Palkowitz called *code blue* and went back to the control panel. CO Rohrer and CO Maldonado were the first to arrive on the unit. Palkowitz told the officers "cell 10 is hanging up". Rohrer and Maldonado went to cell 2110 and opened the door. The officers struggled to lift Matthew who was apparently unconscious and had difficulty cutting the bed sheet from the anchor point on the bunk bed. Once Maldonado was able to cut the sheet they laid Matthew down on the bunk bed. The officers were unable to untie the sheet that remained tied around Matthew's neck.

At that time, several nurses arrived at the cell, Shuey, Abernathy, Hohenwarter, and Rudy "with emergency medical equipment". It was noted that Matthew was not breathing. Nurse Shuey was able to untie the sheet from around his neck. She was unable to detect a pulse. Abernathy told Rudy to call 911 and Abernathy then left the cell to get the AED, backboard, and medical bag from medical. Note, Sgt. Lefever reported that he too notified custody staff to use the 'red phone' to 'county-wide' to report "a 30 year old male in cardiac arrest from hanging". Shuey then began performing rescue breathing as Hohenwarter began chest compressions.

Abernathy returned with a AED and medical equipment to the cell. The AED was attached by Sgt. Lefever to Matthew and was found to be inoperable. A second AED was called for and then when that one arrived was attached. The second AED worked properly, advising no shock. CPR was continued by and Abernathy providing rescue breathing with an abu bag and Hohenwarter provided the chest compressions. Medical staff continued CPR until emergency medical service responded on site.

At 1340 hours Lancaster Emergency Medical Services Association, Lancaster City Police, and Lancaster City Fire personnel responded to the scene. Paramedics assumed care for Matthew, and medical staff continued to assist. At the direction of paramedics, Matthew was carried out of the cell and by 1348 hours, paramedics left the prison to transport Matthew to Lancaster General Hospital (LGH). Matthew was kept on life support until April 28, 2013 when he was pronounced dead.

**Conclusions/Recommendations –** Matthew Wisniewski had several historic risk factors for suicide including an extensive criminal history, a history of drug and alcohol abuse, and two psychiatric hospitalizations in the past year, apparently for suicidal ideation. Additionally, Matthew apparently had recent problems with his family, specifically his mother that may or may not have been a chronic source of stress for him. However, the intake suicide screens were negative.



Matthew Clayton Wisniewski
DOD: April 28, 2013
Page 5

Intake officers typically complete the suicide screen in a public, non-private area, which may affect its accuracy. This may also be the situation with the medical screen. It is possible that an inmate interviewed in among other inmates, staff, etc. would be less willing to answer honestly and thus negatively influence the results of the suicide screen.

Similarly when Matthew was assessed by mental health, that too was completed at the officers' desk, which affords no privacy and does not encourage disclosure or engender trust. Further, the mental health assessment, requested due to Matthew's report of having mental illness and recent hospitalizations, was inadequate, and incomplete. First, all initial contacts with patients by mental health staff are to include the mental status exam form and the mental health assessment from, neither of which was completed. Secondly, releases of information were not completed to obtain records from the psychiatric hospitalizations at LGH and Ephrata Hospital. Nor was one completed from Cove Forge where Matthew was a patient just a week before coming to jail. Perhaps if the mental health assessment was completed properly, and additional records were received, the information might have led to a different conclusion and treatment plan.

Since Matthew did not disclose to anyone his suicidal thoughts and intentions, or other immediate factors such as hopelessness, he was not considered at risk for suicidal behavior. The method and manner in which he chose to commit suicide, hanging (lethal), the timing (not likely to be discovered), indicate his intent to take his own life and offers little evidence to any behavior to the contrary.

Recommendations:

1. Initiate a continuous quality improvement (CQI) program for mental health assessments to ensure that assessments meet accepted standards of clinical care and PrimeCare Medical Polices and Procedures.

2. Records from psychiatric hospitalizations or inpatient substance abuse treatment facilities must be requested for anyone that received treatment in the past year. This also needs to be monitored with a CQI since it was recommended on three previous mortality reviews of suicides and still is not being done. This is to be completed when the medical intake is being completed and by mental health staff when appropriate.

3. The problematic use of the phrase *code blue* continues and also was mentioned on two prior suicide mortality reviews. A code blue should <u>only</u> be called when someone is in respiratory distress, not breathing, etc. If it is used for <u>every</u> medical



PCM02226

Matthew Clayton Wisniewski
DOD: April 28, 2013
Page 6

assistance call it ceases to be meaningful and medical staff become accustomed to not bringing along proper medical equipment such as emergency bags, AED, oxygen, etc. In this case, as with other suicides, responding medical staff did not bring these items to the scene when responding, thus creating unnecessary delays in providing emergency treatment.

4. AED units need to be checked on a weekly basis to insure they are operational. A log should be maintained of the weekly checks as they are made.

5. Continue to use the Mental Health Services Handout at commitment. Provide the Visitors Handout on mental health and suicide to family and friends that come to visit inmates.

6. Mental health staff will review how to conduct suicide risk assessments.


Prepared by:


_____                      _____
Robert M. Nichols Jr, PsyD                                              Date



**Lancaster County Prison**
**Clinical Mortality Review**
**May 7, 2014**
**Conference Room 11:00AM**
**Confidential and Privileged Information**
**Mortality Review**
**Final Draft**

**Participants:**
Dennis Molyneaux, Warden
Joe Shiffer, Deputy Warden
Michael Billy, Deputy Warden
Edward Klinovski. Major
Tammy Moyer, Director of Administration
Crystal Clark, Solicitor
Andrea McCue, Chief Clerk
Todd Haskins, Vice President of Operations PCM
John Wickizer. LPC Mental Health Supervisor
Dr. Marc Turgeon. DO. Psychiatrist
Robert Nichols, Psy.D., Director of Mental Health
Stephanie Meyer, Health Service Administrator

**Facilitated By:**
Dr. Robert Nichols, Psy.D., Director of Mental Health
Stephanie Meyer, Health Service Administrator

The meeting began with an explanation that the purpose of this meeting is to conduct a Mortality Review, as is required by **NCCHC Standard J-A 10.** The review is to assess and determine the appropriateness of the clinical care; whether corrective action in terms of policies, procedures, or practices is warranted; and whether there are trends requiring further study.  This is also a **Peer Review** protected from disclosure by the **Pennsylvania Peer Review Protection Law;** that means what is said here and later put in writing is confidential and solely for the benefit of those in attendance.

| | |
|---|---|
| **Death of:** | **Kanney, Patrick Joseph** |
| | **LNCP No. 14-1690** |
| **DOB:** | **11-2-1987 (26)** |
| **Booking Date:** | **4/19/2014 10:35am** |
| **Charges:** | **Theft from motor vehicle; loitering and prowling at night** |
| **Housing Unit:** | **G-1** |
| **Cause of Death:** | **Autopsy report is pending** |
| **Date of Death:** | **4/23/2014** |

CONFIDENTIAL

| | |
|---|---|
| **Time of Death:** | **5:30 pm** |
| **Pronounced by:** | **Laura Lee Yoder, Nurse Practitioner** |
| **Autopsy:** | **Pending** |

**Initial Intake Screening:    4/19/2014 at 1:30pm.**
**Initial Health Assessment: History and Physical Examination was**
**scheduled to be performed on 5/3/2014. Patient expired prior to assessment**
**being completed.**

**Other Diagnoses:**
- **History of substance abuse**
- **History of post traumatic stress disorder**
- **History of attention deficit hyperactivity disorder**
- **History of bipolar disorder**

**Allergies:**
- **Haldol**

**Prior Surgical History: unknown**

Please note that the above medical history, is stated by medical documentation obtained with the
consent of this patient by the Lancaster County Prison medical staff and affirms documentation
of diagnostic findings and treating physician's progress notations that had been received and read
by this medical department's practitioners and is part of the medical record.

**Current Medications:**

- Wellbutrin 75mg by mouth daily
- Klonopin 0.5mg (3tablets) by mouth twice daily
- Bentyl 20mg by mouth three times daily
- Vistaril 50mg by mouth twice daily
- Zofran 4mg by mouth three times daily as needed
- PeptoBismol 30cc by mouth twice daily as needed

**Chart Summary:**

Mr. Kanney was admitted to Lancaster County Prison on 4/19 /2014. On 4/19/14 at 1009 Mr.
Kanney's intake suicide screening was completed by Jaycees Candelario, MA. His initial
medical intake was completed by Jaycees Candelario, MA on 4/19/14 at 1330 hours by Jaycees
Candelario, MA. Mr. Kanney's medication verification was completed on 4/19/14 at 1345 hours.
On 4/21/14 Mr. Kanney was brought to medical at approximately 1230 hours by security for his
initial detox evaluation to be completed by a medical provider. While Mr. Kanney was waiting to
be seen he asked the officer if he could use the inmate bathroom and entered the bathroom



CONFIDENTIAL

around 1240 hours. Correctional Officer Miller, William knocked at the bathroom door and receiving no response from the inmate, a call was placed to security supervisors at 1255 hours. Sergeant Maldonado, John arrived in the medical department and opened the inmate bathroom at approximately 1257 hours inmate Kanney was found hanging by his sweatshirt from a metal hook in the bathroom. Medical staff who were in the department were called by security officers and inmate Kanney was cut down by Sergeant Maldonado and lowered to the floor by officers. Mr. Kanney was unresponsive and without any pulse or respirations. AED pads were applied to inmate's chest and CPR was initiated by Stephanie Meyer, RN, H S A. There were no shocks advised.  Rescue breathes were given via Ambu bag by Erica Abernathy, LPN. Jennifer Wynn, LPN called 911 immediately. CPR continued for approximately 10 minutes until EMS arrived at approximately 1307 hours. Upon arrival of EMS an automatic AED machine was applied to Mr. Kanney. Mr. Kenney was intubated by EMS personnel on scene.  Epinephrine and Lidocaine were administered by EMS personnel. Mr. Kanney was placed on a heart monitor and a rhythm was present. The inmate was collared and placed on a backboard and stretcher and transported out of the medical department into the ambulance. Mr. Kanney was transferred to Lancaster General Hospital Emergency Department. Mr. Kanney was placed on life support.  On 4/23/2014 Mr. Kanneys' family made the decision to remove him from life support and he was pronounced dead at Lancaster General Hospital by Laura Lee Yoder, Nurse Practitioner on 4/23/2014 at 1730 hours.

**Administrative Review/Actions:**

See attached letter from the Warden

**Post Presentation – Response/Discussions by Participants:**

**Corrective Actions:**

1. The lock on inmate bathroom door was removed. The metal hook on wall in inmate bathroom was removed by maintenance.

2. Locks on all staff bathroom doors and all treatment area doors in medical were removed by maintenance.

3. Postings on mental health tips with information of what to do if cellmate is suicidal and who to report it to will be placed on all prison housing areas.

4. The brochure for County Prison Mental Health Tips and Information for Residents remains in the Prison lobby for family/visitor education. This brochure will continue to be handed out to all inmates during the intake process.

5. Staff will be educated on staff entries placed into CorEMR after the actual time of evaluation must be noted in entry.



Confidential and Privileged Information

Mortality Review

May 7, 2014

The medical record of Kanney, Patrick Joseph is sealed.

Respectfully Submitted,

Stephanie Meyer, RN, BSN

Health Services Administrator

May 7, 2014

CONFIDENTIAL

## Comprehensive Clinical Review

| | |
|---|---|
| **Name:** | Patrick Joseph Kanney |
| **Place of Incarceration:** | Lancaster County Prison |
| **Date of Birth:** | November 2, 1987 |
| **Date of Death:** | April 23, 2013 |
| **Reviewed:** | CorMER, Incident Reports, Police Reports, Booking Information |

| | |
|---|---|
| **Prepared by:** | Robert M. Nichols, PsyD |

**Background Information** – Patrick Joseph Kanney was a 26-year-old single white male. He reported his address as 8181 Wyndam Road, Pennsauken, New Jersey. His place of birth is not known. He reported that his highest completed grade was 10th grade. He reported receiving special education while in school. His vocational history is not known, he listed his job skills as "laborer".

**Commitment Information** – Kanney was committed to Lancaster County Prison (LCP) on April 19, 2014 at 1035 hrs. on charges of theft, and loitering and prowling. His bail was $50,000. He was arrested in Ephrata Pennsylvania the prior evening, April 18, at approximately 2200 hrs.

Several hours after Kanney was booked into LCP (approx.. 1300 hrs.), nursing performed a "Rapid Screen". They also noted that Kanney brought medication (Wellbutrin and Vistaril) with him that he received at Camden County Prison. At 1449 hrs., nursing contacted Toby Catone, the physician's assistant (PA), for orders. Cantone ordered a detox protocol be implemented and for nursing to contact the psychiatrist for "benzo orders". Kanney was placed on Detox Watch at this time. Nursing then contacted the psychiatrist, Dr. Martin MD, who ordered a Klonopin taper. Nursing did not inform the psychiatrist that Kanney was taking Wellbutrin and Vistaril at this time.

The receiving health assessment and intake suicide screening were completed at 1830 hrs. on April 19, 2014. The suicide screen did not indicate a possible risk for suicide. However, Kanney did endorse several risk factors including 1) no family or friends in the community, 2) experienced significant loss in past six months – lost his home and job, 3) worried about other major problems – homeless, 4) patient has mental health treatment history, and 5) patient has history of drug or alcohol abuse. He denied any past suicide attempts or current thoughts of suicide.

CONFIDENTIAL

Patrick Joseph Kanney
DOD:  April 23, 2014
Page 2

Kanney also reported several psychiatric hospitalizations however he could not remember when
or where he was hospitalized. Further, Kanney stated he was using one to two bundles of heroin
a day and two to three Xanax per day. Kanney also reported bringing in Wellbutrin and Vistaril
with him when he was arrested. These were prescribed for him at Camden County Jail.

Kanney was tasked to mental health for an evaluation due to his history of psychiatric
hospitalizations.

Dr. Martin was called for additional orders for the Wellbutrin and Vistaril on April 20 at 0027
hrs. Dr. Martin ordered Wellbutrin 75mg, he ordered Vistaril 75 mg to begin once the Vistaril
taper was completed.

The mental health nurse was tasked on April 20 at 0848 hrs. to follow-up with psychiatry for
Vistaril orders when taper is completed.

**Medical History** – Kanney has a history of Gonorrhea, Chlamydia, and genital warts. He also
has an extensive substance use history dating back to adolescence. In the past, he has used PCP.
He also admits to heroin and Xanax use daily, and occasional alcohol use. He received substance
abuse treatment on at least two occasions in the past. The first, at Episcopal Hospital in 2008,
second at Penn Foundation in 2011, and his most recent at Seabrook House in 2012. The latter
two were treatment programs which he failed to complete.

At the time of his arrest, he was using a significant amount of Heroin and Xanax that he
purchased illegally on the street.

No other medical problems were documented.

**Psychiatric History** – During his intake, Kanney stated he had many psychiatric hospitalizations
but could not remember when or where. Later, when seen by mental health, he reported a history
of treatment for Bipolar Disorder, Attention Deficit Hyperactivity Disorder (ADHD), and Post
Traumatic Stress Disorder (PTSD).

Kanney was recently received psychiatric treatment while at Camden County Jail. He was
released from there on March 18, 2014.

Kanney is allergic to Haldol.

**Precipitating Factors** – Kanney was committed to LCP on April 19, 2014 on charges of theft
and loitering and prowling. He recently lost his job and his home and at the time of his arrest was
homeless. He had no support system in the area. Kanney told the intake nurse that he had a five-



CONFIDENTIAL

PCM02233

Patrick Joseph Kanney
DOD: April 23, 2014
Page 3

year history of heroin and Xanax abuse. He also had a mental health history beginning in school where he received special education possibly due to having ADHD. He also was diagnosed with Bipolar Disorder and PTSD in the past.

Kanney was evaluated due to his history of mental health treatment by Bonnie Bair, mental health clinician on April 21, 2014 at 1035 hrs. At that time, Kanney complained of "hearing voices and seeing little people". He had poor sleep and his appetite was fair. Cognitively he was alert and oriented, his mood was neutral and congruent with affect, and his speech was coherent. Ms. Bair assessed Kanney with Opiate Dependency. Further she stated he did not present with danger to self and denied suicidal ideation. Ms. Bair's plan was to refer to psychiatry as patient is on medication. Cleared for general population.

**Description of Suicide Act** – See Clinical Mortality Review, Chart Summary.

Additional information, no suicide note was found. Prison staff report Kanney did not make any suicidal statements during phone calls, and had no visits.

There were verbal reports during the mortality review that two inmates reported Kanney had said that he wanted to kill himself but they did not report it to any staff before Kanney committed suicide.

**Conclusions/Recommendations** – Kanney reported several risk factors for suicidal behavior including a history of mental illness dating back to adolescence and substance dependency for the past five years. In the past six months lost his job and his home.

He also reported past incarcerations in Camden County New Jersey the last of which was March of this year. Reportedly, sheriff's deputies from Camden County contacted LCP records staff at some point in time after Kanney was committed to LCP. Their interest in him is not known.

At commitment, Kanney denied any suicidal thoughts during both the booking process and several hours later during his medical intake. Two days later, he was seen by Bonnie Bair, M.A. a mental health clinician and once again denied any suicidal thoughts. Ms. Bair concluded that he was not at risk of suicidal behavior. Two hours later he was found hanged in the inmate restroom in the medical department. There are no reports that he had disclosed his intent to staff or other inmates before he committed suicide. Further, there are no reports of him completing a suicide note or discussing his intentions on a phone call or during a visit.

It is not known how long he considered suicide before hanging himself. Unless he was aware of the restroom in the medical department, it would seem to be that his action was impulsive. It seems less likely that he decided on committing suicide and used the opportunity in the restroom



Patrick Joseph Kanney
DOD:  April 23, 2014
Page 4

to act unless he had prior knowledge of the restroom in medical and the fact that it locked from
the inside.

The following recommendations are made based on review of available records:

1.  Consider restricting the restroom in medical from inmate use and require them to use the
    facilities in their cell prior to coming down to medical.

2.  Discuss medical documentation. Forms are not completely filled out and there are entries
    dated after Kanney committed suicide.

3.  Mental health staff will schedule a meeting to review and discuss this case.

4.  Intake Mental Health pamphlet is given to all new commitments. Also, post a copy of this
    on unit bulletin boards.

5.  Facility should review locations of inmate use bathrooms and other inmate accessible
    rooms throughout the facility (i.e. closets). These areas should be assessed for protrusion
    and locking mechanism, etc.

_____        _____
Robert M. Nichols, PsyD                Date
Director of Mental Health
Primecare Medical, Inc.

CONFIDENTIAL

PCM02235