## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|  |  |  |
|---|---|---|
| JAMES CARROLL and MARY CARROLL, | : | CIVIL ACTION |
| As Co-Administrators of the ESTATE OF | : | |
| PATRICK J. KANNEY, | : | |
|          Plaintiffs | : | |
| | : | NO. 16-1580 |
|   v. | : | |
| | : | |
| LANCASTER COUNTY, et al., | : | |
|          Defendants | : | |

_____

**Henry S. Perkin, M.J.**                                                          **March 14, 2018**

## MEMORANDUM

       This matter is before the Court on the Motion for Summary Judgment of Defendants, William Miller and Tyler Phillips filed on November 10, 2017, Defendants Lancaster County, Warden Dennis Molyneaux, and Sergeant Maldonado's Motion for Summary Judgment filed on November 16, 2017, and the Motion of PrimeCare Medical Defendants for Summary Judgment filed on November 16, 2017. On March 7, 2018, the parties filed a stipulation dismissing all claims against Defendant Enos Martin, M.D. See Dkt. No. 98. Having reviewed and considered the contentions of the parties, the Court is prepared to rule on the pending motions for summary judgment.[1]

_____

[1]      Specifically, the Court considered the Motion for Summary Judgment of Defendants, William Miller and Tyler Phillips (Dkt. 50) and accompanying Exhibits MP1 through MP5 filed on November 10, 2017; the Memorandum of Law in Support of the Motion for Summary Judgment of Defendants, Miller and Phillips (Dkt. 50) filed on November 10, 2017; Plaintiffs' Response to Defendant Miller's and Phillips' Motion for Summary Judgment (Dkt. 58) and accompanying Exhibits A through GG filed on November 30, 2017; Plaintiffs' Statement of Material Facts in Dispute (Dkt. 58-1) filed on November 30, 2017; the Reply Memorandum of Law of Defendants Miller and Phillips to Plaintiffs' Response to the Defendants' Motion for Summary Judgment (Dkt. 59) filed on December 6, 2017; the Response of Defendants Miller and Phillips to Plaintiffs' Statement of Material Facts in Dispute (Dkt. 60) filed on December 6, 2017; the Motion of PrimeCare Medical Defendants for Summary Judgment (Dkt. 51) filed on November 16, 2017; the Brief of PrimeCare Medical Defendants in Support of Their Motion for Summary Judgment (Dkt. 51-1) filed on November 16, 2017; the Statement of Material Facts of PrimeCare Medical Defendants in Support of Motion for Summary Judgment (Dkt. 52) and accompanying Exhibits A through V filed on November 16, 2017; Plaintiffs' Statement of Material Facts in Dispute in Response to PrimeCare Defendants'

## I.  **BACKGROUND**

Based upon the record papers, exhibits, depositions, and the parties' statements of facts, the pertinent facts to this Court's determination are as follows:

Plaintiffs James Carroll and Mary Carroll ("Plaintiffs") are the parents of Patrick J. Kanney ("Kanney").  Compl. ¶ 5.  On April 18, 2014, Kanney was arrested in Ephrata, Lancaster County for theft, loitering, and prowling.  Id. ¶ 19.  Kanney could not post bail and was taken to Lancaster County Prison ("LCP") to be held as a pretrial detainee.  Id. ¶ 20.  Upon being committed to LCP, Kanney underwent intake screenings and health assessments.  LCP Correctional Officer Joshua Zielinski ("Officer Zielinski") performed the initial intake screening of Kanney.  Dkt. 58, Ex. F, Zielinski Dep., pp. 13-16.  During the intake screening, Kanney disclosed to Officer Zielinski that he was "dope sick" and used a bundle a day for three months straight.  Id. at 20-22.  Officer Zielinski also performed a strip search of Kanney, which was documented by Officer Carl Koltz.  Id. at 40-42; Dkt. 58, Ex. G, Koltz Dep., pp. 14-18.  A copy of the intake forms were given to the medical department, PrimeCare.  Dkt. 58, Ex. G, Koltz

---

Motion for Summary Judgment (Dkt. 75) and accompanying Exhibits A through LL filed December 21, 2017; Plaintiffs' Response to the PrimeCare Defendants Statement of Material Facts not in Dispute (Dkt. 76) filed December 21, 2017; Plaintiffs' Response to the PrimeCare Defendants' Motion for Summary Judgment (Dkt. 77) filed December 21, 2017; the Response of PrimeCare Medical Defendants to Plaintiffs' Statement of Material Facts in Dispute in Response to PrimeCare Defendants' Motion for Summary Judgment (Dkt. 82) filed January 3, 2018; the Reply Brief of PrimeCare Medical Defendants in Support of Their Motion for Summary Judgment (Dkt. 85) filed on January 3, 2018; Defendants Lancaster County, Warden Dennis Molyneaux, and Sergeant Maldonado's Motion for Summary Judgment and the Memorandum of Law in Support of Defendants Lancaster County, Warden Dennis Molyneaux, and Sergeant Maldonado's Motion for Summary Judgment (Dkt. 54) filed November 16, 2017; the Statement of Material, Uncontested Facts in Support of Defendants Lancaster County, Warden Dennis Molyneaux, and Sergeant Maldonado's Motion for Summary Judgment (Dkt. 55) and accompanying Exhibits A through O filed November 16, 2017;  Plaintiffs' Response to Defendants Lancaster County's, Warden Molyneaux's and Sergeant Maldonado's Statement of Material Facts not in Dispute (Dkt. 61) filed December 14, 2017; Plaintiffs' Statement of Material Facts in Dispute in Response to Lancaster County's, Warden Molyneaux's and Sergeant Maldonado's Motion for Summary Judgment (Dkt. 62) and accompanying Exhibits A through O and P through LL (Dkt. 63) filed December 14, 2017; and Plaintiffs' Response to Defendant Lancaster County's, Warden Molyneaux's and Sgt. Maldonado's Motion for Summary Judgment  and Memorandum of Law in Support of Response in Opposition to Defendant Lancaster County's, Warden Molyneaux's and Sgt. Maldonado's Motion for Summary Judgment (Dkt. 64) filed on December 14, 2017; Defendants, Lancaster County, Warden Dennis Molyneaux, and Sergeant Maldonado's Response to Plaintiffs' Statement of Material Facts in Response to Defendants' Motion for Summary Judgment (Dkt. 79) filed December 22, 2017; Lancaster Defendants' Reply Brief in Further Support of Their Motion for Summary Judgment (Dkt. 81) filed December 28, 2017.

Dep., p. 31. Jade Fritsch, MA, a PrimeCare employee, conducted a "rapid screen" of Kanney prior to his full medical intake. Dkt. 58, Ex. K, Fritsch Dep., pp. 23-29. The "rapid screen" indicated that Kanney brought two medications into the prison with him, that his pulse was elevated, and that he would be withdrawing from heroin and Xanax, and that he had last used 5 bags of heroin that morning. Id. at 30-36.

Shortly thereafter, Jaycees Candelario electronically completed several forms including a Mental Health Screen for Men, a Receiving Screening and Health Assessment Form, and an Intake Suicide Screen. Dkt. 58, Ex. H, Candelario Dep., pp. 17-19. The Intake Suicide Screening page stated that "[i]f the patient scores 8 or more, a Suicide Watch will be initiated." Dkt. 58, Ex. Y, p. 1. Kanney answered yes to five questions and a Suicide Watch was not automatically initiated. Id. at 1-2. On the Receiving Screening and Health Assessment Form, Kanney indicated that he was addicted to heroin and Xanax and used both the day before entering LCP. Id. at 4. Kanney also indicated that he had not previously tried to commit suicide and that he was not presently suicidal. Id. at 6. On the Mental Health Screen for Men, Kanney answered "yes" to nine of twelve questions. Id. at 11. According to the Mental Health Screen for Men, if a detainee answered "yes" to 6 or more questions, then the detainee should be referred for further mental health evaluation. Id. In the comments section of Kanney's Mental Health Screen for Men, Ms. Candelario indicated that Kanney should be "re evaluate[d]." Id.

Initially, Kristen Zablocki, RN, a PrimeCare employee, issued DOJ Orders for Kanney and placed him on 30 Minute Detox Watch. Dkt. 58, Ex. Z, DOJ Orders, p.1. DOJ Orders refer to medical restrictions on which inmates are placed. Dkt. 57, Ex. G, Kotz Dep., p. 46. Kanney was also placed on work, gym, and yard restrictions and corrections staff were told to assign him a low bunk. Id. Shortly thereafter, and following her exam of Kanney on April 19,

2014, Ms. Candelario updated his DOJ Orders to indicate that the restrictions were to remain in place until a Doctor or Physician Assistant cleared Kanney. Id. at 3.

Katherine ("Katie") Neimer reviewed the intake forms completed by Ms. Candelario. Dkt. 75, Ex. J, Neimer Dep., p. 19. She agreed with Ms. Candelario's completion of the forms. Id. Ms. Neimer called for orders of Kanney's medicines, including Vistaril and Wellbutrin. Id. At the time of her deposition, Ms. Neimer did not recall noticing any inconsistencies between the responses given by Kanney and recorded by Ms. Candelario. Id. at 28. She relied on the information that Ms. Candelario completed to be accurate. Id. at 44.

On April 21, 2014, PrimeCare Medical Staff received a Sick Call Request from Kanney. Dkt. 58, Ex. EE, p.1. On the handwritten form, Kanney indicated that he was hearing strange voices and was overly stressed out. Id. In response to his Sick Call Request, Bonnie Bair, a PrimeCare Mental Health Caseworker, conducted an assessment of Kanney that morning. Dkt. 58, Ex. I, Bair Dep., pp. 22-27. Ms. Bair asked Kanney numerous questions about his symptoms and mental health history. Id. at 41-53. Following her examination, Ms. Bair recommended that sick call requests should be completed as needed. Id. at. 53-54. Ms. Bair indicated that Kanney's mood was neutral and that he denied suicidal ideation. Id. at 56-58. Ms. Bair also recommended that Kanney should be evaluated by a psychiatrist in one week. Id. at 58-59.

On April 21, 2014, Officer William Miller was asked to work a mandatory overtime shift. Dkt. 58, Ex. A, Miller Dep., pp. 28-30. Officer Miller asked to be assigned to the medical unit for this overtime shift. Id. at 32-33. Officer Miller was given a list of approximately eleven inmates, including Kanney, to pick up and bring back to the medical unit. Id. at. 40-41; Dkt. 50, Ex. MP5. Upon returning to the medical unit, the inmates took seats in the

waiting area and Officer Miller positioned himself at the front desk. Id. at 43-44; Dkt. 50, Ex. MP5. Officer Miller did not have any interaction with Kanney prior to April 21, 2014. Id. at 43. Several minutes after arriving in the medical unit, Kanney got up to use the restroom for the first time. Dkt. 50, Ex. MP5. Officer Miller heard Kanney state that his stomach was hurting and that he needed to relieve himself. Dkt. 58, Ex. A, Miller Dep., pp. 50-51. After approximately five minutes, Kanney exited the restroom, adjusted his pants, and returned to his seat. Dkt. 50, Ex. MP5. Two minutes later, Kanney stood up and entered the restroom for the second time. Id. After Kanney had been in the restroom for ten minutes, Officer Miller knocked on the restroom door and then returned to the desk after hearing what he believed to be feet shuffling. Id.; Dkt. 58, Ex. A, Miller Dep., pp.58-59.

Shortly thereafter, Officer Tyler Phillips walked to the front of the medical unit and spoke to Officer Miller. Dkt. 50, Ex. MP5; Dkt. 58, Ex. B, Phillips Dep., pp. 31-32. Then, Officer Phillips walked over to the restroom and listened through the door; he did not hear anything. Id.; Dkt. 58, Phillips Dep., pp. 38-39. Three minutes later, Officer Phillips headed to the back of the medical unit and Officer Miller knocked on the restroom door for a second time and remained there for roughly twenty seconds before he returned to the front desk. Id. Officer Miller did not hear anything from inside the restroom. Dkt. 58, Ex. A, Miller Dep., pp. 62-63. Officer Phillips returned to the front desk and spoke briefly with Officer Miller before heading to the back of the unit again. Dkt. 58, Ex. B, Phillips Dep., pp. 40-41. Officer Miller called for his supervisor, Sergeant John Maldonado, to come to the medical unit and unlock the restroom door. Dkt. 50, Ex. MP5; Dkt. 58, Ex. A, Miller Dep., p. 63; Dkt. 58, Ex. C, Maldonado Dep., pp. 43-45. Approximately one minute later, Officer Phillips instructed the other inmates sitting near the door to move away. Dkt. 50, Ex. MP5. Officer Miller knocked on the restroom door a third

time.  Id.  Sergeant Maldonado entered the medical unit, knocked on the restroom door, waited a few seconds, and then unlocked it.  Id.; Dkt. 58, Ex. A, Miller Dep., pp. 65-66; Dkt. 58, Ex. C, Maldonado Dep., p.47.  Sergeant Maldonado and Officer Miller observed Kanney hanging by his shirt from a hook on the back of the restroom door and immediately called for medical assistance.  Dkt. 58, Ex. A, Miller Dep., pp. 65-67; Dkt. 58, Ex. C, Maldonado Dep., pp. 52-54.  Approximately eighteen minutes elapsed from the moment Kanney entered the restroom for the second time and the moment that Sergeant Maldonado unlocked the restroom door.  Dkt. 50, Ex. MP5.

Various medical personnel rendered aid to Kanney until the paramedics and emergency medical technicians arrived on scene.  Id.; Dkt. 58, Ex. C, Maldonado Dep. p. 55; Dkt. 58, Ex. O, p. 3.  Kanney was transported to Lancaster General Hospital, where he was resuscitated. Dkt. 58, Ex. O, p. 4; Dkt. 58, Ex. W, Postmortem Rep., p. 1.  Kanney's family was notified.  After doctors determined that Kanney had sustained a brain injury which rendered him ventilator dependent, Kanney's family decided to withdraw life sustaining measures.  Dkt. 58, Ex. W, Postmortem Rep., p. 1.  Kanney died on April 23, 2014. Id.  Following an autopsy, Lancaster County Forensic Pathologist Dr. Wayne K. Ross opined that Kanney's cause of death was Passive Hanging and the manner of death was Suicide.  Id. at 6.

## II.    STANDARD OF REVIEW

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 251-252 (1986).  The moving party has the initial burden of informing the court of the basis for the motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party.  Anderson, 477 U.S. at 249.  A factual dispute is material only if it might affect the outcome of the suit under governing law.  Id. at 248.

To defeat summary judgment, the non-moving party cannot rest on the pleadings, but rather that party must go beyond the pleadings and present specific facts showing that there is a genuine issue for trial and cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989) (citing Celotex, 477 U.S. at 325).  The non-moving party has the burden of producing evidence to establish *prima facie* each element of its claim. Celotex, 477 U.S. at 322-323.  If the court, in viewing all reasonable inferences in favor of the non-moving party, determines that there is no genuine issue of material fact, then summary judgment is proper.  Id. at 322; Wisniewski v. Johns-Manville Corp., 812 F.2d 81, 83 (3d Cir. 1987).  When the non-moving party will bear the burden of proof at trial, the moving party's burden can be "discharged by 'showing' - that is, pointing out to the District Court - that there is an absence of evidence to support the non-moving party's case."  Jones v. Indiana Area Sch. Dist., 397 F. Supp.2d 628, 642 (W.D. Pa. 2005) (quoting Celotex, 477 U.S. at 325).

## III.    DISCUSSION

Subject matter jurisdiction in this case is proper pursuant to 28 U.S.C. § 1331. Because Plaintiff's state law wrongful death and survival action claims form part of the same

case or controversy, subject matter jurisdiction over those claims is proper pursuant to 28 U.S.C. § 1367(a).

A.     **Count I – 42 U.S.C. § 1983 – Due Process Clause – Deliberate Indifference to Known Risk of Suicide**

It is clearly established that the suicide of a pretrial detainee can support a recovery under § 1983.  See Colburn v. Upper Darby Township, 946 F.2d 1017, 1023 (3d Cir. 1991) ("Colburn II"); see also Williams v. Borough of W. Chester, 891 F.2d 458 (3d Cir. 1989); Freedman v. Allentown, 853 F.2d 1111 (3d Cir. 1988).  In order to establish liability under § 1983 in prison suicide cases, a plaintiff must prove: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew or should have known of the vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability.  See Colburn v. Upper Darby Township, 838 F.2d 663 (3d Cir. 1988), cert. denied, 489 U.S. 1065, 109 S. Ct. 1338, 103 L. Ed. 2d 808 (1989) ("Colburn I").  To prevail, plaintiff must demonstrate "[a] level of culpability higher than a negligent failure to protect from self-inflicted harm."  Colburn II, 946 F.2d at 1024.

To demonstrate a "particular vulnerability to suicide," plaintiff must present affirmative evidence from which a reasonable jury could conclude that a "strong likelihood" exists that self-inflicted harm will occur.  The "mere possibility" of self-inflicted harm is insufficient.  Id. (quoting Torraco v. Maloney, 923 F.2d 231, 236 (1st Cir. 1991)).  Moreover, even where a strong likelihood exists, the plaintiff must establish that the custodial officials "knew or should have known" of that strong likelihood.  Colburn II, 946 F.2d at 1024.  Whether the custodial officials "knew or should have known" can be demonstrated when the officials have "actual knowledge of an obviously serious suicide threat, a history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities."  Id. at 1025 n.1 (citations omitted).  "The

'strong likelihood' of a suicide must be 'so obvious that a lay person would easily recognize the necessity for preventative action.'" Id. (quoting Monmouth County Correctional Inst. Inmates v. Lanzaro, 834 F.2d 326 (3d Cir. 1987) (citations omitted)).

Finally, "[t]o impose liability under Section 1983, a plaintiff must establish with particularity that the named defendant was directly and personally involved in the deprivation of plaintiff's rights." Payton v. Vaughn, 798 F. Supp. 258, 260 (E.D. Pa. 1992) (citing Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3d Cir. 1976). The plaintiff must either show actual participation, or actual knowledge and acquiescence in the unlawful conduct. Id. (citing Roach v. Kligman, 412 F. Supp. 521, 528 (E.D.Pa 1976)). The doctrine of respondeat superior is inapplicable in § 1983 claims. Id.

1. Correctional Officer William Miller and Correctional Officer Tyler Phillips

Plaintiffs assert that Officer Miller and Officer Phillips knew or should have known of Kanney's vulnerability to suicide because he "was on detox watch and a suicide risk." Dkt. 58, Pls.' Resp., p. 10. Plaintiffs further argue that the Lancaster County Prison detox policy requires corrections officers to perform 30 minute checks of inmates placed on detox watch. Dkt. 58, Pls.' Resp., p. 10-11. Plaintiffs also argue that a jury could infer that Officer Miller and Officer Phillips should have known of Kanney's vulnerability to suicide based on deposition testimony that each would have handled the situation differently if they had actual knowledge of Kanney's vulnerability to suicide. Dkt. 58, Pls.' Resp., p. 10.

Officers Miller and Phillips are entitled to summary judgment because Plaintiffs have failed to produce sufficient evidence to establish *prima facie* the second element of a § 1983 prison suicide case—that "the custodial officers knew or should have known of the

[inmate's] vulnerability" to suicide. <u>Colburn II</u>, 946 F.2d at 1023. It is clear from the record that Kanney was not placed on a suicide watch, so at best, based on Kanney's DOJ Orders, Officers Miller and Phillips were aware or should have been aware that Kanney was on detox (drug withdrawal) watch. DOJ Orders, p. 1-4. "The Court of Appeals for the Third Circuit has clearly and repeatedly held that the increased risk of suicide due to intoxication or drug withdrawal cannot support a deliberate indifference claim." <u>Ferencz v. Medlock</u>, 2014 U.S. Dist. LEXIS 92173, *12 (E.D.Pa. July 8, 2014)(citing <u>Woloszyn v. County of Lawrence</u>, 396 F.3d 314, 322-23 (3d Cir. 2005) and <u>Colburn II</u>, 946 F.2d at 1026-27); <u>see also</u> <u>Wargo v. Schuylkill County</u>, 348 F. App'x 756 (3d Cir. 2009)(not precedential)(affirming summary judgment for prison officials where interactions of detainee exhibiting signs of drug addiction and withdrawal with prison officials did not demonstrate strong likelihood of particular vulnerability to suicide)). That a detainee is intoxicated or withdrawing is not enough to permit a jury to conclude that custodial officers knew or should have known of a particularized risk of suicide. <u>See</u> <u>Colburn II</u>, 946 F.2d at 1026-27.

      Moreover, neither Officer Miller nor Officer Phillips had any meaningful interactions with Kanney prior to his suicide in the Medical Department restroom. Miller Dep. p. 43; Phillips Dep. p. 24. Officer Miller's first interaction with Kanney occurred when Officer Miller escorted Kanney from his housing unit to the Medical Department. Miller Dep. p. 42-43. Then, while in the Medical Department, Kanney briefly spoke to Officer Miller, and indicated that his stomach was upset and that he really needed to use the restroom. Miller Dep. p. 50-51. This innocuous interaction did not and could not demonstrate to Officer Miller that Kanney had a strong likelihood of a particular vulnerability to suicide. Officer Miller's interactions with Kanney were ordinary. Similarly, Officer Phillips did not have any interactions with Kanney

prior to his suicide. Phillips Dep. p. 24. In fact, Officer Phillips only interacted with Kanney through the restroom door and they never conversed with each other. Phillips Dep. p. 31-32; 38-40. Thus, Kanney's interactions with Officer Miller and Officer Phillips prior to his suicide did not demonstrate that he had a particular vulnerability to suicide and are insufficient to impute knowledge of any such vulnerability to Officer Miller or Officer Phillips. See also Wargo v. Schuylkill County, 348 F. App'x 756 (3d Cir. 2009) (explaining that a detainee's interactions with prison officials prior to his suicide attempt, though unusual, were insufficient to place prison officials on notice of any particularized vulnerability to suicide that may have existed).

Finally, Lancaster County Prison does not have a policy which dictates the amount of time an inmate is permitted to use the restroom. Miller Dep. p. 56; Peters Rep., p. 9-10. Because Kanney was placed on detox watch, correctional officers were required to check on him every thirty minutes, as required by the Lancaster County Prison Intoxication and Withdrawal Policy LNCP-06. Dkt. 58, Ex. S, p. 2. As previously noted, less than eighteen minutes elapsed from the time Kanney entered the restroom for the second time and the time that Sergeant Maldonado unlocked the restroom door. Ex. MP5. Moreover, less than thirty minutes elapsed from the time that Kanney entered the restroom the first time and the time that Sergeant Maldonado unlocked the restroom door. Ex. MP5.

Accordingly, Officer Miller and Officer Phillips are entitled to summary judgment for the § 1983 deliberate indifference claim against them in Count I of the Amended Complaint because Plaintiffs have failed to produce evidence sufficient to establish *prima facie* that the officers knew or should have known of Kanney's alleged vulnerability to suicide.

2. <u>Sergeant John Maldonado</u>

Plaintiffs assert both individual and supervisory liability claims for deliberate indifference to vulnerability to suicide against Sergeant Maldonado. Dkt. 64, Pls.' Resp., p. 5. Plaintiffs generally contend that they have "produced ample evidence that Kanney should have been on suicide watch, and the failure to put him on suicide watch resulted in his death." Dkt. 64, Pls.' Resp., p. 6. Plaintiffs further aver that the Intake Suicide Screening Form and the Health Assessment were incorrectly filled out and that a jury could infer Kanney had a "particular vulnerability to suicide." Dkt. 64, Pls.' Resp., p. 6-8. Additionally, Plaintiffs contend that it is irrelevant that Sergeant Maldonado did not have any contact with Kanney prior to his suicide. Dkt. 64, Pls.' Resp., p. 11.

Sergeant Maldonado is entitled to summary judgment because Plaintiffs have failed to produce sufficient evidence to establish *prima facie* the second and third elements of a § 1983 prison suicide case—that "the custodial officers knew or should have known of the [inmate's] vulnerability" to suicide and that "those officers 'acted with reckless indifference' to the detainee's particular vulnerability." <u>Colburn II</u>, 946 F.2d at 1023. As previously discussed, it is clear from the record that Kanney was not placed on a suicide watch, so at best, based on Kanney's DOJ Orders, Sergeant Maldonado was aware or should have been aware that Kanney was on detox (drug withdrawal) watch. DOJ Orders, p. 1-4. "The Court of Appeals for the Third Circuit has clearly and repeatedly held that the increased risk of suicide due to intoxication or drug withdrawal cannot support a deliberate indifference claim." <u>Ferencz v. Medlock</u>, 2014 U.S. Dist. LEXIS 92173, *12 (citing <u>Woloszyn</u>, 396 F.3d at 322-23 and <u>Colburn II</u>, 946 F.2d at 1026-27). That a detainee is intoxicated or withdrawing is not enough to permit a jury to

conclude that custodial officers knew or should have known of a particularized risk of suicide. See Colburn II, 946 F.2d at 1026-27.

Moreover, Sergeant Maldonado had no interactions with Kanney prior to his suicide in the Medical Department restroom. Dkt. 55, Maldonado Dep. p. 16. Sergeant Maldonado's only interaction with Kanney occurred when Sergeant Maldonado unlocked the restroom door in the Medical Department and cut Kanney down from the clothing hook. Maldonado Dep. p. 52-55; Ex. MP5. Thus, Kanney's interactions, or lack thereof, with Sergeant Maldonado prior to his suicide did not demonstrate that he had a particular vulnerability to suicide and are insufficient to impute knowledge of any such vulnerability to Sergeant Maldonado.

Furthermore, Sergeant Maldonado's only interaction with Kanney could not possibly support a claim that he was deliberately indifferent to Kanney's alleged particular vulnerability to suicide. If anything, Sergeant Maldonado's actions represent the opposite of deliberate indifference. Immediately upon opening the restroom door in the Medical Department, Sergeant Maldonado cut Kanney down from the clothing hook. Maldonado Dep. p. 52-55. Plaintiffs fail to establish that Sergeant Maldonado was directly or personally involved in the alleged deprivation of Kanney's rights. See Payton, 798 F.Supp. at 260.

It is also worth noting that Plaintiffs fail to provide any meaningful discussion of the actions taken by Sergeant Maldonado which would support a deliberate indifference claim. In their response, Plaintiffs fail to explain with any particularity how Sergeant Maldonado knew or should have known of Kanney's alleged vulnerability to suicide or how Sergeant Maldonado acted with reckless indifference. The majority of Plaintiffs Response focuses on the actions of Sergeant Maldonado's co-Defendant, Warden Dennis Molyneaux. Dkt. 64, Pls.' Resp. p. 5-10.

As Defendants Lancaster County, Warden Dennis Molyneaux, and Sergeant Maldonado aptly point out in their reply, "Plaintiffs do not address supervisory liability as to Sergeant Maldonado in . . . their Brief." Dkt. 78, Lancaster Defs.' Reply Br. p. 9, n.2.

Accordingly, Sergeant Maldonado is entitled to summary judgment for the § 1983 deliberate indifference claim against him in Count I of the Amended Complaint because Plaintiffs have failed to produce evidence sufficient to establish *prima facie* that Sergeant Maldonado knew or should have known of Kanney's alleged vulnerability to suicide, that Sergeant Maldonado was deliberately indifferent to that alleged vulnerability, or that Sergeant Maldonado was personally involved in the alleged deprivation of Kanney's rights.

3. <u>PrimeCare, Bonnie Bair, Kristin Zablocki, RN, Jaycees Candelario, MA, Jade Fritsch, MA, Nicole Smith, MA, Katie Neimer, RN, Erica Abernathy, LPN, Susan Taylor, RN, Stephanie Meyer, HAS and Toby Catone, PA</u>

PrimeCare and its individual employees move for summary judgment on Plaintiffs' § 1983 deliberate indifference claims against them in Count I of the Amended Complaint. As stated in the introductory paragraph in this Memorandum Opinion, Enos Martin, M.D., was dismissed from this case by stipulation of the parties on March 7, 2018. <u>See</u> Dkt. No. 98. Further, Plaintiffs abandon their deliberate indifference claims against Defendants Kristin Zablocki, Nicole Smith, Erica Abernathy, Susan Taylor, Stephanie Meyer, and Toby Catone in their Plaintiffs' Response and Brief in support of the Response to PrimeCare's Motion for Summary Judgment. Accordingly, summary judgment is granted to Defendants Zablocki, Smith, Abernathy, Taylor, Meyer and Catone as to Plaintiffs' claims in Count I of the Amended Complaint. Dkt. No. 83, Defs.' Reply Br., pp. 7-8 (citing <u>Morello v. Kenco Toyota Lift</u>, 142 F. Supp. 3d 378, 381 n. 3 (E.D. Pa. 2015)(considering claim abandoned where not addressed in opposition brief and granting summary judgment); <u>Cicchiello v. Beard</u>, 726 F. Supp. 2d 522, 531

(M.D. Pa. 2010) (finding failure to address claim in brief in opposition to motion for summary judgment constitutes abandonment of claim); Aubrecht v. Pa. State Police, 2009 U.S. Dist. LEXIS 32558, at *28 (W.D. Pa. Mar. 23, 2009) (granting summary judgment as to plaintiff's claim not addressed in plaintiff's brief in opposition); Clarity Software, LLC v. Allianz Life Ins. Co., 2006 U.S. Dist. LEXIS 56217, at *34 (W.D. Pa. Aug. 11, 2006) (granting summary judgment against plaintiff for failure to address viability of claim in brief in opposition to motion for summary judgment).

       With respect to the remaining PrimeCare Defendants, Fritsch, Candelario, Neimer and Bair, Plaintiffs contend that they all knew or should have known that Kanney had a particular vulnerability to or risk of suicide but were deliberately indifferent to or ignored that risk. Again, in order to establish liability under § 1983 in prison suicide cases, a plaintiff must prove: (1) the detainee had a "particular vulnerability to suicide," (2) the custodial officer or officers knew or should have known of the vulnerability, and (3) those officers "acted with reckless indifference" to the detainee's particular vulnerability. See Colburn I. To prevail, plaintiff must demonstrate "[a] level of culpability higher than a negligent failure to protect from self-inflicted harm." Colburn II, 946 F.2d at 1024. In order to show that Kanney had a particular vulnerability to suicide, the Plaintiffs must show that there was "a strong likelihood, rather than a mere possibility, that self-inflicted harm [would] occur." Wargo, 348 F. App'x at 759 (quoting Woloszyn, 396 F.3d at 320 (citations omitted)).

       Plaintiffs first argue that Kanney's withdrawal from drugs amounted to a particular vulnerability to suicide. Pls.' Br. at 5 (citing Pls.' Mat. Facts, ¶ 56.) However, as previously noted above, "[t]he Court of Appeals for the Third Circuit has clearly and repeatedly held that the increased risk of suicide due to intoxication or drug withdrawal cannot support a

deliberate indifference claim." Ferencz, 2014 U.S. Dist. LEXIS 92173, at *12 (citing Woloszyn, 396 F.3d at 322-23 and Colburn II, 946 F.2d at 1026-27). Thus, Plaintiffs cannot use Kanney's drug withdrawal to support their claim for deliberate indifference on the part of the remaining PrimeCare Defendants.

PrimeCare argues that Kanney did not have a particular vulnerability to suicide. They argue generally that "the undisputed medical records" show that Kanney repeatedly reported that he did not feel suicidal and reported that he never tried to commit suicide. Dkt. 51, PrimeCare Mot., p. 8. They note that none of the medical staff recalled seeing scarring on Kanney's wrists. Dkt. 75, Pls.' Br., Ex. H, Candelario Dep., p. 28; Ex. F, Zielinski Dep., p. 17; Ex. K, Fritsch Dep., p. 42; Ex. I, Bair Dep., p. 17; Ex. JJ, Smith Dep., p. 22. Plaintiffs respond that PrimeCare ignores the fact that but for "a grossly inept Suicide Intake by Candelario, by PrimeCare's own standards, Kanney should have been put on suicide watch." Dkt. 77, Pls.' Br., p 5. Other factors cited by Plaintiffs to support their argument that Kanney had a particular vulnerability to suicide are also based upon the intake forms completed by Candelario which showed that Kanney had been the victim of a sexual offense, lacked close friends or family in the community, had recently experienced a significant loss, was worried about major problems, had a history of mental health treatment and was overly anxious, panicked, afraid or angry. Id., Pls.' Br., pp. 4-5 (citing Pls.' Statement of Material Facts in Dispute); Pl.'s Br., Ex. BB, LCP Intake; Ex. F, Zielinski Dep., pp. 20, 21, 22, 23. Plaintiffs also contend that Kanney's particular vulnerability to suicide was evident from a scar on his left wrist from a 2013 apparent suicide attempt with scissors which required sutures to close the wound. The coroner noted in his PostMortem Report that "[a] well healed, linear, horizontally oriented incision is appreciated across the left wrist. Suture marks are appreciated around the same." Dkt. 75, Pls.' Resp., Ex.

W, p. 3.  Viewing the facts in the light most favorable to the Plaintiffs, we conclude that

Plaintiffs have amassed enough facts to warrant sending the case to a jury to decide whether

there was a strong likelihood that "self-inflicted harm would occur."

Under the second and third prongs required to establish liability under § 1983 in

prison suicide cases, that custodial officer or officers knew or should have known of the

vulnerability to suicide, and that those officers "acted with reckless indifference" to the

detainee's particular vulnerability, Plaintiffs must point to evidence establishing that each

Defendant knew or should have known of Kanney's particular vulnerability to suicide and acted

with deliberate indifference to the vulnerability.  According to the Third Circuit, an official

"knew" of a vulnerability if they "have had actual knowledge of an obvious suicide threat, a

history of suicide attempts, or a psychiatric diagnosis identifying suicidal propensities."

Keohane v. Lancaster County, 2010 U.S. Dist. LEXIS 85914, * 18 (E.D. Pa. Aug. 13,

2010)(quoting Colburn II, 946 F.2d at 1025 n.1).  We analyze these standards with respect to the

four remaining Defendants who were involved with Kanney's intake and treatment, Jade Fritsch,

Jaycees Candelario, Katie Neimer and Bonnie Bair.

    *a.  Jade Fritsch*

Medical Assistant Jade Fritsch performed a rapid medical screening of Kanney

following his initial screening by LCP staff.   The "rapid screen" indicated that Kanney brought

two medications into the prison with him, that his pulse was elevated, that he would be

withdrawing from heroin and Xanax, and that he had last used 5 bags of heroin that morning.

Dkt. 58, Ex. K, Fritsch Dep., pp. 23-29, 30-36.  Ms. Fritsch estimated that the overall time she

spent with Kanney that afternoon was no longer than 5 minutes.  Id., p. 21.  She took his vital

signs.  Id. at 23.  After an intern took Kanney's pulse rate of 128, Ms. Fritsch took his pulse

again and determined it to be 100.  Id. at 33-35, 41-42.  She recalled manually checking

Kanney's pulse, but could not remember any scarring on his wrist.  Id. at 42.  She testified that if

she had seen scarring on his wrist, she would have thought of a prior suicide and she "definitely

would have questioned it . . . and probably would have had a mental health [employee] talk to

him . . . anyone that was available [in mental health]."  Id. at 42-3.  The extent of Plaintiffs'

argument against Ms. Fritsch is that she knew that Kanney was withdrawing from heroin and

Xanax and should have put him automatically on suicide watch instead of detox watch.  As

stated above, Plaintiffs cannot use Kanney's drug withdrawal as a basis for any deliberate

indifference claim, therefore the § 1983 claim for deliberate indifference against Ms. Fritsch

lacks merit and summary judgment will be entered in her favor.

### b. *Jaycees Candelario, Katie Neimer and Bonnie Bair*

Medical Assistant Jaycees Candelario electronically completed several forms

including a Mental Health Screen for Men, a Receiving Screening and Health Assessment Form,

and an Intake Suicide Screen.  Dkt. 58, Ex. H, Candelario Dep., pp. 17-19.  The Intake Suicide

Screening page stated that "[i]f the patient scores 8 or more, a Suicide Watch will be initiated."

Dkt. 58, Ex. Y, p. 1.  Kanney answered yes to five questions and a Suicide Watch was not

automatically initiated.  Id. at 1-2.  On the Receiving Screening and Health Assessment Form,

Kanney indicated that he was addicted to heroin and Xanax and used both drugs the day before

entering LCP.  Id. at 4.  Kanney also indicated that he had not previously tried to commit suicide

and that he was not presently suicidal.  Id. at 6.  On the Mental Health Screen for Men, Kanney

answered "yes" to nine of twelve questions.  Id. at 11.  According to the Mental Health Screen

for Men, if a detainee answered "yes" to 6 or more questions, then the detainee should be

referred for further mental health evaluation.  Id.  In the comments section of Kanney's Mental

Health Screen for Men, Ms. Candelario indicated that Kanney should be "re evaluate[d]." Id.

On the Intake Suicide Screen form, Question 17 asks a two part question, whether Kanney appeared under the influence of drugs and whether Kanney was showing signs of withdrawal. Ms. Candelario marked the first part of Question 17 as "no." A "yes" answer to the second part of the question is worth 8 points, and one of the PrimeCare employees testified that 8 points automatically places someone on suicide watch. Dkt. 75, Ex. II, Carvajal Dep., p. 24. Ms. Candelario admitted that based on Kanney's response to questions regarding his use of and addiction to heroin, she should have done another visual assessment of Kanney to determine whether her answer to Question 17 was correct, but she failed to do so. Dkt. 75, Ex. H, Candelario Dep., p. 42.

Question 10 on the Intake Suicide Screen form asked whether Kanney had "attempted suicide previously." Following the question, there is a parenthetical stating "([c]heck wrist and note method)." Dkt. 75, Ex. H, Candelario Dep., p. 28. Ms. Candelario testified that only if the detainee affirmatively answered that they had previously attempted suicide, she would "check the [wrist]." Id. Adding, "I would check any other parts if given permission to. I would contact my charge nurses and state, you know, patient has some markings on their bodies. Can you re-evaluate them, check them just to make sure they're going to be all right." Id. Kanney responded to Question 10 that he had not previously attempted suicide and Ms. Candelario did not remember looking at Kanney's wrists and does not know if he had any scarring on his wrists. Id. Ms. Candelario's action in not checking an inmate's wrist unless he acknowledged a previous suicide attempt contrasts with the testimony of both Erica Carvajal, who stated that if an inmate denied suicide attempts, she would check their wrists because that directive "was on the form," and also Nicole Smith, who would also check the inmate's wrist "for marks of cutting or

any attempts of trying to harm themselves" regardless of whether they denied prior suicide attempts. Dkt. 75, Ex. II, Carvajal Dep., p. 22; Ex. JJ, Smith Dep., p. 25. Ms. Smith checked Kanney's TB test on his forearm on April 21, 2014, and did not recall seeing any scarring on Kanney's wrist. Dkt. 75, Ex. JJ, Smith Dep., p. 22.

On the Receiving Screening and Health Assessment Form, question one under the subsection for Psychiatric Problems asks "[d]oes the patient's behavior, history or physical appearance suggest the risk of suicide, assault or psychiatric condition." Dkt. 58, Ex. Y, p. 6. Ms. Candelario answered "no." Id; Dkt. 75, Ex. H, Candelario Dep., p. 44. Four questions later on the same form, asks "Have you ever been a victim from a criminal act? If yes What?" Ms. Candelario indicated "yes" and in the comments wrote "Patient states being assaulted and robbed, molested as a child." Id. at 7; Dkt. 75, Ex. H, Candelario Dep., p. 46. In the next section of the form, under "Special Needs/PREA," a question is asked "Have you ever been a victim of a sexual and/or violent crime? If yes; what?" Id. Ms. Candelario checked the box "no." Id.; Dkt. 75, Ex. H, Candelario Dep., p. 46.

Katherine ("Katie") Neimer, a Registered Nurse, reviewed the intake forms completed by Ms. Candelario. Dkt. 75, Ex. J, Neimer Dep., p. 19. She agreed with Ms. Candelario's completion of the forms. Id. She called for orders of Kanney's medicines, including Vistaril and Wellbutrin. Id. At the time of her deposition, she did not recall noticing any inconsistencies between the responses given by Kanney and recorded by Ms. Candelario. Id. at 28. She relied on the information that Ms. Candelario provided to be accurate and agreed that if Ms. Candelario did not check Kanney's wrists that his suicide risk score could be lowered. Id.

On April 21, 2014, PrimeCare Medical Staff received a Sick Call Request from Kanney. Dkt. 58, Ex. EE, p.1. On the handwritten form, Kanney indicated that he was hearing

strange voices and was overly stressed out.  Id.  In response to his Sick Call Request, Bonnie

Bair, a PrimeCare Mental Health Caseworker, conducted an assessment of Kanney that morning.

Dkt. 58, Ex. I, Bair Dep., pp. 22-27.  Ms. Bair would have reviewed Ms. Candelario's notes from

April 19, 2014 on April 21, 2014, the day that she saw Kanney and would have taken note of any

inconsistencies between the Inmate Screening Form and the Mental Health Screen for Men.  Dkt.

75, Ex. I, Bair Dep., pp. 18, 19, 47.  At her deposition, Ms. Bair did not recall reading any

information about Kanney being molested as a child, but stated that she "would assess for

suicidality after reading that.  I'm not saying it makes them a higher risk."  Id. at 19-20.  Ms.

Bair did not recall seeing any scarring on Kanney's wrists.  Id. at 17.  Ms. Bair asked Kanney

numerous questions about his symptoms and mental health history.  Id. at 41-53.  Kanney

complained of hearing voices and seeing little people.  Id. at 43.  It did not appear to Ms. Bair

that Kanney was actually hearing voices or seeing things because someone who was actually

hearing and seeing things would present as distracted due to listening to voices and have moods.

Id. at 43, 68.  Kanney did not know what the voices were saying.  Id. at 64.  Ms. Bair stated that

seeing little people could possibly be a sign of hallucinating which could be a symptom of a

mental health disorder or withdrawal.  Id.  at 43.  Ms. Bair completed a Mental Health

Assessment Form based upon questions she posed to Kanney.  Id. at 48.

       Ms. Bair stated that she did not recall specifically asking Kanney if he ever tried

to hurt himself, if he felt like hurting himself at that time, or if he had a history of any kind of

cutting mutilation, but it was her routine to ask those three questions.  Id. at 50.  If Kanney's

response was affirmative, Ms. Bair would have checked a "yes" box on the Mental Health

Assessment Form, but she did not do so, which indicates that Kanney denied all three questions.

Id.  Following her examination, Ms. Bair recommended that sick call requests should be

completed as needed.  Id. at. 53-54.  Ms. Bair indicated that Kanney's mood was neutral and that he denied suicidal ideation.  Id. at 56-58.  Ms. Bair also recommended that Kanney should be evaluated by a psychiatrist in one week due to his medications and his status as detoxing, and she informed Kanney that if he wanted to see anyone from Mental Health to discuss issues or problems or talk, all he had to do was submit a Sick Call request.  Id. at 58-59, 61.

We find that issues of material fact exist as to whether it was obvious that Ms. Candelario should have known that Kanney had a particular vulnerability to suicide based on her intake of Kanney including whether she was required to check Kanney's wrists for scars after he indicated that he had never previously attempted suicide and whether the contradictory responses contained in the intake forms should have alerted her to place Kanney on suicide watch.  It is also disputed whether Ms. Candelario was aware of Kanney's other suicide risk factors but still completed the intake forms improperly and ignored those risks and also whether all of these actions by Ms. Candelario could enable a jury to find that she acted with reckless indifference.  Based on these issues of fact and Ms. Neimer's and Ms. Bair's actions in reviewing the intake forms completed by Ms. Candelario, there are also material questions of fact as to whether Ms. Neimer and Ms. Bair acted with reckless indifference.  A jury might conclude that Ms. Neimer and Ms. Bair did not conduct a thorough review of the intake forms and the various inconsistencies contained therein which may have thwarted Kanney's placement on suicide watch.  Accordingly, Plaintiffs § 1983 claims against PrimeCare, Ms. Candelario, Ms. Neimer, and Ms. Bair survive summary judgment.

**B.      Count II –  42 U.S.C. § 1983 and § 1988 – Custom and Policy of Unconstitutional Conduct – Lancaster County, Warden Dennis Molyneaux and PrimeCare**

A municipality is liable under § 1983 when a plaintiff can demonstrate that the

municipality itself, through the implementation of a municipal policy or custom, causes a constitutional violation.  Monell v. New York City Dept. of Social Services, 436 U.S. 658, 691-95, 56 L. Ed. 2d 611, 98 S. Ct. 2018 (1978).  Liability will be imposed when the policy or custom itself violates the Constitution or when the policy or custom, while not unconstitutional itself, is the "moving force" behind the constitutional tort of one of its employees.  Polk County v. Dodson, 454 U.S. 312, 70 L. Ed. 2d 509, 102 S. Ct. 445 (1981).  Liability cannot be predicated, however, on a theory of respondeat superior or vicarious liability.  Monell, 436 U.S. at 693-94.  A plaintiff can establish causation by "demonstrating the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences."  Board of County Commissioners of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 407, 137 L. Ed. 2d 626, 117 S. Ct. 1382 (1997).

"[T]he standard for personal liability under section 1983 is the same as that for municipal liability."  Carter v. City of Philadelphia, 181 F.3d 339, 356 (3d Cir. 1999).  "[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy, inflicts the injury . . . the government as an entity is responsible under § 1983."  Id.  If "the policy in question concerns a failure to train or supervise municipal employees, liability under section 1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of persons with whom those employees will come into contact."  Id. (quoting City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).  The "failure to train may amount to deliberate indifference where the need for more or different training is obvious, and inadequacy very likely to result in violation of constitutional rights."  Id.  "For example, if the police often violate rights, a need for further training might be obvious."  Id. (citing City of Canton, 489 U.S. at 390 n.10;

Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989) ("[n]ormally, an unreasonable risk in a supervisory liability case will be shown by evidence that such harm has in fact occurred on numerous occasion" and a "supervisory official failed to respond appropriately in the face of an awareness of a pattern of such injuries")).  However, liability for failure to train cannot be predicated solely upon a showing that a municipality's employees could have been better trained or that additional training was available which would have reduced the overall risk of constitutional injury.  Canty v. City of Philadelphia, 99 F. Supp. 2d 576, 581 (E.D. Pa. 2000) (citing Colburn, 946 F.2d at 1029-1030).

The Third Circuit applies a three-part test to determine whether the deliberate indifference requirement has been met:

> it must be shown that (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.

Id. (citing Walker v. City of New York, 974 F.2d 293, 297-298 (2d Cir. 1992)).

In other words, to state a claim, plaintiff must show that the municipality's "failure to provide specific training . . . has a causal nexus with [the plaintiff's] injuries" and "that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred."  Reitz v. County of Bucks, 125 F.3d 139, 145 (3d Cir. 1997) (citing Colburn v. Upper Darby Twp., 946 F.2d 1017, 1030 (3d Cir. 1991)).  Plaintiff must also show "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate."  Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d

Cir. 1997) (quoting <u>Freedman v. City of Allentown</u>, 853 F.2d 1111, 1117 (3d Cir. 1988)).

<ol>
<li value="1"><u>Lancaster County and Warden Dennis Molyneaux</u></li>
</ol>

Plaintiffs assert several § 1983 <u>Monell</u> claims against Lancaster County and LCP Warden Dennis Molyneaux based on his failure to properly train subordinates and his failure to adopt necessary policies at LCP.[2]  Dkt. 64, Pls.' Resp. p 15.  Specifically, Plaintiffs contend that Lancaster County and Warden Molyneaux (1) failed to train correctional offers in detox watch and suicide risk, (2) failed to train correctional officers on how to monitor an inmate using the restroom, (3) failed to train correctional officers and PrimeCare employees on the proper way to fill out intake forms, (4) failed to enact policies requiring inmates withdrawing from opiates be placed on suicide watch, and (5) failed to enact policies regarding clothes hooks and locking doors accessible to inmates.  Dkt. 64, Pls.' Resp. p.15-17.

In their motion, Defendants contend that Plaintiffs have not established their failure to train claims because "both Lancaster County and PrimeCare Medical had adequate and comprehensive policies in place for the identification and treatment of inmates who were deemed to be at risk of committing suicide."  Dkt. 54, Defs. Mem. of Law p. 17.  Defendants further aver that all LCP inmates are screened multiple times for suicidality and mental health problems and that PrimeCare Medical staff conducted thousands of sessions with inmates.  Dkt. 54, Defs. Mem. of Law p. 17-18.  Defendants further contend that LCP had adequate suicide prevention policies, practices, and training in place because LCP was continually accredited by the National

---

2        Although Plaintiffs devote much of their response to articulating a § 1983 deliberate indifference claim against Warden Molyneaux, such argument is misplaced because Plaintiffs failed to include a § 1983 deliberate indifference claim against Warden Molyneaux in their Amended Complaint.  <u>See</u> Dkt. 21, Am. Compl. Count I.  Aside from the state law claims, the only claim raised against Warden Molyneaux in the Amended Complaint is a § 1983 <u>Monell</u> claim based on alleged unconstitutional customs and policies.  <u>See</u> Am. Compl. Count II.

Commission on Correctional Health Care and the Pennsylvania Department of Corrections. Dkt. 54, Defs. Mem. of Law p. 19.

Lancaster County and Warden Molyneaux are entitled to summary judgment on the § 1983 <u>Monell</u> claims against them in Count II of the Amended Complaint because Plaintiffs have failed to establish that Lancaster County or Warden Molyneaux had actual or constructive knowledge, and acquiesced in the alleged violations of suicide screening and monitoring procedures or failed to enact needed policies.

     *a. Failure to Train*

With respect to the failure to train correctional officers in detox watch and suicide risk and the failure to train correctional officers and PrimeCare employees on the proper way to fill out intake forms claims, Plaintiffs may have pointed to sufficient evidence that a few members of the LCP staff did not know of certain suicide screening procedures or failed to properly administer those screenings. However, individual violations of LCP procedures do not constitute "policy" and may only constitute "custom" when such procedures are violated with such widespread frequency that policy making officials, such as Warden Molyneaux, have either actual or constructive notice, and acquiesced in the "custom." <u>Berg</u>, 219 F.3d at 276.

Plaintiffs contend that Warden Molyneaux "has final decision-making authority over the enactment and implementation of all policies and procedures at LCP." Dkt. 64, Pls.' Resp., p. 15. However, even assuming that Warden Molyneaux was the final policy making official, Plaintiffs have not presented evidence that he had knowledge of the alleged breaches of the suicide screening and monitoring procedures either in the case of Kanney or at any point prior to Kanney's suicide. Nor have Plaintiffs presented sufficient evidence that Lancaster County's policy making officials had constructive notice of the alleged breaches.

Plaintiffs have not cited to any evidence regarding how many suicide screening forms were improperly filled out or how many inmates previously locked themselves in restrooms for a lengthy period. While Plaintiffs have produced some evidence concerning the overall number of suicides that occurred at LCP between 1998 and Kanney's suicide, a close examination of the documents reveals that the circumstances surrounding these suicides vary greatly. Dkt. 63, Ex. KK; Dkt. 63, Ex. U. Of the seven Mortality Reviews provided by Plaintiff, none involve a situation where an inmate committed suicide in a locked restroom and two involve a situation where an inmate jumped to his death. Dkt. 63, Ex. KK.

Two of the records produced by Plaintiff require more thorough explanation and review. The Mortality Review of a 2011 suicide reveals that two medical providers, who were not involved with Kanney's screening, failed to properly and consistently fill out his suicide screening forms. Dkt. 63, Ex. KK. This 2011 Mortality Review recommended that the intake screening procedures be reviewed and that medical personnel review the screening forms completed by officers. Dkt. 63, Ex. KK. Following this isolated incident, over eighteen months passed without a suicide. The Mortality Review of a 2013 suicide, the last before Kanney's, reveals that the intake screenings were conducted in public and that the Mental Health Assessment and Mental Status Exam were not conducted at the appropriate time by Bonnie Bair, a defendant in this action. Dkt. 63, Ex. KK. The 2013 Mortality Review recommended that intakes be conducted in a private area and that mental health staff review how to conduct mental health assessments. Dkt. 63, Ex. KK. Nearly one year lapsed between the 2013 suicide and Kanney's suicide in April 2014.

The Court finds that although Plaintiffs have produced evidence of two prior instances where suicide screening processes may have been improperly followed, this evidence

is insufficient to demonstrate that there was a pattern or custom of individuals improperly filling out the paperwork because of the temporal isolation of the incidents. The Court specifically notes that following both of these suicides, recommendations were made for corrective action, and LCP operated without incident for months. The 2011 suicide occurred prior to Warden Molyneaux's tenure as Warden and involved medical personnel not involved in the instant action. Plaintiffs have not presented evidence that Warden Molyneaux had knowledge of the alleged breaches by the medical personnel involved in the 2011 suicide. Plaintiffs have also not presented evidence that the medical personnel involved in the 2011 suicide made repeated errors when completing the suicide screening forms or that Lancaster County was aware of any repeated errors. While the 2013 suicide occurred during Warden Molyneaux's tenure as Warden, the screening issue in that case concerned the time and manner in which the mental health screening forms were completed, not inconsistencies with the answers given on the forms. The 2013 Mortality Review recommended that "burst" training in suicide prevention be given to staff, that more privacy be afforded during the intake screening, and that mental health personnel review the proper way to conduct assessments. Dkt. 63, Ex. KK. Plaintiffs have not produced any evidence to suggest that these corrective actions were not undertaken by Lancaster County.

Further, Plaintiffs have not produced a record of the frequency of alleged breaches sufficient to show that Warden Molyneaux or Lancaster County had actual or constructive knowledge, and acquiesced in the alleged violations of suicide screening and monitoring procedures. Two isolated incidents do not constitute a pattern, policy, or custom of failing to properly train LCP personnel. Moreover, "a municipality's deliberately indifferent failure to train is *not* established by [] presenting evidence of the shortcomings of an individual." Simmons v. City of Philadelphia, 947 F.2d 1042, 1060 (3d Cir. 1991) (citing City of Canton, 109

S. Ct. at 1206). "It is well-settled that an employee's deviation from existing policy cannot, without more, establish the requisite causal link between the alleged constitutional harm and the municipality—only when a governmental policy *itself* effects an injury may a municipality be held to account under Section 1983." Nealman v. Laughlin, 2016 U.S. Dist. LEXIS 116881, *34-35 (M.D.Pa. Aug. 31, 2016) (emphasis in original) (citing Monell, 436 U.S. at 691). Here, at best Plaintiffs may have provided evidence that a few LCP staff did not follow applicable procedures, but Plaintiffs have failed to establish that policymakers knew of or acquiesced in their behavior and made a deliberate decision not to provide training. To the contrary, the evidence suggests that LCP engaged in a process of policy evaluation and corrective action, contacted an outside consultant to evaluate LCP procedures, and provided suicide training to all staff. Dkt.58, Ex. N, Hayes Rpt.; Dkt. 58, Ex. GG; Dkt. 58, Ex. B, Phillips Dep. p. 12-14; Dkt. 58, Ex. C, Maldonado Dep. p. 27-28; Dkt. 55, Ex. L. The Court further notes that the Suicide Prevention Program was revised numerous times, including in September 2012. Dkt. 55, Ex. L.

Plaintiffs also contend that Lancaster County and Warden Molyneaux failed to train correctional officers on the monitoring of inmates using the restroom. The Court finds that Plaintiffs have not demonstrated that the "risk reduction associated with training is so great that failure of those responsible for the content of the training program to provide it can reasonably be attributed to a deliberate indifference." Woloszyn, 396 F.3d at 325 (citing Colburn II, 946 F.2d at 1029-30. Plaintiffs have failed to produce any evidence that such training would greatly reduce the risk of suicide. Plaintiffs have not produced any evidence to suggest that it is common practice for inmates to lock themselves in restrooms at LCP or that it is common for suicidal inmates, generally, to lock themselves in restrooms for extended periods of time. A close review

of the record reveals no evidence that LCP had a training issue with respect to inmate use of the restrooms.

### b. Policy / Custom

Plaintiffs also contend that Lancaster County and Warden Molyneaux failed to enact policies requiring inmates withdrawing from opiates to be placed on suicide watch and failed to enact policies regarding clothing hooks and locking doors accessible to inmates. Plaintiffs do not attempt to hold Lancaster County and Warden Molyneaux liable based on policies that existed, rather their contentions are based on the absence of purportedly necessary policies. Both the Supreme Court and the Third Circuit have recognized that for purposes of Section 1983 Monell liability, a policy may exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" Natale, 318 F.3d at 584 (citing Bd. of the County Comm'rs of Bryan County, Oklahoma, 520 U.S. at 417-18).

With respect to the failure to enact policies requiring inmates withdrawing from opiates to be placed on suicide watch claim, the Court finds that Plaintiffs have not established that Lancaster County or Warden Molyneaux were deliberately indifferent to the need for such policy. As previously noted, the Third Circuit has "clearly and repeatedly held that the increased risk of suicide due to intoxication or drug withdrawal cannot support a deliberate indifference claim." Ferencz, 2014 U.S. Dist. LEXIS 92173, *12 (E.D.Pa. July 8, 2014) (citing Woloszyn, 396 F.3d 314, 322-23 (3d Cir. 2005) and Colburn II, 946 F.2d at 1026-27). Thus, because an increased risk of suicide due to intoxication or drug withdrawal is insufficient to support a

deliberate indifference claim, it naturally follows that a policymaker cannot be deliberately indifferent for failing to implement a policy requiring inmates going through drug withdrawal to automatically be placed on suicide watch.

With respect to Plaintiffs' claim for the failure to enact policies regarding clothing hooks and locking doors accessible to inmates, the court finds that Plaintiffs have not established that the need for Lancaster County and Warden Molyneaux to affirmatively act was so obvious in light of the inadequacy of existing practices. See Natale, 318 F.3d at 584. Plaintiffs have failed to produce any evidence that other inmates at LCP have previously locked themselves in restrooms or committed suicide by hanging themselves from a clothing hook in a restroom. While the evidence produced by Plaintiffs does establish that the manner of death in some of the prior suicides at LCP was hanging, those inmates hung themselves in their cells. Dkt. 63, Ex. KK. Plaintiffs have produced no evidence that any prior suicide at LCP occurred when an inmate hung himself from a clothing hook located in a restroom or in any other area of the facility. Said another way, Plaintiffs have produced no evidence to show that Lancaster County or Warden Molyneaux were on notice that permitting an inmate who repeatedly denied suicidal ideation to use a locking restroom in the medical unit would likely result in that inmate committing suicide by hanging himself from a clothing hook located in that restroom.

Accordingly, Lancaster County and Warden Molyneaux are entitled to summary judgment on the § 1983 Monell claims against them in Count II of the Amended Complaint because Plaintiffs have failed to produce evidence sufficient to establish *prima facie* that Lancaster County or Warden Molyneaux had actual or constructive knowledge, and acquiesced in any alleged violations of suicide screening and monitoring procedures or that he failed to enact needed policies.

2.  PrimeCare

Plaintiffs assert failure to train and policy or custom <u>Monell</u> claims against PrimeCare at paragraphs 65, 66, 67 and 71 of the Amended Complaint.  Plaintiffs specifically claim that PrimeCare: (1) has a policy, custom or practice of failing to provide adequate policies and procedures for identifying and treating persons who are high suicide risks in an effort to save money (Dkt. 21 Am. Compl., ¶ 65-66); (2) has a policy, practice or custom of failing to adequately train medical staff regarding warning signs of potential suicides, and failing to discipline employees who allow suicides to occur on their watch (<u>Id.</u>, ¶ 67); and (3) recognized and accepted a policy consisting of an inadequate system of review of claims of inadequate medical care, prior suicides and complaints of doors that lock. (<u>Id.</u>, ¶ 71).  In Plaintiffs' response to PrimeCare's Motion for Summary Judgment, Plaintiffs modify their initial <u>Monell</u> claims to the following:  (1) failure to have a policy requiring qualified persons to conduct Intake Suicide Screening (Dkt. 77, Pls.' Mem. Law, p. 13); (2) failure to train its employees who performed Intakes or reviewed Intakes on the proper way to answer the questions, suicide risk factors, and withdrawal from drugs/alcohol (<u>Id.</u> at 14-15); and (3) failure to enact a policy requiring that inmates who were withdrawing from opiates should be placed on suicide watch when the need for such a policy was obvious (<u>Id.</u> at 16-17.).

"A private corporation contracted by a prison to provide health care for inmates cannot be held liable on a respondeat superior theory; rather, it can only be held liable for constitutional violations if it has a custom or policy exhibiting deliberate indifference to a prisoner's serious medical needs."  <u>Henry v. Buskirk</u>, 2011 U.S. Dist. LEXIS 18644 (E.D.Pa. 2011) (citing <u>Natale</u>, 318 F.3d at 583-84 and <u>Monell</u>, 436 U.S.at 691-94).

a. *Failure to Train*

Plaintiffs claim that PrimeCare failed to adequately train employees performing or reviewing intakes on the proper way to answer questions, the warning signs or risk factors of suicide and withdrawal from drugs and alcohol, and failed to discipline employees who "allow suicides to occur on their watch." Dkt. 21 Am. Compl., ¶ 67. Plaintiffs argue that the National Commission on Correctional Health Care ("NCCHC") guidelines require that intake suicide screening must be conducted by a qualified mental health professional, citing <u>Barkes v First Corr. Med., Inc.</u>, 766 F3d 307 (3d Cir. 2014). PrimeCare notes that the alleged qualified mental health professional requirement is, in fact, not mandated but is merely an allegation by the <u>Barkes</u> plaintiffs in that case. Plaintiffs cannot point to any record evidence supporting the tenet that a qualified mental health professional must conduct intake suicide screening. In fact, the Supreme Court stated in dicta in <u>Taylor v Barkes</u> that "[n]o decision of this Court establishes a right to the proper implementation of adequate suicide prevention protocols. No decision of this Court even discusses suicide screening or prevention protocols." 135 S.Ct. 2042, 2044 (2015). The Court went on to explain that neither <u>Colburn I</u> nor <u>Colburn II</u> clearly established such a right. <u>Id.</u> at 2045.

Medical Assistant Candelario administered the Intake Suicide Screening even though she admitted that she did not know any of the signs for suicide risk. Dkt. 75, Ex. Y, Candelario Dep., pp. 8, 9, 10, 11, 14. Plaintiffs may have pointed to sufficient evidence that Ms. Candelario failed to properly administer the screening intake forms and that Ms. Neimer and Ms. Bair did not properly review those forms. However, individual violations of PrimeCare procedures do not constitute "policy" and may only constitute "custom" when such procedures are violated with such widespread frequency that policy making officials have either actual or

constructive notice and acquiesced in the "custom." <u>Berg</u>, 219 F.3d at 276.

Plaintiffs have not cited to any evidence regarding how many suicide screening forms were improperly filled out or how many inmates previously locked themselves in restrooms for a lengthy period. Moreover, as previously stated, while Plaintiffs have produced some evidence concerning the overall number of suicides that occurred at LCP between 1998 and Kanney's suicide, a close examination of the documents reveals that the circumstances surrounding these suicides vary greatly. Dkt. 63, Ex. KK; Dkt. 63, Ex. U. Of the seven Mortality Reviews provided by Plaintiff, none involve a situation where an inmate committed suicide in a locked restroom and two involve a situation where an inmate jumped to his death. Dkt. 63, Ex. KK.

Two of the records produced by Plaintiff require more thorough explanation and review. The Mortality Review of Mr. Snyder's 2011 suicide reveals that two medical providers, who were not involved with Kanney's screening, failed to properly and consistently fill out his suicide screening forms. Dkt. 63, Ex. KK. This 2011 Mortality Review recommended that the intake screening procedures be reviewed and that medical personnel review the screening forms completed by officers. Dkt. 63, Ex. KK. Following this isolated incident, over eighteen months passed without a suicide. The Mortality Review of Mr. Wisniewski's 2013 suicide, the last before Kanney's, reveals that the intake screenings were conducted in public and that the Mental Health Assessment and Mental Status Exam were not conducted at the appropriate time by Bonnie Bair, a defendant in this action. Dkt. 63, Ex. KK. The 2013 Mortality Review recommended that intakes be conducted in a private area and that mental health staff review how to conduct mental health assessments. Dkt. 63, Ex. KK. Nearly one year lapsed between the 2013 suicide and Kanney's suicide in April 2014.

The Court finds that although Plaintiffs have produced evidence of two prior instances where suicide screening processes may have been improperly followed, this evidence is insufficient to demonstrate that there was a pattern or custom of individuals improperly filling out the paperwork because of the temporal isolation of the incidents. The Court specifically notes that following both of these suicides, recommendations were made for corrective action, and LCP operated without incident for months.  The 2011 suicide involved medical personnel not involved in the instant action.  Plaintiffs have not presented evidence that the medical personnel involved in the 2011 suicide made repeated errors when completing the suicide screening forms. The screening issue in the 2013 suicide concerned the time and manner in which the mental health screening forms were completed, but not inconsistencies with the answers given on the forms.  The 2013 Mortality Review recommended that "burst" training in suicide prevention be given to staff, that more privacy be afforded during the intake screening, and that mental health personnel review the proper way to conduct assessments. Dkt. 63, Ex. KK.  Plaintiffs have not produced any evidence to suggest that these corrective actions were not undertaken by either Lancaster County or PrimeCare.

Two isolated incidents do not constitute a pattern, policy, or custom of failing to properly train PrimeCare personnel.  Moreover, "a municipality's deliberately indifferent failure to train is *not* established by [] presenting evidence of the shortcomings of an individual." Simmons, 947 F.2d at 1060 (citing City of Canton, 109 S. Ct. at 1206).  "It is well-settled that an employee's deviation from existing policy cannot, without more, establish the requisite causal link between the alleged constitutional harm and the municipality—only when a governmental policy *itself* effects an injury may a municipality be held to account under Section 1983." Nealman, 2016 U.S. Dist. LEXIS 116881, *34-35 (emphasis in original) (citing Monell, 436

U.S. at 691). Here, at best Plaintiffs may have provided evidence that a few PrimeCare staff did not follow applicable procedures, but Plaintiffs have failed to establish that policymakers knew of or acquiesced in their behavior and made a deliberate decision not to provide training. To the contrary, the evidence suggests that LCP and PrimeCare engaged in a process of policy evaluation and corrective action, contacted an outside consultant to evaluate procedures, and provided suicide training to all staff. Dkt.58, Ex. N, Hayes Rpt.; Dkt. 58, Ex. GG; Dkt. 58, Ex. B, Phillips Dep. p. 12-14; Dkt. 58, Ex. C, Maldonado Dep. p. 27-28; Dkt. 55, Ex. L. The Court further notes that the Suicide Prevention Program was revised numerous times, including in September 2012. Dkt. 55, Ex. L.

    *b. Policy/Custom*

    With respect to Plaintiffs' claim that PrimeCare failed to provide adequate policies and procedures for identifying and treating persons who are high suicide risks in an effort to save money, PrimeCare argues that its suicide prevention policy was consistent with current best practices and accepted standards of correctional care pursuant to the National Commission on Correctional Health Care ("NCCHC"), as noted by PrimeCare's expert, Thomas W. White, Ph.D. Further, PrimeCare contends that "the treatment protocol set forth in the PrimeCare suicide prevention policy did not apply to Kanney because he was assessed as non-suicidal based upon his statements of non-suicidality and non-suicidal behavior." Dkt. 51, PrimeCare Br., p. 17. PrimeCare also argues that there is no evidence that, in an effort to save money, PrimeCare implemented policies that would inhibit a medical professional from treating an inmate that was a high risk for suicide.

    This Monell theory is baseless considering it would subject both PrimeCare and Lancaster County to significant future litigation and cost them both much more money than any

such policy would save them.  In addition, Plaintiffs do not respond to this argument in their

brief.  Accordingly, summary judgment is granted to PrimeCare on this <u>Monell</u> claim. <u>See</u>

<u>Morello</u>, 142 F. Supp. 3d at 381 n.3 (considering claim abandoned where not addressed in

opposition brief and granting summary judgment); <u>Cicchiello</u>, 726 F. Supp. 2d at 531 (finding

failure to address claim in brief in opposition to motion for summary judgment constitutes

abandonment of claim); <u>Aubrecht</u>, 2009 U.S. Dist. LEXIS 32558, at *28 (granting summary

judgment as to plaintiff's claim not addressed in plaintiff's brief in opposition); <u>Clarity Software,</u>

<u>LLC</u>, 2006 U.S. Dist. LEXIS 56217, at *34  (granting summary judgment against plaintiff for

failure to address viability of claim in brief in opposition to motion for summary judgment).

       With respect to Plaintiffs' claim for failure to enact policies requiring inmates

withdrawing from opiates to be placed on suicide watch, Plaintiffs have not established that

PrimeCare, like Lancaster County and Warden Molyneaux, was deliberately indifferent to the

need for such policy.  As previously noted, the Third Circuit has "clearly and repeatedly held that

the increased risk of suicide due to intoxication or drug withdrawal cannot support a deliberate

indifference claim."  <u>Ferencz</u>, 2014 U.S. Dist. LEXIS 92173, *12 (citing <u>Woloszyn</u>, 396 F.3d at

322-23 and <u>Colburn II</u>, 946 F.2d at 1026-27).  Thus, because an increased risk of suicide due to

intoxication or drug withdrawal is insufficient to support a deliberate indifference claim, it

follows that a policymaker cannot be deliberately indifferent for failing to implement a policy

requiring inmates going through drug withdrawal to automatically be placed on suicide watch.

       With respect to Plaintiffs' claim that PrimeCare had a policy of an inadequate

system of review of claims of inadequate medical care, prior suicides and complaints of doors

that lock, PrimeCare notes that, following an inmate's suicide, both a comprehensive clinical

review and, as required by the National Committee on Correctional Health Care (NCCHC"), a

clinical mortality review is conducted. A clinical mortality review is "an assessment of the clinical care provided and the circumstances leading up to a death. Its purpose is to identify any areas of patient care or the system's policies and procedures that can be improved." Dkt. 51, PrimeCare Br., p. 20 (quoting Ex. U). PrimeCare also notes that it developed educational handouts for every inmate regarding how to access mental health care services and instructions on a course of action and who to contact if they felt bad or if they knew of another inmate who was going to hurt himself. Dkt. 51, Ex. V, pp. 41-42. PrimeCare also consulted with Lindsay Hayes, an expert on suicide prevention, to evaluate and make recommendations for the improvement of its policies and procedures regarding suicide prevention. Id. at 42-43, 44. Plaintiffs do not respond to this argument in their brief.

Accordingly, summary judgment is granted to PrimeCare on this Monell claim. See Morello, 142 F. Supp. 3d at 381 n.3 (considering claim abandoned where not addressed in opposition brief and granting summary judgment); Cicchiello, 726 F. Supp. 2d at 531 (finding failure to address claim in brief in opposition to motion for summary judgment constitutes abandonment of claim); Aubrecht, 2009 U.S. Dist. LEXIS 32558, at *28 (granting summary judgment as to plaintiff's claim not addressed in plaintiff's brief in opposition); Clarity Software, LLC, 2006 U.S. Dist. LEXIS 56217, at *34 (granting summary judgment against plaintiff for failure to address viability of claim in brief in opposition to motion for summary judgment).

C.    Qualified Immunity

Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights known to a reasonable person. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). It is the defendants' burden to establish that they are entitled to such immunity.

See Stoneking v. Bradford Area School District, 882 F.2d 720, 726 (3d Cir. 1989).

Courts apply a two-step inquiry to determine whether a defendant is entitled to qualified immunity. First, a court must determine whether a constitutional right was violated. Second, a court must determine whether the right was clearly established such that a reasonable officer would have known the conduct violated their rights. Saucier v. Katz, 533 U.S. 194, 201-02 (2001). In Pearson v. Callahan, 555 U.S. 223 (2009), the Supreme Court found a court may address whether a right was clearly established before addressing whether a constitutional right was violated. "Under the test announced in Harlow, reasonableness is measured by an objective standard; arguments that the defendants desired to handle or subjectively believed they had handled the incidents properly are irrelevant." Stoneking, 882 F.2d at 726 (citing Anderson v. Creighton, 483 U.S. 635, 641 (1987)).

Because this Court finds that Defendants Miller, Phillips, Maldonado and Molyneaux are entitled to summary judgment on Plaintiffs' § 1983 claims in Counts I and II of the Amended Complaint, this Court need not address Defendants' qualified immunity arguments.

**D.    State Law Claims: Count IV – Wrongful Death and Count V – Pennsylvania Survival Act**

Plaintiffs assert both wrongful death and survival actions against Defendants Lancaster County, Warden Molyneaux, Sergeant Maldonado, Officer Miller, and Officer Phillips. Plaintiffs argue that their wrongful death and survival actions are based on both § 1983 and Pennsylvania state law. Dkt. 21, Am. Compl. ¶¶ 75-78. Defendants Lancaster County, Warden Molyneaux, and Sergeant Maldonado aver that Plaintiff's state law survival and wrongful death claims are barred by the express provisions of the Pennsylvania Political Subdivision Tort Claims Act ("PSTCA"), 42 Pa. C.S.A. § 8541, *et seq.* Plaintiffs aver that their wrongful death and survival claims are not barred by the PSTCA because those claims arise out

of the § 1983 claim for violation of Kanney's Fourteenth Amendment rights. Dkt. 64, Pls.'

Resp. p. 17. Specifically, Plaintiffs contend that they "seek to vindicate [Kanney's] § 1983

claims by way of Pennsylvania's wrongful death and survival statutes." Dkt. 64, Pls.' Resp. p.

17 (citing Moyer v. Berks Heim Nursing Home, 2014 U.S. Dist. LEXIS 36600, *6-7 (March 20,

2014).

       Because this Court has granted summary judgment on all of Plaintiffs' § 1983

claims against Defendants Lancaster County, Warden Molyneaux, Sergeant Maldonado, Officer

Phillips, and Officer Miller, any wrongful death or survival action claims based on alleged

violations of § 1983 against those Defendants fail as a matter of law. Accordingly, to the extent

Plaintiffs' wrongful death and survival action claims in Counts IV and V of the Amended

Complaint are based on § 1983 violations, Defendants Lancaster County, Warden Molyneaux,

Sergeant Maldonado, Officer Miller, and Officer Phillips are entitled to summary judgment on

those claims.

       As previously noted, Plaintiffs' also assert wrongful death and survival actions

based on Pennsylvania state law against Defendants Lancaster County, Warden Molyneaux,

Sergeant Maldonado, Officer Miller, and Officer Phillips. Dkt. 21, Am. Compl. ¶¶ 75-78. The

general provision with respect to governmental immunity dictates that:

> Except as otherwise provided in this subchapter, no local agency shall be liable
> for any damage on account of any injury to a person or property caused by any act
> of the local agency or any employee thereof or any other person.

42 Pa. C.S.A. § 8541. In order for a claim to be maintained against a local agency, two

conditions must first be met. First, the damages sought in the present suit must be recoverable

under the common law, or a statute creating a cause of action absent the defenses provided in the

act; and second, that Plaintiff's injury "was caused by the negligent acts of the local agency or

employee thereof acting within the scope of his office or duties with respect to one of the categories listed in subsection (d)."  42 Pa. C.S.A. § 8542(a).

Section 8542(b) provides that a local governmental agency is immune from any suit based upon the negligent acts of the agency or employee, unless the cause of action relates to one of eight categories.  The eight enumerated exceptions to immunity are: (1) vehicle liability; (2) the care, custody or control of personal property; (3) the care, custody or control of real property; (4) trees, traffic controls and street lighting; (5) utility service facilities; (6) streets; (7) sidewalks; or (8) the care, custody or control of animals.  42 Pa. C.S.A. § 8542(b).  These exceptions are to be narrowly construed.  See  Mascaro v. Youth Study Ctr., 514 Pa. 351, 523 A.2d 1118, 1123 (1987).  Defendants Lancaster County, Warden Molyneaux, and Sergeant Maldonado contend that none of the exceptions apply in the present case and that Plaintiffs' claims against Lancaster County are barred.  Dkt. 54, p. 17-18.  Moreover, Defendants contend that because "the liability of local agency employees cannot exceed the liability of their employing agency," then Warden Molyneaux and Sergeant Maldonado also cannot be liable. See 42 Pa. C.S.A. § 8545.

Because none of narrowly construed exceptions to the PTSCA apply in this case, Plaintiffs' wrongful death and survival actions based on Pennsylvania state law are barred against Lancaster County, Warden Molyneaux, and Sergeant Maldonado.  Although Officers Miller and Phillips did not move for summary judgment of these Pennsylvania wrongful death and survival actions, perhaps because they argued that they are qualifiedly immune from suit in this case, the claims against both Officer Miller and Officer Phillips are also barred by the PSTCA because they were also Lancaster County employees.  Dkt. 54, p. 9 n.1.  Thus, Defendants Lancaster County, Warden Molyneaux, Sergeant Maldonado, Officer Miller, and

Officer Phillips are entitled to summary judgment on Plaintiffs' Pennsylvania state law wrongful death and survival action claims in Counts IV and V of the Amended Complaint.

####    E.    Punitive Damages

Plaintiffs also claim punitive damages against all Defendants and the PrimeCare Defendants move for summary judgment on this damages claim. Punitive damages in § 1983 cases are available when an individual defendant has acted with a "reckless or callous disregard of, or indifference to, the rights and safety of others." Keohane, 2010 U.S. Dist. LEXIS 85714, *51-52 (quoting Keenan v. City of Phila., 983 F.2d 459 (3d Cir. 1992)). "Whether conduct rises to that level is for the jury to decide." Id. (citing Woolfolk v. Duncan, 872 F Supp. 1381, 1392 (E.D. Pa. 1995)). Because a reasonable jury could find that the conduct of the remaining PrimeCare Defendants rose to the level of "reckless," the claim for punitive damages survives against PrimeCare, Jaycees Candelario, Katie Neimer and Bonnie Bair.

## IV.    CONCLUSION

For the foregoing reasons, Summary Judgment is **GRANTED** as to Plaintiffs':

- § 1983 Deliberate Indifference claims in Count I of the Amended Complaint against Defendants Sergeant John Maldonado, William Miller, Tyler Phillips, Kristin Zablocki, Nicole Smith, Erica Abernathy, Susan Taylor, Stephanie Meyer, Toby Catone and Jade Fritsch;

- § 1983 Monell claims in Count II of the Amended Complaint against Lancaster County and Warden Dennis Molyneaux;

- § 1983 Monell claims in Count II of the Amended Complaint against PrimeCare;

- § 1983 and Pennsylvania state law wrongful death claims in Count IV of the Amended Complaint against Lancaster County, Warden Dennis Molyneaux, Sergeant Maldonado, William Miller, and Tyler Phillips; and

- § 1983 and Pennsylvania state law survival actions in Count V of the Amended Complaint against Lancaster County, Warden Dennis Molyneaux, Sergeant Maldonado, William Miller, and Tyler Phillips.

Summary Judgment is **DENIED** as to Plaintiffs':

- § 1983 Deliberate Indifference claims in Count I of the Amended Complaint against Defendants PrimeCare, Jaycees Candelario, Katie Neimer and Bonnie Bair; and

- Punitive Damages claim against PrimeCare, Jaycees Candelario, Katie Neimer and Bonnie Bair.

The remaining claims in this case are the § 1983 Deliberate Indifference claims in the Amended Complaint (Count I) and punitive damages against Defendants PrimeCare, Jaycees Candelario, Katie Neimer and Bonnie Bair and the State Law Claims for negligence (Count III), wrongful death (Count IV) and survival (Count V) against Defendants PrimeCare, Jaycees Candelario, Katie Neimer, Bonnie Bair, Kristin Zablocki, Nicole Smith, Erica Abernathy, Susan Taylor, Stephanie Meyer, Toby Catone and Jade Fritsch.

An appropriate Order follows.